**BLOCH & WHITE** LLP

152 WEST 57TH STREET, EIGHTH FLOOR
NEW YORK, NEW YORK 10019
(212) 702-8670
WWW.BLOCHWHITE.COM

DIRECT DIAL: (212) 901-3825
DIRECT E-MAIL: BWHITE@BLOCHWHITE.COM

January 10, 2023

Honorable Cathy Seibel
U.S. District Court for the Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

  *Re: Virgil v. Finn, et al.*, No. 22-cv-3169 (CS)

Dear Judge Seibel:

  We write in response to the DOCCS Defendants' request for a conference in anticipation of a Rule 12(b)(6) motion to dismiss. Such a motion would be futile. The Amended Complaint (the "AC") documents Defendant Finn's savage beating of a handcuffed Mr. Virgil. Finn, then a DOCCS officer purportedly suffering from PTSD who had a history of assaulting handcuffed incarcerated persons ("IPs"), was surrounded by guards throughout the attack. Some were directly involved and several later submitted false reports about the incident. The AC brings excessive force claims against most of them and Finn. The AC also brings claims against the DOCCS Defendants, alleging in meticulous detail their responsibility, both (i) directly and (ii) as policymakers, as shown below. In arguing for early dismissal, the DOCCS Defendants oddly ignore huge categories of allegations and the few they do address they either mischaracterize or dispute. They then manufacture a *per se* bar to bringing policymaker claims against them yet ignore a wealth of precedent endorsing just this type of claim on indistinguishable facts, including in recent (and pending) cases against Annucci. Discovery is warranted as to these very serious claims.

**I. Plaintiff Pled a Direct Participation Claim Against the DOCCS Defendants**

  The DOCCS Defendants do not dispute that a supervisor is liable for failing to prevent an officer's use of force if they were deliberately indifferent to an unreasonable risk that that officer would use such force. They instead dispute, as a factual matter, that Finn posed such a risk or that they knew of it. But the AC alleges two distinct—yet reinforcing—facts the DOCCS Defendants knew of that demonstrated Finn posed an unreasonable risk:[1] (i) Finn was suffering from PTSD following a recent violent incident that made him particularly susceptible to violence against IPs; and (ii) Finn had a history of violence against IPs precisely mirroring his attack on Mr. Virgil.

  The DOCCS Defendants dispute those facts. They assert that sending Finn back to work soon after his traumatic event did not pose an unreasonable risk to IP safety. But Mr. Virgil alleged

---

[1] The DOCCS Defendants take issue with a few references in the AC to what they "should have known," citing *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020) for the notion that actual knowledge must be proven. This is a red herring. *Tangreti* was a summary judgment decision on a full record and doesn't control here. This issue was recently addressed in detail in *Stone #1 v. Annucci*, where, in denying Annucci's motion to dismiss, the court concluded "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind" and only need show that "it is plausible that this evidence . . . would have put the Supervisory Defendants on notice that existing policies . . . were deficient." 2021 WL 4463033, at *10 (S.D.N.Y. 2021). Plaintiff did just that. (In any event, he elsewhere alleges the DOCCS Defendants' actual awareness of the risks that led to his attack. AC ¶¶ 10, 206, 262-63, 277, 307, 316, 352.)

as such. AC ¶¶ 178-186. And he supported that with statements from *five* witnesses who *each* blame the DOCCS Defendants for the attack because they sent Finn back to work too soon. AC ¶¶ 143-155. The DOCCS Defendants suggest they lacked notice because Finn's *diagnosis* came after the attack on Mr. Virgil, but it is the symptoms, not the diagnosis, that Mr. Virgil alleges caused the attack. And all reports suggest Finn's symptoms were obvious; further, the DOCCS Defendants not only knew of the incident, but they also spoke with Finn about it. AC ¶¶ 167, 171. Next, the DOCCS Defendants downplay Finn's history of using the precise excessive force he used against Mr. Virgil, *i.e.*, smashing a handcuffed IPs head against a wall. AC ¶ 177. They contend this was "*arguably* excessive," but that's an argument for the jury. They then suggest they weren't aware of the incident, but the AC alleges they were, supported by the fact that Annucci heads DOCCS (and "own[s] everything" bad), and Royce oversaw Green Haven's grievance process and is responsible for maintaining grievance records. AC ¶¶ 178, 272, 309, 316.

## II.     Plaintiff Separately Pled a Policymaker Claim Against the DOCCS Defendants

The AC exhaustively outlines policymaker claims against the DOCCS Defendants. AC ¶¶ 187-320. The DOCCS Defendants almost entirely ignore those detailed allegations and instead summarily disregard them as "masqueraded" *Monell* claims. But they're not. They are individual claims that the DOCCS Defendants knew of and disregarded a serious risk of excessive force to Mr. Virgil, in that (i) they were responsible for the policies, practices, and customs ("PPCs") at DOCCS and Green Haven (which they do not seem to dispute), (ii) they were on notice that those PPCs were constitutionally deficient, yet (iii) they were deliberately indifferent to the risk those PPCs posed to IPs such as Mr. Virgil. Court-after-court has upheld just this type of claim, including in cases that post-date and address *Tangreti*,[2] and even in some that were (and remain pending) *against Annucci*.[3] Mr. Virgil alleges in detail both (i) the facts and events that put the DOCCS Defendants on **notice** that their PPCs were deficient; and (ii) the specific way the DOCCS Defendants were **deliberately indifferent** to the effect of those PPCs.

*Notice*. Mr. Virgil alleges the DOCCS Defendants knew their PPCs were deficient in two areas: (i) excessive force and cover ups thereof; and (ii) response to workplace trauma. As to excessive force and cover ups, the DOCCS Defendants target only the settled lawsuits identified in the AC (of which there are a great many) and argue they are insufficient to put them on notice that their PPCs were deficient.[4] But the law says otherwise. Indeed, "courts within this Circuit have recognized that prior lawsuits are relevant for showing notice of a custom or practice." *Poulos v. Annucci*, 2019 WL 6311012, at *8 (N.D.N.Y. 2019) (citing *Edwards v. NYC*, 2015 WL 5052637 (S.D.N.Y. 2015) (18 lawsuits over 12 years sufficient to survive MTD), *McCants v. Newburgh*, 2014 WL 6645987, at *4 (S.D.N.Y. 2014) (17 lawsuits sufficient), and *Bertuglia v. NYC*, 839 F.

---

[2] The DOCCS Defendants' reference to a "Tangreti test" is highly misleading. As many courts have subsequently concluded, *see infra* at note 3, *Tangreti* did not disturb the traditional method for establishing policymaker liability.

[3] *See Stone #1*, 2021 WL 4463033; *Allen v. Koenigsmann*, 2022 WL 1597424 (S.D.N.Y. 2022); *Taylor v. N.Y.C.*, 2022 WL 744037 (S.D.N.Y. 2022); *Parks v. Stevens*, 2022 WL 61011 (W.D.N.Y. 2022); *Latimer v. Annucci*, 2022 WL 1137055, at *3 (S.D.N.Y. 2022); *Meli v. Burlington,* 585 F. Supp. 3d 615 (D. Vt. 2022); *Jok v. Burlington,* 2022 WL 444361 (D. Vt. 2022); *Houston v. Capra*, 2022 WL 748260 (S.D.N.Y. 2022); *Baltas v. Jones*, 2021 WL 6125643 (D. Conn. 2021); *Myers on behalf of Estate of Myers v. Davenport*, 2022 WL 3017367 (N.D.N.Y. 2022).

[4] The DOCCS Defendants confusingly suggest the settlements relate to "a different correctional facility." But the AC identifies many settlements involving Green Haven officers (as well as others, to be sure). AC ¶¶ 229-35; *see also id.* ¶ 228 ("For example, the following are just a small sample of instances that occurred just at Green Haven"); *id.* ¶ 236.

Supp. 2d 703, 738 (S.D.N.Y. 2012) (15 allegations sufficient). If the *filing* of lawsuits may establish notice of a deficient PPC, obviously the *settlement* of lawsuits may as well. The DOCCS Defendants next suggest the settlements should be ignored because they "almost uniformly occurred years after the subject incident, and they fail to acknowledge liability." Although some may have *settled* after Mr. Virgil's attack, the use of force (and grievance process) generally did not (and they were *filed* much earlier), and the jury will assess the meaning of a settling officers' failure to formally acknowledge liability.

In any event, the DOCCS Defendants ignore other overwhelming evidence of their notice, including: (i) civil and criminal jury findings, AC ¶¶ 225-61; (ii) findings of an independent organization acting under state authority to investigate prisons, which Annucci and a former Green Haven superintendent were briefed on, *see* AC ¶¶ 190-99, 276; (iii) independent research and media organizations issuing national publications, some quoting Annucci, AC ¶¶ 200-18; (iv) under oath admissions by DOCCS' officers, including a former Green Haven superintendent, AC ¶ 307; (v) federal law enforcement stating in Annucci's presence that excessive force "reached crisis proportions in New York state," AC ¶¶ 222-23; (vi) Royce's centrality in the IP grievance process, AC ¶¶ 312-17; (vi) Annucci's public statement that "substantial change" is needed," AC ¶ 207; and (vii) Annucci's testimony to the state Senate that, "I own everything—everything bad that's ever happened [in prisons since May 2013], I'm accountable for everything bad," AC ¶ 272.

Finally, the DOCCS Defendants simply do not address Plaintiff's workplace trauma policy claim. But their notice that these PPCs were deficient is alleged by evidence that DOCCS was the only state entity not to require a psych evaluation after an employee faced trauma and that such was purposeful (to ensure headcount) despite that "something bad [might] happen." AC ¶ 148.

***Deliberate Indifference***. The AC alleges in detail the DOCCS Defendants' deliberate indifference to the deficiency of these PPCs. As to excessive force and cover ups, those allegations include: (i) the sheer number of instances;[5] (ii) lack of discipline, *e.g.*, officers are rarely, if ever, punished for falsifying force reports, AC ¶¶ 287-91;[6] (ii) Annucci's public downplaying of excessive force as a problem, *e.g.*, focusing on force *against* staff not *by* staff, AC ¶¶ 281-82; (iii) a DOCCS directive failing to even suggest that officers need to fill out force reports accurately, AC ¶ 290; (iv) insufficient use of force (and reporting) training, as established in previous litigations, including by a Green Haven superintendent, AC ¶ 319; (v) failure to enact any meaningful changes despite acknowledging the need, AC ¶¶ 278-79; and (vi) resisting efforts at accountability such as making relevant data public, as other jurisdictions do, AC ¶¶ 292-300.

As to workplace trauma, the DOCCS Defendants' deliberate indifference to the effect of officers working while traumatized is evidenced by, as noted, their purposeful failure to evaluate trauma victims so as to maintain headcount despite the corresponding risk of violence against IPs.

---

[5] *See Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (the "sheer number" of complaints of excessive force against officers sufficient to establish a policy or custom of condoning those unconstitutional acts).

[6] Although factual disputes are for another day, discovery has already shown the failure to discipline *here*, *i.e.*, in connection with the attack on Mr. Virgil. For example, in his interrogatory responses, Defendant Langdon admitted he "submitted a written report which report was not completely accurate," and that he "was not disciplined" for it. And that is consistent with a January 6, 2021 memo in which DOCCS stated Langdon "filed an inaccurate Use of Force Report, Form #2104A," which "deviated" from Directive #4944 and was in "violation" of falsification of records rules, yet the memo (shockingly) makes clear that it "was not disciplinary in nature."

Very truly yours,

/s/ *Benjamin D. White*
Benjamin D. White