## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MELVIN L. VIRGIL

        *Plaintiff,*

   v.

AARON FINN, Corrections Officer,
ALEXANDER COSTANTINI, Corrections
Officer, PHILIP LANGDON, Corrections Officer,
JOHN DOE 1-8, Corrections Officers,
ANTHONY J. ANNUCCI, Acting Commissioner
of the New York State Department of Corrections
and Community Supervision,
MARK ROYCE, Former Superintendent of Green
Haven Correctional Facility,
JOHN DOE 9, supervising employee of DOCCS,
in their individual capacities,

        *Defendants.*

Case No. 7:22-cv-3169 (CS) (JMC)

**SECOND AMENDED
COMPLAINT**

## INTRODUCTION

1.      This case is about the horrific, unjustified, and criminal assault of Plaintiff Melvin L.

Virgil, a handcuffed defenseless incarcerated person, the web of elaborate lies that were told to cover

it up, and the culture of brutality and obstruction that allowed it all to happen.  For years, New York

prison officials have let a blue wall of silence obviate justice for hundreds or even thousands of victims

of prison guard brutality.  The result is a prison system patrolled by guards emboldened to brutalize

those in their charge with impunity.  Mr. Virgil faced the consequences.

2.      On March 19, 2020, Defendant Aaron Finn—a corrections officer reportedly suffering

from PTSD that made him "vulnerable to impulse control difficulties and aggressive behavior"—

savagely beat a handcuffed and defenseless incarcerated person, Mr. Virgil, leaving him unconscious,

bloodied on the floor, and permanently injured.  Unlike the overwhelming majority of abuses

occurring inside New York's secretive prison walls, Defendant Finn's assault was captured in part on camera, paving the way for elusive accountability.

3.      Indeed, faced with video evidence of his assault, Defendant Finn had no choice but to plead guilty to federal criminal charges in connection with the attack.  He was ultimately sentenced to three months in prison.  And as part of his criminal proceeding, Defendant Finn admitted under oath that his beating of Mr. Virgil was unjustified, unlawful, intentional, and especially egregious because it was committed against a vulnerable man while acting under the color of law.  In admitting to his crime, Defendant Finn also effectively admitted to each element of a claim under the Civil Rights Act, 42 U.S.C. § 1983.  Thus, as to him, this civil rights case is really just about how much harm he caused.

4.      But Defendant Finn did not act alone.  Far from it.

5.      Defendant Costantini was within feet of Defendant Finn for the entire assault, watching casually at first and then restraining Mr. Virgil as the assault continued.  He did absolutely nothing to stop it.  Defendant Langdon arrived on scene as the attack was just getting underway, and filmed the beginning of the attack on his body worn camera but subsequently "panicked" and shut his camera off.  Long after the damage he could have prevented was done, Defendant Langdon finally told Defendant Finn simply to "Take it easy."  As further revealed by the gruesome videotape of the attack, Defendant Finn was ultimately surrounded by a veritable army of Green Haven corrections officers after he repeatedly and sadistically brutalized Mr. Virgil.  Each was duty bound to intervene and to protect Mr. Virgil and each was capable of having stopped at least part of the sustained attack. Each chose not to do so.

6.      Moreover, after the attack, Defendant Finn and the surrounding officers circled the wagons.  They conspired together to manufacture a singular company line:  Defendant Finn used

force in response to Mr. Virgil's threats and, in any event, only struck Mr. Virgil once in the back of the head. They each told this *exact* same story to their supervisors, repeatedly. In Use of Force reports, in Unusual Incident Reports, in Memoranda, in a Watch Commander log, in letters, and elsewhere.

7.      Their stories, however, were as consistent as they were false. As the video footage revealed, Defendant Finn struck an unthreatening and restrained Mr. Virgil *repeatedly*, including maniacally smashing his head nearly a dozen times against a cement wall and steel bars. Defendant Finn then let Mr. Virgil's limp body fall violently to the ground, leaving him audibly gurgling in a pool of his own blood and then derisively called him a "fucker," all while he remained handcuffed.

8.      The foregoing was a plain violation of the Eighth Amendment. But the officers' conduct did not occur in isolation. Rather, Defendant Finn's supervisors, including Anthony J. Annucci, DOCCS' Acting Commissioner, and Mark Royce, the then-Superintendent of Green Haven, were personally involved in and responsible for Defendant Finn's attack on Mr. Virgil.

9.      Defendants Annucci and Royce had particular reason to know that, in March 2020, Defendant Finn was a powder keg particularly susceptible to using excessive force. For one, in a civil litigation that Defendant Finn settled in February of this year, Defendant Finn was alleged prior to his attack on Mr. Virgil to have committed a nearly identical assault on another Green Haven incarcerated person, *i.e.*, unjustifiably smashing his head against a cement wall while he remained handcuffed. Defendant Finn was accused of engaging in similar conduct in 2015. What's more, at the time of his attack on Mr. Virgil, Defendant Finn was supposedly suffering from PTSD following a violent workplace incident that took place a few months prior in which Defendant Finn was supposedly stabbed and hospitalized. Defendant Finn's reported PTSD "rendered him more vulnerable to impulse control difficulties and aggressive behavior." But despite this underlying mental condition

rendering him particularly susceptible to unjustified violence against the incarcerated people in his charge, Defendant Finn's supervisors sent him back to work much too soon and without conducting a sufficient psychological evaluation to ensure that he did not pose a danger to those individuals, such as Mr. Virgil.  In other words, in March 2020, Defendant Finn was a ticking time bomb that Defendants Annucci and Royce unleashed on the incarcerated population at Green Haven.

10.     But Defendants Annucci and Royce's failures extend beyond their specific knowledge of the dangers posed by Defendant Finn.  Throughout their tenures, a devastating terror of excessive force and cover ups has plagued DOCCS facilities, including Green Haven, reflecting a longstanding culture of violence and obstruction.  Despite being aware of these related problems—which have been meticulously documented, publicized, and confirmed by, among others, independent research organizations, the media, federal and state prosecutors, criminal and civil juries, and an untold number of civil rights plaintiffs who have received payouts following substantiated allegations of wrongdoing—they have done virtually nothing to actually stop them, and have only enacted policies and practices that have furthered the occasion of excessive force   They have acquiesced and shown a deliberate indifference to the precise type of atrocity that Mr. Virgil faced and have failed to implement policies or practices that would have prevented it.

11.     Through the foregoing they have emboldened corrections officers who feel unconstrained to brutalize the vulnerable men in their charge and then cover it up.  This is what led Defendant Finn to attack Mr. Virgil so brazenly while surrounded by an army of his onlooking peers.

12.     By way of the foregoing, Defendants Annucci and Royce were personally involved in the attack on Mr. Virgil, who aims to hold them accountable alongside the officer Defendants.

## JURISDICTION AND VENUE

13.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3) and (4) because this action seeks redress pursuant to 42 U.S.C. § 1983 for Defendants' violations of rights protected by the Eighth and Fourteenth Amendments to the U.S. Constitution.

14.    This court has personal jurisdiction over each of the Defendants because each of the acts complained of took place in the State of New York.

15.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) and (c) because the events giving rise to these claims occurred within its boundaries.

## PARTIES

16.    **Plaintiff Melvin L. Virgil** is in the custody of DOCCS and was at all relevant times located at DOCCS's Green Haven Correctional Facility at 594 Route 216, Stormville, NY 12582.

17.    **Defendants Aaron Finn, Alexander Costantini**, **Phillip Langdon**, and **John Does #1-8**, were at all relevant times employed by DOCCS as COs at Green Haven Correctional Facility.

18.    **Defendant Anthony J. Annucci** was at all relevant times employed by DOCCS as its Acting Commissioner.

19.    **Defendant Mark Royce** was at all relevant times employed by DOCCS as the Superintendent of the Green Haven Correctional Facility.

20.    **Defendant John Doe #9** was at all relevant times employed by DOCCS in a supervisory capacity at Green Haven Correctional Facility.

## STATEMENT OF FACTS

### I.    The Attack on Mr. Virgil

#### a.    Defendant Finn Savagely, Repeatedly, and Unjustifiably Beats Mr. Virgil Bloody and Unconscious While He is Handcuffed and Defenseless

21.    On March 19, 2020, at approximately 12:30 p.m., while incarcerated at Green Haven, Mr. Virgil and his company were returning from lunch (also known as "chow").

22.    After chow, Mr. Virgil approached a "JPay" kiosk, which is installed in common

spaces in DOCCS' facilities for incarcerated people to, among other things, buy and download books and movies.

23.     Mr. Virgil approached the kiosk to download a movie before locking into his cell.

24.     Mr. Virgil had previously been permitted to use that JPay kiosk after chow and before locking into his cell.

25.     Defendant Finn was assigned to the bubble of the Company 6 A Block at the time.

26.     While on duty there, Defendant Finn saw Mr. Virgil approach the JPay kiosk.

27.     Defendant Finn and Mr. Virgil had a verbal disagreement over whether Mr. Virgil was permitted at that time to access the JPay Kiosk.

28.     Defendant Finn demanded that Mr. Virgil give his identification to him and Mr. Virgil questioned why he needed to do so.

29.     Defendant Finn then left the bubble to confront Mr. Virgil.

30.     Officers assigned to the bubble are not supposed to leave the bubble to interact with incarcerated persons and it is not normal for them to do so.

31.     Mr. Virgil remained calm and non-threatening throughout the verbal disagreement.

32.     Without any further provocation, Defendant Finn sprayed Mr. Virgil in the face with Oleoresin Capsicum spray, also known as "O/C" or "pepper spray."

33.     Defendant Finn then ordered Mr. Virgil to get against the adjacent wall.

34.     Mr. Virgil was then handcuffed behind his back and he was patted down.

35.     Defendant Finn then moved Mr. Virgil in the block and, on information and belief, called in a "red alert."

36.     Again, with no provocation or justification, Defendant Finn slammed Mr. Virgil's head into a steel gate as they walked down the block.

37.     Mr. Virgil lost consciousness as a result of this attack.

38.     At this time, other officers responded to the block due to the "red alert."

39.     On information and belief, Defendant Costantini was assigned to Company 6 A Block and was present throughout the attack on Mr. Virgil.

40.     Defendant Costantini was wearing a body worn camera, which he had on minutes before the incident when he was taking incarcerated persons to chow, but he supposedly "forgot to turn it on" when the incident with Defendant Finn occurred.

41.     Again, with no provocation or justification, Defendant Finn forcefully slammed Mr. Virgil against the adjacent wall, and slammed his head against the wall several times.

42.     Defendant Costantini was just a few feet away at the time.

43.     Defendant Costantini saw Defendant Finn slam Mr. Virgil's head against the cement wall.

44.     As Defendant Costantini saw Defendant Finn violently slam Mr. Virgil's head against the wall, he slowly and calmly walked closer to the two, while watching the assault take place.

45.     Defendant Costantini did not see Mr. Virgil struggle or in any way engage in conduct that might warrant the use of physical force against him.

46.     Defendant Costantini knew that it is "never" permissible to hit an incarcerated person in the back of the head because it can "cause permanent damage."

47.     Defendant Costantini knew that Mr. Virgil was handcuffed at the time.

48.     Defendant Costantini knew that it was not permissible to use force on a handcuffed incarcerated person.

49.     Defendant Costantini had a reasonable opportunity to stop Defendant Finn's attack.

50.     Defendant Costantini did nothing to stop Defendant Finn's attack on Mr. Virgil.

51.     Defendant Langdon then arrived on the block as Defendant Finn was thrashing Mr. Virgil's body and head into the wall.

52.     Defendant Langdon activated his body camera prior to arriving on the scene.

53.     Defendant Langdon, however, then turned his body camera off "midway through this use-of-force" because he "just panicked."

54.     Defendant Langdon continued toward Defendant Finn, Defendant Costantini, and Mr. Virgil, pulled out his baton, and stood directly behind Defendant Finn as Defendant Finn was assaulting Mr. Virgil.

55.     Defendant Langdon had a reasonable opportunity to stop Defendant Finn's attack.

56.     Defendant Langdon did nothing to stop Defendant Finn's attack.

57.     Defendant Costantini, who remained within reach of Defendant Finn as he beat Mr. Virgil, still had a reasonable opportunity to stop Defendant Finn's attack.

58.     Defendant Costantini still did nothing to stop Defendant Finn's attack.

59.     After violently slamming Mr. Virgil's head into the wall several times, Defendant Finn and Mr. Virgil fell toward a set of steel bars by the nearby stairway.

60.     Again with no provocation or justification, as Mr. Virgil's body lay still against the ground, Defendant Finn grabbed Mr. Virgil by the shoulders of his sweater and slammed Mr. Virgil's wobbling head several times into the steel bars above the surrounding stairway.

61.     Defendant Langdon stood behind Defendant Finn with his baton out as Defendant Finn was slamming Mr. Virgil's head into the steel bars.

62.     As Defendant Finn was completing his last slam of Mr. Virgil's head into the steel bars, Defendant Langdon finally said:  "Take it easy, take it easy, take it easy."

63.     Defendant Langdon had a reasonable opportunity to stop Defendant Finn's attack well

prior to his statement that Defendant Finn should "take it easy."

64. Other than saying "take it easy" after Defendant Finn had been brutalizing Mr. Virgil, Defendant Langdon did nothing to stop Defendant Finn's attack on Mr. Virgil.

65. Defendant Finn then let Mr. Virgil's body fall to the ground and called him a "fucker."

66. After Mr. Virgil hit the ground, an audible guttural moan came out of his throat as he lay in a pool of his own blood.

67. Each of the Defendants Finn, Langdon, and Costantini heard the guttural moan from Mr. Virgil.

68. Mr. Virgil then laid on his side with his legs bent at the knee.

69. In a semi-conscious state, Mr. Virgil began to roll on his back.

70. As Mr. Virgil rolled on his back, Defendant Costantini quickly grabbed Mr. Virgil's feet so that he could not move them.

71. Defendant Finn then yelled at Mr. Virgil to get on his stomach.

72. Mr. Virgil, who was semi-conscious, rolled onto his stomach.

73. Defendant Finn then held Mr. Virgil's torso down to the floor, while Defendant Costantini continued to restrain Mr. Virgil's legs.

74. Mr. Virgil, who was in and out of consciousness at the time, never kicked at the officers nor was he threatening.

75. When the Defendant officers stood Mr. Virgil up, there was a puddle of blood on the floor by Mr. Virgil's feet, a splatter of blood by Mr. Virgil's head, and another pool of blood in the corner where the bars and the wall met.

76. The blood described in the foregoing paragraph was not present before Mr. Virgil was beaten by Defendant Finn.

77.     Mr. Virgil remained handcuffed, compliant, and non-threatening during the duration of the aforementioned incident.

78.     After the incident, Defendant Finn left the scene and told several officers who asked what happened that he simply "sprayed" Mr. Virgil with pepper spray.

### b.  The Other Officer Defendants Stood Idly By

79.     On information and belief, as Defendant Finn beat Mr. Virgil against the wall and then against the steel bars, there were eight other COs watching the incident, identified herein as John Does #1-8.

80.     John Does #1-8 can be seen on body camera footage capturing the end of the incident. As described more fully below, DOCCS was ordered to produce that body camera footage, but produced it with the faces of the John Doe defendants blurred.

81.     Despite significant diligence, the identities of John Does #1-8 thus remain unknown to Mr. Virgil.

82.     On information and belief, each of John Does #1-8 had a reasonable opportunity to stop Defendant Finn's attack.

83.     John Does #1-8 did nothing to stop the attack.

### c.  Mr. Virgil's Devastating and Continuing Injuries from the Attack

84.     Following the attack, Mr. Virgil was taken to the Green Haven medical unit and examined.

85.     Mr. Virgil suffered four lacerations on his face that resulted from the attack:  (i) one to his mid-forehead that was 1 1/3 inches long and bleeding, which required two sutures; (ii) one to his left eyebrow that was 2 1/2  inches long and required eight sutures; (iii) another one to his left eyebrow that was 1 inch long and required two sutures; and (iv) one to his left cheek that was 1/3 of an inch and was closed with Dermabond glue.

86.     Mr. Virgil suffered a gash to his upper lip as a result of the attack.

87.     Mr. Virgil suffered a gash to his gums as a result of the attack.

88.     One or more of Mr. Virgil's teeth were chipped as a result of the attack.

89.     Mr. Virgil suffered pain, bruising, and swelling to his face, forehead, and neck as a result of the attack.

90.     Mr. Virgil suffered cuts to his mouth and top and bottom lips as a result of the attack.

91.     Mr. Virgil has permanent scars on his forehead and eyebrow as a result of the attack.

92.     Mr. Virgil suffered from constant, severe, throbbing headaches for more than ten days as a result of the attack, and he continues to suffer from severe headaches two or three times a week, which he did not experience before the attack.

93.     Mr. Virgil's teeth ached after his attack, and his left central incisor is still damaged and his left lateral incisor still aches to this day.

94.     Mr. Virgil suffered and is suffering severe emotional trauma as a result of the attack.

95.     Immediately after the attack, Mr. Virgil felt hopeless and fearful.

96.     Any time Mr. Virgil hears handcuffs jingle he becomes fearful, anxious, and tense, and remains as such for 25-30 minutes, which he did not experience before the attack.

97.     Mr. Virgil lives every day in fear that he may be assaulted again.

## II.     The Conspiracy to Cover Up the Attack

### a.     After the Attack, the COs Circle the Wagons and Submit Nearly Identical—yet False—Reports to their Supervisors Regarding the Incident

98.     In multiple reports submitted to their supervisors after the attack, Defendant Finn and several other officers submitted false reports as to the incident with Mr. Virgil on March 19, 2020.

99.     Each of the reports (falsely) described a similar series of events:  Defendant Finn used force against Mr. Virgil in response to a physical threat from Mr. Virgil, and the only force Defendant

Finn applied was one application of pepper spray and a single blow to the back of Mr. Virgil's head.

### i. Finn's Story

100.    Defendant Finn reported what occurred in a March 19, 2020 Use of Force staff memorandum, which he submitted as a Form 2104A and was signed off on by an "Area Supervisor."

101.    Defendant Finn described the events leading up to the use of force as follows:

> I observed inmate Virgil 96B2200 walking up the company with his tablet. I gave inmate Virgil a direct order to lock in. He said that he was getting on the kiosk and not to tell him what to do. I gave him another direct order to lock in and he continued to plug in his tablet. I then secured my bubble and the company end gate. I approached the kiosk that inmate Virgil was at while activating my body camera. I gave Virgil a direct order to lock in. He replied 'No what are you going to do?' I then told him to give me his ID. He replied 'Why don't you take it from me!' As he stated this he bladed me and puffed out his chest aggressively.

102.    In fact, Defendant Finn would later concede during his sentencing hearing that he had not activated his body camera during his initial altercation with Mr. Virgil.

103.    Defendant Finn then described his use of force, in its entirety, as:

> I pulled my OC spray #93 from its holster and administered one application of two, one second bursts to Virgil's face. It had the desired effect. Virgil turned and began to walk down the company. I called a response on my 2way and gave Virgil a direct order to get on the wall. He complied. Virgil then complied with my orders to place his right hand behind his back and then his left as I cuffed them in that respective order as he complied. I moved Virgil off 6 company since there were inmates still on the company. As I led Virgil to the wall in front of the third deck bubble he violently [smashed?] the cuffs together behind his back trapping my left middle finger between them. In pain and unable to free my hand I delivered one strike to the back of Virgil's head with my elbow. Virgil released my finger and I used body holds to get him on the ground. Virgil remained combative trying to turn and face me as I gave direct orders to stop resisting and get on his stomach. The response team then arrived and took over [gaining?] compliance of the inmate.

104.    Defendant Finn effectively repeated this same false story in a March 19, 2020 Inmate Misbehavior Report, wherein he represented that he simply "applied one application of O/C pepper spray, canister #93 consisting of 2-1 second bursts to the facial area." Defendant Finn then said that while he was "escorting inmate Virgil off the company the inmate suddenly and aggressively twisted the handcuff chain together which squished and pinched my left middle finger in the cuff chain

preventing me from removing my hand causing injury."

### ii. Costantini's Story

105.    Defendant Costantini also submitted a March 19, 2020 Use of Force Report (Form #2104A) which omitted the truth of the use of force that was actually used against Mr. Virgil.

106.    In describing the "events leading up to the use of force," Defendant Costantini simply stated:  "I observed a combative inmate on the floor resisting by him attempting to turn and kick staff."

107.    The above statement was not only false—because Mr. Virgil did not try to kick staff, he was effectively unconscious—Defendant Costantini makes no reference to the contemporaneous fact that Defendant Finn had been beating Mr. Virgil.

108.    Defendant Costantini then stated the force that he supposedly used:  "I then used a body hold by applying downward pressure to the inmates ankles and legs to prevent him from kicking staff and gain compliance."

109.    Defendant Costantini stuck to this story even after later viewing available body camera footage making clear the story he told in the March 19th Use of Force report was inaccurate. Specifically, in a May 13, 2020 letter to Green Haven's Superintendent, Defendant Royce, Defendant Costantini contended that he had "reviewed camera footage from 3/19/2020.  At the conclusion of the footage, I found it unnecessary to change my original 2104A."

### iii. Langdon's Story

110.    On March 24, 2020, Defendant Langdon wrote a letter to Deputy Superintendent Russo regarding the incident that was false and, again, consistent with the other officers' false stories.

111.    In addition to explaining why his body camera was supposedly not working, Defendant Langdon reported falsely that Defendant Finn was "struggling with [Mr. Virgil]," and that

he "observed Officer Finn take the inmate down to the floor," omitting that before going "down to the floor," Defendant Finn savagely beat Mr. Virgil both against the wall and against steel bars:

> On Mar. 19th I responded to a response called to A block 3rd deck. I was at B and C corridor and in route to A Block I activated my body camera. When I arrived in A Block 3rd deck across from 6 company I observed Officer Finn struggling with an inmate on the wall and then observed Officer Finn take the inmate down to the floor. I then relieved Officer Finn and took control of a compliant inmate on the floor. The area Sgt came on scene moments later and directed me to assist the inmate off the floor to the wall. I am unaware and do not know why my body camera was off when I turned it on in route to the response. I am regularly 203 and have had several issues in the past w/ Camera # 661. The clip is cracked, the screen is broken, and it has shut off randomly in the past.

112.    Like Defendant Costantini, Defendant Langdon stuck to his story even after later reviewing the body camera footage of the events. Specifically, in a May 13, 2020 letter to the superintendent, Defendant Royce (dated the same day as Defendant Costantini's analogous letter), he stated: "After reviewing my body camera footage from a use of force from 3-19-20, I find it unnecessary to revise my original 2104A."

### iv.  Leifeld's Story

113.    The story that Lt. Berndt Leifeld reported to his supervisors was almost identical to the false story that Defendant Finn had reported, and even used nearly identical language.

114.    Specifically, an April 2, 2020 Unusual Incident Report captures Lt. Leifeld's report that Defendant Finn

> administered one application of OC pepper spray from canister 93 consistent of two-one second bursts to the facial area of inmate Virgil. The desired effect was achieved and inmate Virgil came into compliance with staff direction. Officer Finn called for a response via his two way radio. Sgt. Benitez notified and responded.

115.    In that report, as did Defendant Finn, Lt. Leifeld falsely accused Mr. Virgil of physically instigating the incident, reporting that the "events causing" the incident were that "inmate Virgil then lunged towards Officer Finn."

116.    Lt. Leifeld then continued, describing the nearly identical—yet false—story regarding

14

the subsequent use of force that Defendant Finn told.  Specifically, as with Defendant Finn, Lt. Leifeld

contended that Mr. Virgil injured Defendant Finn by manipulating his handcuffs and that Defendant

Finn responded with a single blow to the back of Mr. Virgil's head:

> Due to multiple [incarcerated people] returning from chow and out on the
> company, Officer Finn applied mechanical restraints to the wrists of inmate Virgil
> and escorted off company.  While escorting inmate Virgil, inmate Virgil suddenly
> and aggressively twisted the hand cuff chain together squishing Officer Finn's left
> middle finger in the cuff chain.  Officer Finn struck inmate Virgil in the back of
> the head with a right elbow strike.  Inmate Virgil hit the wall and fell to the ground.
> While on the ground, inmate Virgil became combative attempting to kick at staff.
> Officer Costantini used body holds to apply downward pressure to inmate Virgil's
> upper body to keep him on the ground.  Response team arrived and inmate Virgil
> came into compliance with staff direction.

117.    On information and belief, Lt. Leifeld also drafted a false entry in the Green Haven

Watch Commander Log regarding the incident.

118.    Lt Leifeld's entry in the Watch Commander Log effectively repeated the same story

as above, falsely reporting that the only force used by any of the officers was "OC Pepper, Body

holds."

### v.  Sgt. Benitez's Story

119.    Although Sgt. Dennis Benitez, Jr. may not have arrived on the scene until after

Defendant Finn's attack had mostly subsided, he submitted various reports he contended were relayed

to him.

120.    The reports that were supposedly provided to Sgt. Benitez told almost the exact same

false story using almost the exact same language as the other reports:  that Mr. Virgil instigated the

violence and that Defendant Finn's assault of Mr. Virgil consisted of one blow to the back of his head.

121.    Specifically, in a March 19, 2020 letter to Defendant Royce, Sgt. Benitez provided

"an account relayed to me by staff of the UOF relating to inmate Virgil."  Sgt. Benitez's retelling of

the incident then repeats each of the lies of the other officers.

122.   *First*, that Mr. Virgil "stepped forward toward Officer Finn by blading and puffing out his chest in an aggressive manner."

123.   *Second*, that Defendant Finn applied

> one application of O/C pepper spray, canister #93 consisting of 2-1 second bursts to the facial area on inmate Virgil.  The desired effect was achieved, and Officer Finn called for a response via his 2way radio.  Officer Finn gave the inmate a direct order to face the wall and then to place his hands behind his back where Officer Finn applied mechanical restraints to a compliant inmate.  Due to other inmates who were still on the company from the return of chow Officer Finn escorted inmate Virgil off the company.  While escorting inmate Virgil off the company the inmate suddenly and aggressively twisted the handcuff chain together which squished and pinched Officer Finn's left middle finger in the cuff chain preventing him from removing his hand.

124.   *Third*, that the principal use of force was as follows:

> At this time Officer Finn struck the inmate in the back of the head with his right elbow.  Inmate Virgil hit the wall and fell towards the left hitting the stairwell bars before falling to the ground.  As inmate Virgil is on the ground, he became combative by trying to turn around toward the officer and kicking.  Officer Finn used body holds by applying downward pressure to the inmates upper body to keep him facing the ground.  Officer Constantine who was also on 3rd deck securing the return of chow observed the inmate being combative and not complying.  Officer Constantine used body holds to the incarcerated people ankles and legs.  He applied downward pressure to them to prevent the inmate from injuring staff and to gain compliance.

125.   Sgt. Benitez told almost the exact same (false) story on a Use of Force Report that was drafted the same day, March 19, 2020.

### vi.  Other Officers' Stories

126.   After the attack, other officers submitted reports that were also false and consistent with the false stories reported by Defendants Finn, Costantini, Langdon, and Leifeld and Sgt. Benitez.

127.   An undated "Preliminary Unusual Incident Report" stated as follows:

> Officer Finn struck inmate Virgil in the back of the head with a right elbow strike. Inmate Virgil hit the wall and fell to the ground.  While on the ground, inmate Virgil became combative attempting to kick at staff.  Officer Costantini used body holds to apply downward pressure to inmate Virgil's legs.  Inmate Virgil remained combative.  Inmate Virgil was attempting to turn around towards staff.  Officer Finn used body holds to apply downward pressure to inmate Virgil's upper body to keep him on the ground.  Response team arrived and inmate Virgil came into compliance with staff direction.

16

128. Finally, an August 8, 2020 Use of Force report similarly stated as follows:

> Describe actual force used: Officer Finn administered one application of OC pepper spray from canister 93 consisting of 2-1 second bursts to the facial area of inmate Virgil. Inmate Virgil suddenly and aggressively twisted the hand cuff chain together squishing Officer Finn's left middle finger in the cuff chain. Officer Finn struck inmate Virgil in the back of the head with a right elbow strike. Inmate Virgil hit the wall and fell to the ground. While on the ground, inmate Virgil became combative attempting to kick at staff. Officer Costantini used body holds to apply downward pressure to inmate Virgil's legs. Inmate Virgil remained combative. Inmate Virgil was attempting to turn towards staff. Officer Finn used body holds to apply downward pressure to inmate Virgil's upper body to keep him on the ground. Response team arrived and inmate came into compliance with staff direction.

129. That report concluded by stating: "Review and Evaluation by Superintendent: Based on a review of the incident as reported, which included documentation submitted and a review of the body worn camera footage, this incident has been referred to the departments office of special investigations for further review and action as deemed appropriate."

130. The above reports were as consistent as they were false.

131. The above reports were not only directly refuted by body camera footage, but also by Defendant Finn himself when he allocuted under oath, as identified below.

132. On information and belief, the officer Defendants and other officers told similarly false stories elsewhere, both in written and oral reports to their supervisors and colleagues.

133. Given the fact that these stories were all consistent—and consistently false—the officers, on information and belief, came together to agree on a false narrative.

134. On information and belief, none of the officers identified above were disciplined or punished for filing false reports concerning the attack on Mr. Virgil.

**b. DOCCS Tries to Conceal Video Footage of the Attack, but is Ordered to Produce it In Part, Paving the Way for Mr. Virgil to File this Action**

135. At an April 23, 2020 disciplinary hearing concerning the incident, Mr. Virgil was shown certain body camera footage of the incident, revealing to him that such video in fact existed.

136.    On May 1, 2020, a New York Freedom of Information Law ("FOIL") request was made to DOCCS, requesting the videos shown at the hearing.

137.    DOCCS rejected the request, primarily on the ground that the videos were protected from public disclosure by Section 50-a of the New York Civil Rights Law, which allowed for the concealment of certain personnel records of COs.

138.    The determination was appealed, but prior to the adjudication of that appeal, as discussed further below, the Legislature repealed § 50-a.

139.    Nevertheless, DOCCS argued on the administrative appeal that the videos need not be disclosed pursuant to three separate provisions of the Public Officers Law:  §§ 87(2)(e)(i), 2(e)(ii), and 2(f).

140.    DOCCS rejected the appeal.

141.    An Article 78 proceeding was then filed challenging DOCCS' rejection of the FOIL request, and Justice Richard M. Platkin ultimately rejected DOCCS' arguments and entered an order on August 25, 2021 requiring DOCCS to produce the portions of the videos that were shown to Mr. Virgil at his disciplinary proceeding.

142.    Nevertheless, Justice Platkin permitted DOCCS to redact the portions of the video that would reveal the identity of the officers that DOCCS believed were not involved in the use of force or the pat frisk of Mr. Virgil.

143.    DOCCS subsequently produced the videos.

144.    On December 22, 2022, the Third Department ordered DOCCS to pay legal fees in connection with the FOIL request because DOCCS "had no reasonable basis for denying" the request.

III. **DOCCS Investigates the Incident, Yet Only Finn is Disciplined—None of the Other Officers Who Failed to Intervene or Who Filed False Reports Were Disciplined At All**

145.   Following the assault on Mr. Virgil, DOCCS conducted an investigation of the incident through its Office of Special Investigations ("OSI").

146.   Pursuant to the OSI investigation, Defendants Finn, Langdon, and Costantini were subject to compelled and sworn interrogations by OSI investigators.

147.   Defendant Langdon testified under oath on May 21, 2020 at 10:33 a.m., and stated, among other things:  (i) Mr. Virgil was not resisting throughout the incident; (ii) he does not remember if Defendant Finn sprayed Mr. Virgil with pepper spray; (iii) he was not familiar with DOCCS' Directive 4944 concerning the Use of Force; (iv) he did not fill out a Form 2104A Use of Force Report because he "didn't want anything to do with the situation because [he] knew the situation was bad, so if not one was going to ask [him] for it [he] didn't want [his] name on it," and no one told him to fill one out; (v) he turned his body worn camera off "midway through this use-of-force" because he "just panicked"; (vi) he filled out a "to/from report"; and (vii) he was not trained on the use of body worn cameras.

148.   Defendant Finn testified under oath on May 21, 2020 at 11:48 a.m. and stated, among other things:  (i) that after his verbal disagreement with Mr. Virgil, he pepper sprayed Mr. Virgil after which he became fully compliant, and then when he tried to handcuff Mr. Virgil, he supposedly "smashed the handcuffs together . . . trapping my finger," leading Defendant Finn to deliver a single "blow to the back of his head with my elbow to get my hand free," (ii) that he doesn't "remember anything after that," including banging Mr. Virgil's head against the steel bars, a supposed lack of memory that he repeated throughout the interview, even as to things that were captured on video, such as his falsely telling several officers after the incident that he only had pepper sprayed Mr. Virgil; (iii) that he "used a least amount of force necessary for that particular incident"; (iv) that he is "[n]ot

19

normally" allowed to strike incarcerated persons in the back of the head with his elbow because it

could be considered lethal force; (v) that he filled out a 2104A report documenting more supposed

details of the incident based on his "assumptions" given that he does not remember what happened;

(vi) that he took Mr. Virgil to the ground "[b]ecause he assaulted me" and "[h]e was combative at that

point"; (vii) that he had not given direct orders to Mr. Virgil and that he thus does not know how Mr.

Virgil was meant to know what he wanted him to do; (viii) that he didn't remember what Mr. Virgil

was doing once on the ground; (ix) that he had no substantive training on when to use body worn

cameras, and there is no directive, indeed, he asked for one from multiple people and no one ever

provided it to him; (x) that he wrote his Use of Force report later in the day, despite his lack of memory

as to what happened, based on "just officers' word of mouth" and what "they were saying that that's

what happened," but none of them said anything about him slamming Mr. Virgil's head against steel

bars:

> After I struck the inmate I basically blacked out, but I remember bits and
> pieces of stuff almost like waking up from a dream.  I couldn't tell you how
> things happened or what order things happened.
>
> But I can remember images of things, when I got back from the hospital I did
> talk to other officers.  And based on what they were saying and what I had
> visually in my head from like little snippets, I was like, yeah, that happened,
> and that's what I put in my paperwork, because that's what I remember.
> That's what I recall.  I couldn't tell you exactly how it happened or anything
> like that.  It's very fuzzy.

149.    Defendant Costantini testified under oath on May 22, 2020, and stated, among other

things:  (i) that he knew that COs were "[n]ever" supposed to elbow inmates in the back of the head

because it "[c]ould cause damage," including "permanent damage," and that COs are also not

supposed to hit inmates while they are handcuffed; (ii) that he knew if he sees an officer using

excessive force he is supposed to "[p]ut a stop to it"; (iii) that he supposedly did not recall Defendant

Finn slamming Mr. Virgil's head against steel bars because he was supposedly just "focused on [Mr.

Virgil's] legs at that point in time"; (iv) that he did not include any of Defendant Finn's use of force on his 2104A report because, in his view, it had "nothing to do with my use-of-force.  That's Officer Finn's use-of-force. . . .  Yeah, I put my use-of-force that was in there, not Finn's use-of-force"; (v) that he did not identify Defendant Langdon as a witness because he supposedly "did not know Officer Langdon was with me on the inmate" until he watched "camera footage about a month-and-a-half later"; (vi) that Mr. Virgil was supposedly kicking so hard that his shoe came off.

150.    On December 7, 2020, Defendant Langdon took part in a "counseling session" with DOCCS Deputy Superintendent for Security.

151.    Following that session, Defendant Langdon was issued a memorandum that explained that, in connection with the incident, he had violated DOCCS Departmental Rules regarding the conduct of employees and the falsification of records.

152.    The memorandum concluded that Defendant Langdon had purposefully shut off his body camera during the incident, and that he "filed an inaccurate Use of Force Report, Form #2104A, and that his "reporting clearly deviated from the policies set forth in the Departmental Directive #4944, 'Use of Physical Force', specifically Section IV, which covers use of force reporting and documenting procedures."

153.    The Deputy Superintendent made clear to Defendant Langdon "the ramifications that your actions have on your fellow employees and the overall operations and good order of the facility and the discredit this reflects on the facility and the Department as a whole."

154.    Despite the foregoing, the memorandum made clear that "this counseling was not disciplinary in nature."

155.    Defendant Langdon was never disciplined in connection with his role in the incident, including his failure to intervene, his shutting off of his body worn camera, or his submission of false

reports.

156.    On information and belief, Defendant Costantini was not even subject to this non-disciplinary "counseling session" process.

157.    Defendant Costantini was never disciplined in connection with his role in the incident, including his failure to intervene, his failure to activate his body worn camera, or his submission of false reports.

158.    On information and belief, no other officers, including but not limited to the John Doe officers, were disciplined in connection with their roles in the incident, including their failure to intervene or submission of false reports.

IV.    **Defendant Finn Pleads Guilty to Federal Charges in Connection with the Attack**

      a.    **Defendant Finn Pleads Guilty to Depriving Mr. Virgil of his Constitutional Rights, and Acknowledges Under Oath That His Attack on Mr. Virgil Was Unjustified, Unlawful, and Committed Against a Vulnerable Victim**

159.    After viewing video of the incident, DOCCS purportedly ordered an investigation by its Office of Special Investigations, which ultimately referred the matter to the Federal Bureau of Investigation.

160.    A superseding felony indictment was issued charging Defendant Finn with one count of violating 18 U.S.C. § 242 in connection with his assault of Mr. Virgil, to which Defendant Finn pled guilty on July 12, 2022.

161.    At the July 12th change of plea hearing, Defendant Finn stated the following under oath:

> In March of 2020, I was employed as a corrections officer at a state prison in Dutchess County.  In my role as a corrections officer, it was my job to enforce the prison rules and to help protect the [incarcerated people.]  On March 19th, 2020, I was tasked with clearing an area of the prison after mealtime. As I did this, I came across an inmate who refused to obey my order that he go back into his cell.  I used pepper spray and cuffed him, but then my hand got caught in his handcuffs and I lost my composure and shoved his head against a metal bar on more than one occasion, using force that

was far too excessive and that was unjustified and unreasonable.  I willfully and used force that was excessive and unlawful and caused injury.  And I'm very sorry.

162.     Despite being under oath, that statement downplayed the severity of Defendant Finn's attack on Mr. Virgil.

163.     That statement portrayed a materially false narrative of what occurred.

164.     Upon subsequent questioning, Defendant Finn admitted that he had not simply shoved Mr. Virgil against a metal bar, as he had just testified, but that he had also slammed Mr. Virgil against *both* a metal bar *and separately* against a cement wall.  "THE COURT.  Okay.  So was it just the bars that he hit or was it also the walls?  THE DEFENDANT:  It was also the wall, your Honor."

165.     Defendant Finn not only hit Mr. Virgil's head against the steel bar "on more than one occasion," he had also slammed Mr. Virgil's head against the wall more than once.

166.     Defendant Finn acknowledged sentencing enhancements were warranted because, at the time of the attack, (i) he was acting under color of state law, (ii) Mr. Virgil was handcuffed, and (iii) Mr. Virgil was a vulnerable victim.

167.     Defendant Finn also acknowledged a sentencing reduction due to acceptance of responsibility.

168.     On September 2, 2022, Judge Nelson Román issued an order approving and accepting Defendant Finn's plea.

> **b.  Defendant Finn, Other Officers, and Defendant Finn's Family Blame Defendant Finn's Supervisors at DOCCS for the Attack on Mr. Virgil**

169.     Defendant Finn submitted a sentencing submission to Judge Román, which centrally addressed the supposed effects of a reported PTSD diagnosis Defendant Finn received following his attack on Mr. Virgil, which he reportedly developed following a separate incident in October 2019.

170.     According to Defendant Finn, on October 28, 2019, an incarcerated person at Green Haven stabbed him several times, inflicting wounds to his head, neck, and back.  *See United States v.*

*Finn*, No. 21-cr-650 (S.D.N.Y. Oct. 20, 2022), ECF No. 26.

171.    Defendant Finn was supposedly diagnosed with PTSD after speaking to mental health providers "immediately" following his attack on Mr. Virgil.  *Id.*, Dkt. No. 26-19.

172.    Defendant Finn was later evaluated by Dr. Elliot B. Rosenbaum, a psychologist who supposedly confirmed the PTSD diagnosis and reported that the October 2019 incident rendered Defendant Finn "more vulnerable to impulse control difficulties and aggressive behavior."

173.    In Dr. Rosenbaum's opinion, the events on March 19, 2020 triggered Defendant Finn's PTSD, which precipitated Defendant Finn's attack on Mr. Virgil:

> When taking into account the relevant literature on PTSD and the available information regarding the incident, it is my opinion that the events on March 2020 likely served as a trigger for the re-experiencing/intrusive symptoms and dissociative reactions caused by the traumatic nature of the prior stabbing incident. In other words, on March 19, 2020, when Mr. Finn was presented with a seemingly similar traumatic incident, mimicking the events of the prior stabbing incident, the extreme stress and fear that he felt resulted in post-traumatic amnesia and dissociation. This response would have rendered him more vulnerable to impulse control difficulties and aggressive behavior.

*Id.*, Dkt. No. 26 at 9.

174.    According to Defendant Finn, his attack on Mr. Virgil "can be directly linked" to the October 2019 incident.  *Id.*  In fact, he stated:  "had I known that I could do something like this due to a past trauma I would not have gone back to work." *Id.*, Dkt. No. 26-19.

175.    Several of Defendant Finn's fellow Green Haven officers and family members submitted letters in connection with Defendant Finn's sentencing and blamed Defendant Finn's supervisors at DOCCS for the attack on Mr. Virgil.

176.    In their telling, the DOCCS supervisors sent Defendant Finn back to work too soon after the October incident and without performing a sufficient assessment of Defendant Finn's psychological orientation.

177.    Green Haven CO Robert Faby stated that Defendant Finn was brought back to work

"too soon, most likely due to short staffing, and without a proper 'pscyh[] eval.'" *Id*., Dkt. No. 26-12 at 2.

178.    CO Faby blamed DOCCS for Defendant Finn's assault on Mr. Virgil.

179.    CO Faby stated that DOCCS could have prevented the assault if they had "taken the appropriate measures before mandating [Finn] to return to work.  They failed him, and in doing so, failed the victim who got hurt." *Id*. at 3.

180.    In CO Faby's view, DOCCS is "reactive, not proactive.  Instead of heading things off, they wait for something bad to happen and THEN consider making changes." *Id*.

181.    CO Faby also stated that "[e]very other state entity (PD, FD, etc . . .) requires a Psychological Evaluation after any traumatic incident, except for NYSDOCCS.  Once [Finn's] 'cocktail' was done, it was back to business.  Anyone who gets stabbed while their help stands by and watches while ignoring calls for help would no doubt develop PTSD, and a proper 'Psych[] Eval' may have caught it." *Id*. at 2.

182.    Green Haven CO Ryan Lieberman stated that after the October 2019 incident, Defendant Finn was "withdrawn" and "quiet," and that he "returned to work after that incident but to many of us it seemed too soon after enduring such a traumatic experience." *Id*., Dkt. No. 26-10

183.    Green Haven CO Katrina Eichler stated: "[I was] obviously concerned because it felt like he returned too soon (if I was stabbed on the job I don't know that I would have been mentally stable to return, my own opinion.)". *Id*., Dkt. No. 26-7.

184.    CO Eichler also stated that Finn was "on edge" and "acted like everyone wanted to harm him." *Id*.

185.    Defendant Finn's father-in-law reported that Defendant Finn worried about going back to work after the attack, but that his supervisors—including "the person in charge of [DOCCS]'"

and "a few other dignitar[ies]"—communicated with Defendant Finn about the incident and shortly thereafter Defendant Finn was ordered back to work, which Defendant Finn's father-in-law thought was "bullshit." *Id.*, Dkt. No. 26-5 at 3.

> I asked [Finn] if he had talked to any state doctors or state psychiatrists, or anyone beside me, he said no, he wasn't sure how things were done, who he could or should talk to, and that there seemed to be some kind of political shenanigans going on around the whole incident.  He had been contacted by the person in charge of the department of corrections, and a few other dignitar[ies] on the same call, and they assured him that they would make sure he was 'taken care of' and other such things. Which turned out to be utter bullshit . . . after he finished his 3 months on cocktail, and shortly before the incident that happened on March 19th 'the state' said he had to return to work.

186.    Defendant Finn's wife stated that Defendant Finn was "suddenly and quickly cleared to return to work . . . likely due to staff shortages." *Id.*, Dkt. No. 26-1.

187.    Defendant Finn's friend, Patrick Clausen, stated that Defendant Finn was at his house "the very next day after he had been ordered back to work and administratively locked out having a near panic attack trying to figure things out." *Id.*, Dkt. No. 26-8 at 3.

188.    Defendant Finn went back to work on February 14, 2020, less than five weeks before he attacked Mr. Virgil.

### c.  Defendant Finn is Sentenced to Three Months in Prison

189.    At a sentencing hearing on November 2, 2022, Defendant Finn was sentenced by Judge Román to a term of three months' imprisonment and one year of supervised release.

**V.    Defendants Annucci, Royce, and/or John Doe #9 Were Aware of and Deliberately Indifferent to the Acute Risk that Defendant Finn Posed in March 2020 of Inflicting Unjustified Excessive Force**

190.    Defendants Annucci and Royce each had two separate but related reasons to know that Defendant Finn posed an intolerable risk of using excessive force on March 19, 2020, yet they unjustifiably let him work anyway:  (i) at the time he attacked Mr. Virgil, Defendant Finn was reportedly suffering from PTSD stemming from an  earlier violent workplace incident resulting in

Defendant Finn's stabbing, which made Defendant Finn particularly prone to unjustified and excessive force given that he unjustifiably viewed situations in prisons as threatening even when they were not; and (ii) Defendant Finn had a history of using excessive force in the same manner as he did against Mr. Virgil (*i.e.*, slamming the head of a handcuffed incarcerated person into a wall).

191.    As alleged above, at the time of his attack on Mr. Virgil, Defendant Finn was supposedly suffering from PTSD stemming from an October 2019 incident that rendered him subject to impulse control issues and aggressive behavior.

192.    Defendant Finn was ordered back to work following the October 2019 incident on February 14, 2020,

193.    In the telling of Defendant Finn, his fellow officers, and family members, his PTSD led him to view situations as threatening even when they were not.

194.    According to Defendant Finn, the attack on Mr. Virgil "can be directly linked" to the October 2019 incident.

195.    Defendant Finn's supervisors, including Defendants Annucci, Royce, and/or John Doe #9, should have taken steps to ensure that Defendant Finn was fit to return to work following the October incident, including by, among other things, requiring that Defendant Finn receive a thorough psychiatric evaluation or other assessment before ordering him to return to work.

196.    Defendant Finn's supervisors, including Defendants Annucci, Royce, and/or John Doe #9, failed to conduct a sufficient psychological evaluation of Defendant Finn before allowing him back to work following the incident.

197.    Defendant Finn's supervisors, including Defendants Annucci, Royce, and/or John Doe #9, ordered Defendant Finn back to work too early following the incident.

198.    The attack on Mr. Virgil was directly caused by the decision to send Defendant Finn

back to work too early following the October 2019 incident.

199.    Defendant Annucci personally contacted Defendant Finn about the October 2019 incident, including by calling Defendant Finn and "assur[ing] him that they would make sure he was 'taken care of' and other such things."

200.    Following that contact with Defendant Annucci, "'the state' said [Defendant] Finn was to return to work."

201.    On information and belief, Defendant Annucci was responsible for ordering Defendant Finn back to work following the October 2019 incident.

202.    On information and belief, Defendant Royce was personally involved in the aftermath of the October 2019 incident.

203.    On information and belief, Defendant Royce was one of the "dignitar[ies]" that was on the call involving Defendant Annucci and Defendant Finn.

204.    On information and belief, Defendant Royce, as the superintendent of Green Haven, was responsible for ordering Defendant Finn back to work in February 2020 following the October 2019 incident.

205.    On information and belief, Defendant John Doe #9 was personally involved in the aftermath of the October 2019 incident.

206.    On information and belief, Defendant John Doe #9 was responsible for ordering Defendant Finn back to work in February 2020 following the October 2019 incident.

207.    In addition, Defendant Finn was ordered back to work in this condition despite having a history of the use of excessive force.

208.    As alleged further below, in a case that Defendant Finn subsequently settled, Carlos Garcia, a person incarcerated at Green Haven, alleged that Defendant Finn had used

unconstitutionally excessive force against him prior to Defendant Finn's attack on Mr. Virgil.

209.    Mr. Garcia alleged that Defendant Finn attacked him from behind, placed him in a chokehold that caused him to lose consciousness, and then, when handcuffed, bent his shackled arms upward and rammed his head into a brick wall.

210.    On information and belief, Defendants Annucci, Royce, and John Doe #9 knew of Mr. Garcia's claims and/or the underlying allegations.

211.    On information and belief, Defendant Finn was not disciplined for his attack on Mr. Garcia.

212.    Defendant Finn was also accused of another unprovoked assault on another Green Haven incarcerated person on November 24, 2015.

213.    That incarcerated person alleged that he tried to correct Defendant Finn's pronunciation of his name, to which Defendant Finn responded:  "I didn't fucking ask you to correct me, take it inside," and "you need to shut your fucking mouth and stop being such a pussy about your name."

214.    When the incarcerated person responded, "Respect is given not demanded," Defendant Finn supposedly grabbed him by the waist and threw him to the floor.

215.    The November 24, 2015 incident led to an investigation by DOCCS' Office of Special Investigations.

216.    That investigation found the allegations to be unsubstantiated, but only because there was no physical evidence to prove the incarcerated person's account, which Defendant Finn denied.

217.    On information and belief, Defendants Annucci, Royce, and John Doe #9 knew of that incarcerated person's claims and/or the underlying allegations.

218.    Defendant Finn's purported PTSD diagnosis, which rendered him subject to impulse

control problems and aggressive behavior, as well as Defendant Finn's documented history of using excessive force against handcuffed incarcerated persons, each independently demonstrated that Defendant Finn posed an unacceptable risk in March 2020 of harming incarcerated people through the use of unjustified and unconstitutional excessive force.

219.    In light of the foregoing risk, Defendants Annucci, Royce, and John Doe #9 had a duty not to permit Defendant Finn to be working around incarcerated persons on March 19, 2020.

220.    Had Defendants Annucci, Royce, or John Doe #9 not permitted Defendant Finn to be working at Green Haven on March 19, 2020 (or ordered him to do so), Mr. Virgil would not have been attacked.

221.    Under the tenures of Defendants Annucci and Royce, DOCCS and Green Haven—in contrast to other state entities—have had a policy or practice of failing to conduct sufficient psychiatric evaluations of COs after they face instances of trauma that may lead them to pose a risk of using unconstitutional excessive force.

222.    Defendant Finn's supervisors, including Defendants Annucci, Royce, and/or John Doe #9, failed to conduct a sufficient psychological evaluation of Defendant Finn before allowing him back to work following the incident.

223.    Under the tenures of Defendants Annucci and Royce, DOCCS and Green Haven have a policy or practice of sending COs back to work too early after they face instances of trauma that may lead them to pose a risk of using unconstitutional excessive force.

224.    As a result of the foregoing policies or practices, COs like Defendant Finn—who are reportedly diagnosed with PTSD rendering them with impulse control issues and a penchant for aggressive behavior—are allowed to work despite the unacceptable risk that they will inflict unjustified excessive force on incarcerated people.

**VI.   The "Culture of Brutality" and "Elaborate Cover Up[s]," Which Had "Reached Crisis Proportions in New York State," Allowed the Attack on Mr. Virgil to Happen**

225.   DOCCS and Green Haven—under the tenures of Defendants Annucci and Royce—have suffered from a longstanding pattern, practice, and custom of its COs' use of excessive force against incarcerated people.  As relevant here, the pattern, practice, and custom extends to two related behaviors: (i) COs' uses of excessive force, followed by (ii) COs' conspiratorial efforts to lie about what occurred to hide the misconduct.

226.   The confluence of these two behaviors allows excessive force instances to occur by allowing COs—like Defendant Finn and the other officer Defendants—to feel as if they can violate incarcerated people's Eighth Amendment rights with impunity.

227.   As alleged above in Sections I-III, what happened to Mr. Virgil is a direct consequence of the foregoing.

> **a.   A Longstanding and Pervasive Pattern, Practice, and Custom of Staff Violence and Cover Ups Permeates DOCCS Facilities, and Especially Green Haven**

228.   As documented by groups such as the Correctional Association of New York ("CANY"), the New York Times, the Marshall Project, the United States Department of Justice, as well as dozens of victims that have recovered funds from the state in connection with COs' excessive force, DOCCS—and Green Haven in particular—has experienced throughout Defendants Annucci and Royce's tenures a sustained epidemic of its COs physically abusing incarcerated people in their care in violation of the Eighth Amendment and then lying to cover it up.

> **i.   In 2006, the Correctional Association of New York Documented the Grim Realities of the Violence Green Haven COs Inflict on Incarcerated people, Which the Superintendent "Did Not See as a Serious Problem."**

229.   On May 24, 2006, CANY representatives visited Green Haven to make observations and recommendations concerning the facilities' operations, ultimately publishing an extensive report documenting its findings (the "CANY Report").

230.    CANY is "the only independent organization in New York with authority under state law to monitor prisons," and has a "unique mandate" that it carries out "through onsite prison monitoring visits," which results in CANY "report[ing] [its] findings to the legislature and the broader public."

231.    The CANY Report documented in detail the realities of the violence that COs inflict on incarcerated people at Green Haven.

232.    The CANY Report noted that "[c]omplaints from incarcerated people about abuse by correction officers were consistent and widespread," and that "[t]hroughout the prison we received reports of staff participating in physical abuse. . . .The consistency with which we heard these reports in all of the prison has led us to conclude that there is a significant misconduct among some of the security staff at Green Haven."

233.    The CANY Report stated that "[e]ighty-one percent of the respondents thought that relations with staff were worse at Green Haven than at other prisons in which they had been confined."

234.    Despite Green Haven being worse for relations between *staff and incarcerated people*, however, the CANY Report also concluded that relations *between incarcerated people* were *better* at Green Haven than in other facilities.

235.    One particular conclusion from the CANY Report was as follows:

> Eighty percent of inmates were interviewed told us that physical assault by staff is a common occurrence at the facility, and almost one-quarter of the respondents reported personally experiencing a physical confrontation with staff.  Throughout the day, we heard reports of a group of COs called the "beat-up squad" who are responsible for physical confrontations with incarcerated people.

236.    The CANY Report found these reports to be particularly credible.  The report noted that there was a "long list of COs who [the incarcerated people] described as professional and helpful," but "a few COs were named consistently, throughout the facility, as being abusive.  The willingness

of inmates to call attention to professional behavior among staff lends a great deal of credibility to their claim that there are also staff who engage in misconduct."

237.   When CANY reported "the high level of complaints by [incarcerated people] about their treatment by staff" to the then-Green Haven superintendent, "he did not see [it] as a serious problem."

> ii.   **From 2015-16, The Marshall Project and The New York Times Meticulously Document the "Culture of Brutality," including Cover Ups, in DOCCS Facilities**

238.   Over the span of a year between 2015-16, The Marshall Project and The New York Times conducted an exhaustive investigation into the problem of excessive force and cover ups in DOCCS facilities (the "MP/NYT Investigation").

239.   The MP/NYT Investigation "examined brutality by corrections officers at prisons across the state and how they are rarely held accountable," and concluded that:

> The result is that a culture of brutality has been allowed to thrive in the prisons, where a few rogue guards, often known on the cellblocks as beat-up squads, administer vigilante justice, while fellow officers look the other way, according to cases documented over the past year by The New York Times and its reporting partner, The Marshall Project.

240.   The MP/NYT Investigation also noted that "[p]erhaps the biggest challenge for investigators is the culture of silence among guards."

241.   The first results of the MP/NYT Investigation were published on the front page of the February 26, 2015 edition of the New York Times, and focused on the criminal beating of incarcerated person George Williams by officers at Attica Correctional Facility.

242.   With no justification or provocation, three COs beat Mr. Williams to the precipice of death, leaving him with a broken shoulder, several cracked ribs, two broken legs (one requiring surgery), a severe fracture of the orbit around his left eye, a large amount of blood in his maxillary sinus, and multiple cuts and bruises.

243.    Following the attack, the officers orchestrated an elaborate cover up, in which they falsified what occurred in official reports, such as an "unusual incident memo," and burned evidence that contained Mr. Williams' blood.

244.    Defendant Annucci was aware of the attack on Mr. Williams and gave a public statement following the officers' convictions stemming from the incident.  He stated that the guards' "criminal actions and this type of behavior have absolutely no place within the department."

245.    Defendant Annucci also represented that he would seek "substantial changes," including to "appropriately discipline any security staff who commit egregious acts of misconduct."

246.    The MP/NYT Investigation made clear why Mr. Williams' case was the impetus for its investigation: "An examination of this case and dozens of others offers a vivid lesson in the intractable culture of prison brutality."

247.    The MP/NYT Investigation also revealed DOCCS officers' unjustified violent response to incarcerated people after an escape at Clinton Correctional Facility in 2015.  As it reported, "For days after the June prison break, corrections officers carried out what seemed like a campaign of retribution against dozens of Clinton incarcerated people, particularly those on the honor block . . .. In letters reviewed by the Times, as well as prison interviews, incarcerated people described a shockingly similar catalog of abuses, including being beaten while handcuffed, choked and slammed against cell bars and walls."

248.    The MP/NYT Investigation's story covering the brutality in Clinton Correctional Facility also focused on one notoriously violent guard, known as "Captain America," who would tie plastic bags around incarcerated people's necks and tighten them until the incarcerated people passed out.  Subsequent investigation revealed that officer to be Chad Stickney.

249.    The MP/NYT Investigation also reported on what was known as the Fishkill

Correctional Facility's "Beat Up Squad," which consisted of a group of officers notorious for committing gruesome and unjustified assaults on incarcerated people.

250.    The MP/NYT Investigation described in detail the Beat Up Squad's unjustified and brutal killing of incarcerated person Samuel Harrell, and the elaborate cover up thereof.

251.    The MP/NYT Investigation reported that the prison building in which the homicide of Mr. Harrell took place had not only "long been singled out as a violent place," but that CANY had specifically briefed Defendant Annucci in the fall of 2013 on the unjustified violence that routinely took place there.

252.    Months later, the MP/NYT Investigation unearthed other graphic instances of excessive force and cover ups, including, for example, CO Michael Bukowsky's brutal assault of incarcerated person Ramon Fabian at the Ulster Correctional Facility.  An arbitrator assigned to adjudicate the incident found CO Bukowsky "guilty of using excessive force and lying to investigators."

253.    The MP/NYT Investigation identified that the Bukowski incident was part of a troubling pattern, noting that "[o]fficer discipline has taken on special significance as New York faces fresh accusations of brutality in its vast incarceration system of 53,000 inmates."  The report noted that "[c]ritics including the Correctional Association of New York, a nonprofit group that monitors the state's prisons, say the episodes show that [DOCCS] has often ignored brutality."

254.    Subsequent reporting out of the MP/NYT Investigation detailed "a kind of parable of brutality and injustice on the cellblocks": a vicious beating of schizophrenic incarcerated person Leonard Strickland at Clinton Correctional Facility, who was pushed down a flight of stairs by COs and beaten nearly to death by a group of guards.  The investigation noted that the "case fits a troubling pattern of savage beatings by corrections officers at prisons across New York State and a department

that rarely holds anyone accountable."

255.    When asked about the MP/NYT Investigation's story on the Strickland attack, and the lack of accountability associated with it, Defendant Annucci "declined a request for an interview."

256.    Finally, the MP/NYT Investigation took stock of the significant liability the State had faced in making hundreds of payouts to victims of unconstitutional excessive force against incarcerated people.  Specifically, they concluded that between 2010 and 2015, "the state has paid out at least $8.8 million in settlements or jury awards in cases in which guards were accused of prisoner abuse or excessive force, according to court records assembled by The Times and The Marshall Project."  The report also noted that "[a]mong those 207 cases, the names of some officers and prisons crop up repeatedly."

       **iii.    In 2016, Following a Group of DOCCS COs' Savage and Criminal Beating of Kevin Moore and an "Elaborate Cover Up" Thereof, U.S. Attorney Preet Bharara Announces that "Excessive Use of Force in Prisons . . . Has Reached Crisis Proportions in New York State."**

257.    On November 12, 2013, in the early stages of Defendant Annucci's tenure, a group of COs at Downstate Corrections Facility brutally and with neither justification nor provocation assaulted incarcerated person Kevin Moore, ripping out his dreadlocks—which one officer kept as a "trophy"—and beat him so severely that his ribs and facial bones were broken.

258.    After the assault, the COs conspired to concoct an elaborate cover up of the attack, including by manufacturing fake injuries to make it appear as if Mr. Moore had been the aggressor. The officers also created false records, including false use of force reports that relayed the fabricated conspiratorial story the officers had made up.

259.    On September 21, 2016, then-United States Attorney Preet Bharara announced federal charges against five of the officers involved, including separate charges related to (i) the use of excessive force and (ii) filing of false reports.  At the announcement, Mr. Bharara stated:

Today's charges allege a brutal beating and a brazen cover-up by five state correction officers that left Kevin Moore, a 54-year-old inmate, with life-threatening injuries and in the hospital for 17 days. [Incarcerated people] may be walled off from the public, but they are not walled off from the Constitution. And when correction officers viciously beat an inmate in their charge, then collude among themselves to cover it up—as alleged here—they trample on the Constitution and the very laws they have sworn to uphold.

260.    Mr. Bharara summarized the key issue succinctly at the press conference: "Excessive use of force in prisons, we believe, has reached crisis proportions in New York State."

261.    Defendant Annucci was at the press conference alongside Mr. Bharara in announcing the criminal charges against the officers.[1]

262.    As detailed further below, each of the five officers were convicted on all charges. Two were convicted following a jury trial and received 100- and 87-months incarceration, respectively, and their convictions and sentences were affirmed by the Second Circuit. *See United States v. Scott*, 979 F.3d 986, 988 (2d Cir. 2020). As the Circuit noted, at trial, the Government presented evidence that the officers sought to cover up the assault by fabricating their own injuries and making them appear more severe to give the false impression that Mr. Moore had been the aggressor. *Id*. They falsified the initial use-of-force incident report, and then also "parroted this same [false] story in subsequent use-of-force reports." *Id*. at 989. The other three officers pled guilty, with one receiving 40 months incarceration and the others receiving sentences of time served.

### iv.   In Recent Years, an Overwhelming Number of DOCCS COs—Including Defendant Finn—Are Subject to Significant Civil and/or Criminal Liability in Connection with Excessive Force Claims

263.    Consistent with this historical pattern, in recent years, under the leadership of Defendants Annucci and Royce, an overwhelming number of DOCCS COs—including Defendant Finn—have faced significant legal consequences following their unjustified use of excessive force

---

[1] https://www.justice.gov/usao-sdny/pr/five-correction-officers-charged-federal-crimes-beating-inmate-downstate-correctional

against incarcerated people.

264.   On information and belief, the COs who commit these unlawful acts are rarely disciplined in any serious manner.

265.   The following examples—illustrative, not exhaustive—are demonstrative of the culture of excessive force that exists in DOCCS facilities.  On information and belief these instances reflect just a small number of the instances of excessive force in DOCCS' facilities.

266.   For example, the following are just a small sample of instances that occurred just at Green Haven.

267.   On February 14, 2020, a jury awarded incarcerated person Jerome Anderson $650,000 after finding a sergeant and three COs at Green Haven liable for excessive force after brutally assaulting him. *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Feb. 24, 2020), Dkt. No. 133. After trial, the judge described the testimony that was offered:  after Mr. Anderson provided a statement to the Office of Special Investigations concerning certain conduct of the sergeant, the officers coordinated an attack on him by escorting him to an area of the facility that was not under surveillance and then punched, stomped, and kicked him for several minutes. *See id.*, Dkt. No. 161.

268.   On February 7, 2022, six Green Haven COs—including Defendant Finn—settled claims against them for $9,500 alleging that they assaulted incarcerated person Carlos Garcia.  *See Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y Feb. 17. 2022), Dkt No. 101.  Mr. Garcia had alleged, among other things, that Defendant Finn attacked him from behind, put him in a chokehold until he lost consciousness, and that when he regained consciousness, Defendant Finn and another CO bent his arms upward and slammed his head into a brick wall, all while he was handcuffed.  *See id.*, Dkt. No. 30-1.

269.   Also on February 7, 2022, nine Green Haven COs settled claims against them for

$87,500 alleging that they assaulted incarcerated person Benjamin Stephens, Jr. on at least three occasions.  *See Stephens v. Venettozzi*, No. 13-cv-5779 (S.D.N.Y. Feb. 7, 2022), Dkt. No. 381.  Mr. Stephens alleged that a CO assaulted him by smashing his head on a table and causing him to lose consciousness and then have a seizure, and two other COs punched and slapped his head while wearing leather gloves and then choked him for several seconds.  *See id.*, Dkt. No. 226.

270.   On July 30, 2021, five Green Haven officers settled claims against them for $75,000 alleging that they assaulted incarcerated person Nakia Rose.  *See Rose v. Garritt*, No. 16-cv-3624 (S.D.N.Y. July 30, 2021), Dkt. No. 128.  Mr. Rose alleged that the officers surrounded him and ordered him to place his hands on a wall, after which one CO punched the right side of his face and another punched the left side of his face.  *See id.*, Dkt. No. 2.  A sergeant then ordered the COs to bring Mr. Rose to the floor, where the COs handcuffed him and gruesomely beat him up, including by kicking and punching him and twisting his ankles.  *Id.*

271.   On May 16, 2019, two Green Haven COs settled claims against them for $40,002, following a jury verdict against them for that same amount, alleging that they assaulted incarcerated person Eon Shepherd on several occasions.  *See Shepherd v. Fisher*, No. 08-cv-9297 (S.D.N.Y. May 16, 2019), Dkt. No. 298.  On one such occasion, a CO groped Mr. Shepherd's genitals for almost a minute, causing unbearable pain.  *See id.*, Dkt. 281.

272.   On October 29, 2018, thirteen Green Haven COs settled claims against them for $50,000 alleging that they physically assaulted incarcerated person Jose Quezada in retaliation for previous suits he had filed against officers.  *See Quezada v. Roy*, No. 14-cv-4056 (S.D.N.Y. Oct. 29, 2018), Dkt. Nos. 2, 149, 275.  Over the course of many months, officers coordinated efforts to harass Mr. Quezada by, among other things, spreading rumors about him being a "snitch" and turning off electricity and water in his cell.  *See id.*, Dkt. No. 149.  Eventually, the coordinated harassment

escalated, and ultimately, the officers executed a plan to assault Mr. Quezada. *See id*. They entered his cell, intentionally wounded themselves to make it appear as though he had attacked them, and then they began to violently beat him up. *See id*.

273.    On October 2, 2019, two COs and two sergeants at Green Haven settled claims against them for $15,000, and the State of New York settled claims against it for $11,250, on allegations that the officers used excessive force and retaliated against incarcerated person Jemal Albritton for filing several grievances against officers and staff. *See Albritton v. Morris*, No. 13-cv-3708 (S.D.N.Y Oct. 2, 2019), Dkt. Nos. 157, 270. Mr. Albritton alleged that, after officers planted a weapon on him, they slammed him to the ground, punched him, and struck him with a baton four or five times. *See id.*, Dkt. No. 157. When the officers pinned him down, they began twisting his arms and legs and threatened to break his arm. *Id*. During the assault, Mr. Albritton had difficulty breathing, so an officer administered an inhaler, during which time another officer punched him in the stomach. *Id*.

274.    As noted, the above examples reflect liability incurred by COs for instances of excessive force occurring just at Green Haven, but examples of liability following horrific excessive force exist across all DOCCS facilities. Just a few other such illustrative examples follow:

275.    On May 5, 2020, COs at Sullivan Correctional Facility settled claims against them for $5,000,000 with the estate of Karl Taylor following Mr. Taylor's death caused by COs use of excessive force. *See Ramsay-Nobles v. Keyser*, No. 16-cv-5778 (S.D.N.Y. May 5, 2020), Dkt. No. 429. Mr. Taylor, who had been diagnosed with and medicated for delusional and paranoid personality disorder, got into an altercation with COs after he refused to clean his cell. One CO struck Mr. Taylor in the back of his head several times with his fists and then, as he was being brought to the infirmary, a number of COs beat him, leaving an extensive pool of blood that took 1.5 hours to clean up. Mr. Taylor was pronounced dead at the infirmary after the assault. The

autopsy report identified Mr. Taylor's cause of death as: "cardiac arrythmia complicating hypertensive cardiovascular disease following physical altercation with correction officers."  The report also noted that Mr. Taylor suffered "severe trauma to his neck, eight blunt force impacts to his head, and various internal and external hemorrhages to his both, both back and front."

276.    On April 30, 2021, three COs at Fishkill Correctional Facility were found liable by a jury for using excessive force against Nicholas Magalios, an incarcerated person, in the amount of $1,000,000.  *Magalios v. C.O. Mathew Peralta*, No. 19-cv-6188 (S.D.N.Y.)  The evidence showed that one officer held down Mr. Magalios while other officers brutally kicked and punched him for 30-60 seconds while others looked on and did nothing.  The attack led to significant bruising, marks, abrasions, and lacerations on Mr. Magalios, and the attack aggravated his pre-existing shoulder injury, which required surgery.  Judge Seibel later noted that the "Defendants' conduct was reprehensible, violent, deceitful, and malicious."

277.    On February 3, 2020, COs at Sullivan Correctional Facility settled claims against them for $500,000 concerning allegations that they committed a grievous and sustained assault on Anthony Medina, a visually impaired incarcerated person.  *See Medina v. Buther*, No. 15-cv-1955 (S.D.N.Y. Feb. 3, 2020), Dkt. No. 505; *Medina v. Barrett*, No. 14-cv-6377 (W.D.N.Y.).  Mr. Medina had alleged that, while he was handcuffed, the COs took turns punching him, broke his fingers, chipped his tooth, strangled him with the cord of a device he used to help him read, and sexually assaulted him.  *See id.*, Dkt. No. 447.

278.    In a New York Court of Claims assault-and-battery litigation involving allegations of excessive force by DOCCS COs, the State of New York did not dispute the fact that a group of COs— led by CO Michael Wehby—violently assaulted incarcerated person Jose Rivera, who required a medically-issued protective helmet due to a seizure disorder.  *See Rivera v. State*, 34 N.Y.3d 383,

385-86 (N.Y. 2019).   The Court of Appeals, which ultimately heard the case, described the incident

as follows:

> [CO] Wehby grabbed claimant's jacket, pulled him outside the mess hall and began
> punching him on the face and head.  Claimant was forced to his knees while [CO]
> Wehby hit and stomped on him, at which point two other corrections officers . . .
> pushed claimant down and applied handcuffs.  Wehby removed claimant's helmet
> and continued the assault, yelling expletives and saying, in substance, 'I hope you
> die.'

*Id*. at 386.  At one point, CO Wehby struck Mr. Rivera "in the head with his radio with such force

that the battery became dislodged and hit the wall."  *Id*.  Mr. Rivera lost consciousness during the

attack, and he sustained serious injuries.  When Mr. Rivera was brought to the facility's emergency

room, "medical staff were falsely told that his injuries were the result of a seizure."  *Id*.  CO Wehby

was criminally prosecuted for the assault.

279.     On January 21, 2015, incarcerated person Stephen Ostane settled claims for $450,000

after he was beaten by six COs while handcuffed, resulting in, among other injuries, a compound

femur facture.  *Ostane v. Fischer*, 13-cv-07927 (S.D.N.Y. Jan. 21, 2013), Dkt. 19.

280.     On October 30, 2017, a court entered judgment for incarcerated person Ramon Fabian

in the amount of $400,000 on his claim that while an incarcerated person at Ulster Correctional

Facility, a CO kicked him between his legs, causing him to undergo surgery for a ruptured testicle.

*Fabian v. Bukowski*, No. 16-cv-878 (N.D.N.Y. Oct. 30, 2017), Dkt. No. 44.

281.     On December 7, 2020, various COs and staff at Fishkill Correctional Facility settled

state and federal court claims against them for an undisclosed amount following the brutal assault and

death of incarcerated person Samuel Harrell, a mentally disabled incarcerated person whose story was

described above.  *See Harrell v. Guarino*, No. 15-cv-7065 (S.D.N.Y. Dec. 7, 2020), Dkt. Nos. 214,

238.   As noted in connection with the MP/NYT Investigation, Mr. Harrell's estate alleged that in

response to one of his mental health episodes, a group of COs known as the "beat-up squad" kicked

and punched him until he became motionless and lost consciousness.  Dkt. No. 214.

> **v.   In Recent Years, DOCCS COs Face Significant Criminal and Civil Liability for Covering Up Uses of Excessive Force Against Incarcerated People**

282.   Also consistent with the historical pattern identified above, in recent years, under the leadership of Defendants Annucci and Royce, a massive number of DOCCS COs have faced significant legal consequences following their unjustified cover up of COs' use of excessive force against incarcerated people.

283.   On information and belief, the COs who commit these unlawful acts are rarely disciplined in any serious manner.

284.   The following examples—illustrative, not exhaustive—are demonstrative of the culture of excessive force cover ups that exists in DOCCS facilities.  On information and belief these instances reflect just a small number of the instances of excessive force cover ups in DOCCS' facilities.

285.   Following the "brutal gang-style assault" of incarcerated person Kevin Moore that left him "lay[ing] defenseless on the prison floor begging for mercy," discussed *supra* at ¶¶ 219-24, the officers involved "engaged in an elaborate cover-up of the crime they had committed," in part by making up a "false cover story to hide what they did, repeatedly lying in Corrections Department records and even creating a phony inquiry."   Indeed, five of the officers involved either were convicted by a jury of, or pled guilty to, among other things, violations of 18 U.S.C. § 1519, which criminalizes the falsification of records.

286.   The indictment against the officers documented "The Cover Up" in detail, noting that it included:  (i) an agreement that the COs "would pretend to have been attacked and hurt by Moore before the beating of Moore began;" (ii) "in order to substantiate the fake cover story they concocted, SANTIAGO struck one of the [COs] who had been on the scene on the back with a baton causing

injury marks to make it appear as if he had been attacked by Moore"; (iii) that CO "applied friction with his hand to the injury marks in order to make the injury appear more serious"; (iv) another CO then "took photographs of the marks on the [CO's] back in order to document the false cover story"; (v) the officers then "met and agreed to write a false report describing the force used against Kevin Moore," which would include writing a "Use of Force Report and supporting memoranda in a manner consistent with the fake story they had concocted, falsely reporting that Moore had pushed one of the [COs] backward onto a table and, only in response, had the [COs] used a reasonable amount of force to restrain Moore; (vi) other officers were instructed to "make entries in a Downstate log book that were false, but consistent with the fake story in the Use of Force Report and supporting memoranda"; and (vii) officers "removed all of Mr. Moore's blood from the floor to conceal the severity of the beating" and to make the scene "consistent with the fake Use of Force report."

287.   As alleged above, on April 30, 2021, a jury found three COs at Fishkill Correctional liable for using excessive force against Nicholas Magalios and awarded him $1,000,000.  In addition to the reprehensibility of the attack itself, the evidence else showed that the officers involved "created false reports and gave false testimony that categorically denied using any force against Plaintiff and contended that Plaintiff fabricated the story entirely."  According to Judge Seibel, the jury "necessarily found that Defendants lied repeatedly through those reports and that testimony, demonstrating the malicious and deceitful nature of their conduct."  In affirming an award of punitive damages, Judge Seibel specifically noted that "similar acts often go undetected in correctional facilities."  Judge Seibel also explained that "'Reprehensible' may not be a strong enough word to describe Defendants' conduct here.  They have disgraced themselves and their office, and such conduct seems to be all too acceptable among certain employees of New York's prison system."

288.   As alleged above, on February 3, 2020, DOCCS settled claims brought by Anthony

Medina, a visually impaired incarcerated person, for $500,000.  Not only did the COs brutally assault Mr. Medina, *see supra* at ¶ 238, but after the attack a sergeant prevented the medical staff from conducting a proper evaluation and did not allow Mr. Medina to discuss the assault with medical personnel.  Instead, the officers falsely told medical staff that Mr. Medina had attempted suicide and that they had intervened.  *See Medina v. Buther*, No. 15-cv-1955 (S.D.N.Y. Aug. 21, 2019), Dkt. No. 447.

289.    As noted above, on February 14, 2020, a jury awarded Green Haven incarcerated person Jerome Anderson $650,000 in connection with his assault by a sergeant and three COs.  Not only did the judge recount the graphic details of the assault, *see supra* at ¶  229, he also noted the evidence that each of the officers involved concocted a fabricated story to cover up their assault of Mr. Anderson.  *See Anderson v. Osborne*, No. 17-cv-00539 (S.D.N.Y. Oct. 20, 2020), Dkt. No. 161.

290.    In the case of Samuel Harrell, one of the incarcerated people addressed above who was brutally assaulted by the "Beat Up Squad" at Fishkill Correctional Facility, Frederick Belanger, the highest-ranking medical officer at Fishkill, said he found guards hiding the seriously injured Mr. Harrell after the assault "at the end of a tunnel."  Officers then falsely claimed that Mr. Harrell had assaulted an officer and they distributed a fabricated flyer falsely indicating that Mr. Harrell had died from an overdose.  *See Harrell v. Guarino*, No. 15-cv-7065 (S.D.N.Y. Dec. 2, 2020), Dkt. Nos. 214, 238.

291.    In the case addressed above involving the brutal and criminal attack by CO Michael Wehby, the Court of Appeals noted that DOCCS' Inspector General's Office had conducted an investigation and concluded that the officers involved in the incident were cited for "providing false or misleading statements to the Inspector General."  *See Rivera v. State*, 34 N.Y.3d 383, 385-86 (N.Y. 2019).

292.     On March 18, 2016, three DOCCS COs settled claims against them for $65,000 for excessive force and retaliation, which included allegations that, after COs assaulted incarcerated person Miguel Tirado in response to grievances he had filed, they also planted weapons in his cell (or entirely fabricated the existence of such weapons) and filed numerous false misbehavior reports against him. *See Tirado v. Shutt*, No. 13-cv-2848 (S.D.N.Y. Mar. 18, 2016), Dkt. Nos. 80, 187.

293.     As alleged above, on October 29, 2018, three Green Haven COs settled claims against them for $50,000 that alleged that they had purposefully wounded themselves as a means to make it (falsely) appear as if incarcerated person Jose Quezada had in fact attacked them.  *See Quezada v. Roy*, No. 14-cv-4056 (S.D.N.Y.).

294.     On August 29, 2022, in *Keyes v. Annucci*, No. 18-cv-0372 (N.D.N.Y. Sept. 6, 2022), Dkt. No. 128, three DOCCS COs settled claims against them for $10,000 alleging that they filed false misbehavior reports in an effort to retaliate against several incarcerated people that had reported instances of COs' excessive use of force.

295.     On January 29, 2020, several DOCCS COs settled claims against them for $9,900 on claims that they deliberately falsified an incarcerated person misbehavior report as part of a conspiracy to cover up their assault of incarcerated person John P. Patterson.  *See Patterson v. Patterson*, No. 16-cv-00844 (W.D.N.Y. Jan. 29, 2020), Dkt. Nos. 29, 66.

296.     On May 20, 2020, officers at Five Points Correctional Facility settled claims against them for $9,355 concerning allegations of incarcerated person Jerard Walker that a group of COs struck him many times with a baton on his ribs, back, and head, and then submitted false misbehavior reports to cover up their assault.  *Walker v. Williams*, No. 16-cv-645 (W.D.N.Y.), Dkt. No. 1.

297.     On January 27, 2022, several Elmira Correctional Facility COs settled claims against them for $5,000 alleging that they assaulted incarcerated person Joseph Terry and then conspired to

cover it up by failing to document and register photographs of Mr. Terry's injuries.  *See Terry v. Hulse*, No. 16-cv-252 (S.D.N.Y. Jan. 27, 2022), Dkt. Nos. 101, 194.

298.    On September 8, 2015, a CO at Green Haven settled claims for $5,000 on allegations that he orchestrated an incarcerated person to brutally assault incarcerated person Gary Gillard and then submitted false misbehavior reports to cover up the use of excessive force.  *See Gillard v. Rovelli*, No. 09-cv-0860 (N.D.N.Y. Sept. 8, 2015), Dkt. Nos. 1, 256.

299.    In *Diaz v. Artus*, No. 13-cv-21 (W.D.N.Y. Nov. 11, 2014), Dkt. No. 71, incarcerated person Walter Diaz alleged that officers at Wende Correctional Facility assaulted him on several occasions because he filed grievances against them.  Mr. Diaz further alleged that after the assault, an officer filed a false misbehavior report against him.  *Id.*  On February 15, 2023, the officers settled the case for $300,000.

300.    On information and belief, these cases reflect just a small sum of the recent significant liability stemming from COs covering up of abuse of incarcerated people in DOCCS' facilities.

301.    On information and belief, these instances in which officers faced legal consequences for their cover ups of excessive force are just the tip of the iceberg of excessive force cover up instances, with the substantial majority of such instances occurring without any accountability whatsoever.

      **b.  Defendants Annucci and Royce Were Deliberately Indifferent to these Unconstitutional Patterns, Practices, and Customs, Knowingly Failed to Address Them, and Failed to Enact Requisite Training, Discipline, and Supervision.**

302.    Defendants Annucci and Royce were aware of the pattern, practice, and custom of the use of excessive force against incarcerated people and their associated cover ups and, despite being key policymakers at DOCCS and Green Haven, respectively, they failed to enact and enforce policies that would have prevented such attacks, including the attack on Mr. Virgil.

303.    Defendants Annucci and Royce knew of and disregarded the risk that excessive force

and cover ups would occur and knew that their failure to train, supervise, and discipline in connection with excessive force and cover ups led to an increased number of these incidents.

304.     The violence that Mr. Virgil faced was a reasonably foreseeable consequence of these policies, practices, and customs.

### i.  Defendant Annucci

305.     Defendant Annucci was personally involved in the attack on Mr. Virgil because, among other things, *see supra* at ¶¶ 158-186, he was responsible for the policies, practices, and customs under which the unconstitutional attack occurred, and he allowed the continuance of such policies, practices, and customs to persist unabated.

306.     Defendant Annucci has been deliberately indifferent to the precise type of attack that Mr. Virgil faced, *i.e.*, Defendant Annucci had actual knowledge of the risk of excessive force inflicted on incarcerated people—exacerbated by his acquiescence to cover ups—and he decided to disregard that risk.  Defendant Annucci had policymaking authority for DOCCS, and after plain notice of the unconstitutional practice of excessive force and cover up instances, he allowed it to continue.

307.     The foregoing is demonstrated in a number of ways.

308.     ***First***, Defendant Annucci has at all relevant times been the head of DOCCS and its principal policymaker, both generally and with respect to policies governing the safety of incarcerated people.

309.     Defendant "Annucci as acting commissioner was at all relevant times responsible for enacting policies governing inmate safety and ensuring that such policies are enforced."  *Stone #1 v. Annucci*, 2021 WL 4463033, at *10 (S.D.N.Y. Sept. 28, 2021).

310.     Defendant Annucci "had the authority to create or allow the continuance of [DOCCS] policies that led to [staff] violence or allowed it to continue."  *Id.*

311.    Defendant Annucci was capable of setting the policies, practices, and customs that should have constrained—but did not constrain—Defendant Finn's conduct (and the conduct of the other officer Defendants) on March 19, 2020.

312.    In March 2022, when the New York Senate's Crime Victims, Crime and Correction and Finance committees questioned Defendant Annucci in connection with his nomination to become DOCCS' Commissioner, Annucci stated: "I own everything—everything bad that's ever happened [in prisons since May 2013], I'm accountable for everything bad."[2]

313.    **Second**, Defendant Annucci was on notice of the massive number of instances of excessive force and coverups that were taking place in DOCCS facilities, and that were a firm part of the organization's culture, customs, and practice.

314.    As noted above, under Defendant Annucci's tenure, DOCCS has been required to pay out substantial money damages in lawsuits regarding excessive force and cover ups by DOCCS COs, and Defendant Annucci has himself been served in many of these lawsuits in his individual capacity.

315.    Further, several DOCCS COs have faced criminal liability under Defendant Annucci's tenure, both for using excessive force, and for submitting false reports regarding the use of force, and, on information and belief, Defendant Annucci is (or should be) made aware whenever a DOCCS CO faces criminal liability for workplace conduct.

316.    In addition, as identified above, Defendant Annucci was specifically briefed on the CANY Report in the fall of 2013, which reported unjustified violence occurring in Green Haven.

317.    Defendant Annucci was also made aware of the MP/NYT Investigation, but he chose to decline a request to participate in that investigation.

---

[2] https://www.hudsonvalley360.com/news/nystate/doccs-chief-nomination-hits-a-snag/article_c2f6927d-0dc5-5caa-b8ab-e6a2df185992.html

318.    Finally, Defendant Annucci was present at the press conference announcing charges against five COs following the assault on Kevin Moore, and even noted that the officers' "behavior [has] absolutely no place within the department" and that he would seek "substantial changes," including to "appropriately discipline any security staff who commit egregious acts of misconduct."

319.    Defendant Annucci has not made the "substantial changes" that he acknowledged were warranted.

320.    **Third**, Defendant Annucci has made clear that when confronting violence in DOCCS facilities he is singularly focused on protecting staff from incarcerated people, *not* protecting incarcerated people from staff.

321.    Defendant Annucci has been public about this singular focus on preventing assaults *against* staff, and thus not on attacks like Defendant Finn's, *i.e.*, *by* staff.

322.    For example, on November 22, 2021, Defendant Annucci issued a memorandum to the DOCCS "Incarcerated Population" regarding "Assaults on Staff and Facility Safety."  He wrote:

> I have over thirty-seven years of experience in this agency, and while there has always been the occasional very troubling incident, the trend I am seeing of late, in terms of the sheer savagery of the assault, the randomness of the assault, and the lack of any precipitating event before the assault, is extremely disturbing.  This will not be tolerated."  He continued: "Make no mistake about it.  This Department will do everything within its power to keep everyone safe from assault, regardless of whether the person in [*sic*] an employee, other incarcerated individual, volunteer, visitor, or contractor.  This in turn means holding the guilty party fully accountable in a court of law.

323.    Defendant Annucci released the November 22, 2021 memorandum to the public.

324.    Defendant Annucci's November 22, 2021 memorandum made plain he was committing DOCCS only to "do everything within its power to keep everyone safe from assault" *by incarcerated people*.  Specifically, by stating that efforts will be focused on the safety of "*other incarcerated individual[s]*," Defendant Annucci made clear he was referring only to violence by incarcerated people.

325.     On information and belief, Defendant Annucci has never made a similar commitment to have DOCCS "do everything within its power to keep everyone safe from assault" *by staff*.

326.     Further, it was reported that Mr. Annucci issued an April 21, 2022 memorandum in which he ordered guards to illegally shackle incarcerated persons to desks for hours during out-of-cell time.[3]

327.     Mr. Annucci enacted this prophylactic policy supposedly due to an "escalation of violence" that he said "is very concerning and will not be tolerated."

328.     The initiative was done because, according to Mr. Annucci, he "will do whatever is in [his] power to protect each and every individual in a facility."

329.     On information and belief, Defendant Annucci has never issued a publicly available memorandum regarding the epidemic of unprovoked staff violence and cover ups, nor has he so strongly suggested that such "will not be tolerated."

330.     **Fourth**, Defendant Annucci has provided insufficient training, guidance, and discipline as to both the use of excessive force and the truthful reporting of the same to supervisors.

331.     The sheer number of instances of excessive force and cover ups occurring in DOCCS facilities itself demonstrates that whatever training, guidance, or discipline is taking place (and that the CO Defendants received) is insufficient to curtail abuses like those faced by Mr. Virgil.

332.     On information and belief, Defendant Annucci has instituted almost no training or direction on how to properly fill out use of force (and similar) reports, and the consequences to officers in failing to be truthful in those reports.

333.     For example, the version of Directive 4944 that, on information and belief, was operative at the time of Defendant Finn's attack on Mr. Virgil, which is provided to COs to instruct

---

[3] https://www.nysfocus.com/2022/11/07/anthony-annucci-new-york-prison-shackling/

them on the policies available on the use of force, has a section devoted to filling out use of force reports but never even suggests that they should be filled out accurately, nor does it warn of the consequences of not doing so, including that reporting inaccuracies could be a federal crime. *See* 18 U.S.C. § 1519; *U.S. v. Scott*, 979 F.3d 986 (2d Cir. 2020).

334.   On information and belief, DOCCS COs are rarely, if ever, punished for filing false use of force (and similar) reports. Consequently, COs—like the CO Defendants—feel free to engage in violent activity against incarcerated people—like Mr. Virgil—without fear of getting caught or discovered.

335.   *Fifth*, Defendant Annucci has fiercely resisted efforts to allow excessive force claims to be made public, which has contributed to the policy, practice, and custom of shielding COs from accountability for excessive force and cover up claims. This in turn further emboldens COs to commit attacks just like the attack on Mr. Virgil.

336.   For example, on information and belief, and as discussed more fully below, Defendant Annucci has specifically and unjustifiably refused to create a public dataset of COs' personnel files, as other jurisdictions have, including the City of New York, which would allow for accountability and restrict the number of excessive force instances.

337.   These jurisdictions created public misconduct databases in the aftermath of the Legislature's repeal of § 50-a, which they did following the police murder of George Floyd. Law enforcement in New York under the § 50-a regime were rarely held accountable for uses of excessive force because the statute would ensure that the facts underlying claims of excessive force would never come to light. Specifically, as explained by the Legal Aid Society, the records shielded by § 50-a

> reflect allegations of unconstitutional and unlawful conduct by numerous officers, including information suggesting the use of excessive force. . . . [The repeal of Section 50-a thus] returns to the public a much-needed means of holding officers and those trusted to supervise them accountable that has been missing for decades because of Section 50-a, which was used as a shield to prevent such information from being

publicly disclosed.

338.     As the Legal Aid Society correctly suggested, allowing disciplinary materials concerning the use of excessive force to remain hidden from public view played a direct role in allowing further instances of excessive force to happen:

> As the N.Y. legislature recognized in repealing Section 50-a, officers that ultimately engage in serious misconduct often have histories of complaints that, if known and acted upon, could have prevented the wrongdoing in the first place.

339.     When signing the bill repealing § 50-a, Governor Andrew Cuomo made clear the repeal was designed to "help stop bad actors and send a clear message that brutality, racism, and unjustified killings will not be tolerated."

340.     Following the statute's repeal, however, a group of more than 100 civil and human rights organizations, community-based groups, public defenders and others petitioned Governor Cuomo and Defendant Annucci to create a public misconduct database for DOCCS COs.

341.     Although the City of New York created such a public misconduct database for police officers, on information and belief, DOCCS, under the charge of Defendant Annucci, did not (and has not).

342.     DOCCS' practice of resisting efforts for excessive force instances being made public was made manifest in this specific case.  As alleged above, DOCCS fought aggressively to keep the video evidence of the attack on Mr. Virgil away from both the public and from Mr. Virgil.

343.     The effect of Defendant Annucci's foregoing policies is that COs—like the CO Defendants here—have confidence that they can commit unconstitutional assaults against incarcerated people like Mr. Virgil with relative impunity.

## ii.   Defendant Royce

344.     Defendant Royce, like Defendant Annucci, was personally involved in the attack on Mr. Virgil because, among other things, *see supra* at ¶¶ 158-186, he also created the policies,

practices, and customs under which Defendant Finn's attack occurred, and he allowed the continuance of such policies, practices, and customs to persist.

345.   Defendant Royce has been deliberately indifferent to the precise type of unconstitutional attack that Mr. Virgil faced, *i.e.*, Defendant Royce had actual knowledge of the risk of excessive force inflicted on incarcerated people—exacerbated by his acquiescence in their false cover ups of excessive force instances—and he decided to disregard that risk.  Defendant Royce had policymaking authority for Green Haven, and after plain notice of the unconstitutional practice of excessive force instances, he allowed it to continue.

346.   The foregoing is demonstrated in a number of ways.

347.   ***First***, as Green Haven's Superintendent, Defendant Royce was the head of Green Haven and its principal policymaker.  As a previous Green Haven Superintendent testified, the Superintendent oversees "all aspects of the facility operation through [his] staff" and has broad authority over all day-to-day operations of Green Haven.  *Stephens v. Venetozzi*, No. 13-cv-5779 (S.D.N.Y. Dec. 20, 2018), Dkt. No. 305-3 at 21.  These responsibilities include training and discipline with respect to the use of force and the reporting of same.  On information and belief, Defendant Royce had those responsibilities at all relevant times.

348.   ***Second***, Defendant Royce was on notice of the massive number of instances of excessive force and coverups that were taking place in Green Haven, and that were a firm part of the facility's culture, custom, and practice.

349.   As noted above, under Defendant Royce's tenure, DOCCS officers have been required to pay out substantial money damages in lawsuits regarding excessive force and excessive force cover ups by Green Haven COs, and Defendant Royce has himself been served in many of these lawsuits in his individual capacity.

350.     On information and belief, Defendant Royce was specifically aware of the CANY Report which documented egregious abuse of incarcerated people by Green Haven staff.  In fact, former Green Haven Superintendent William Lee testified that he was aware of the CANY Report at least by April 2018.

351.     Further, as explained below, pursuant to DOCCS Directive 4040, a facility's Superintendent such as Defendant Royce is intimately involved in the Inmate Grievance Procedure, meaning that Defendant Royce is (or should be) aware of each instance of excessive force that is grieved by a Green Haven incarcerated person and is also aware of the officer reports that are submitted in connection with those grievances.

352.     To start, pursuant to Directive 4040, the "Superintendent is responsible to ensure the . . . maintenance of grievance records.  Complete grievance records must include the original grievance, response from each level of review, the investigation, referenced documentation, and verification of implementation, when appropriate."  Directive 4040 § 701.6(k)(2).

353.     Further, Directive 4040 creates a special procedure for claims of harassment—such as excessive force claims—which involve additional and more expedient involvement of the Superintendent. *Id.* § 701.8(c).

354.     In connection with a harassment grievance, "[a]ll documents submitted with the allegation must be forwarded to the Superintendent by close of business that day." *Id.* § 701.8(b). The Superintendent must then "promptly determine whether the grievance, if true, would represent a bona fide case of harassment," and if so, it must either initiate an in-house investigation or potentially request an investigation by DOCCS's Office of Special Investigations or the New York police. *Id.* § 701.8(c)–(d).  Then "[w]ithin 25 calendar days of receipt of the grievance, the Superintendent will render a decision on the grievance and transmit said decision, with reasons stated to the grievant, the

grievance clerk, and any direct party of interest." *Id.* § 701.8(f).

355.    The Superintendent is also deeply involved in the generalized grievance procedure.

356.    At the first step of the procedure, the DOCCS Inmate Grievance Resolution Committee ("IGRC") makes recommendations directly to the Superintendent. *Id.* § 701.5(b)(2)(i). Moreover, any decision by the IGRC which would require "changes in institutional or Departmental policy" is one that "require[s] Superintendent or Central Office action" and "shall be written in the form of recommendations and referred to the Superintendent." *Id.* § 701.5(b)(3). Further, "[a]ny matter on which the committee cannot reach a decision by majority vote shall also be referred to the Superintendent for action and response." *Id.*

357.    The second step of the grievance procedure then involves a direct "appeal to the Superintendent." *Id.* § 701.5(c). In connection with those appeals, the Superintendent receives "the grievance papers and all relevant supplemental data." *Id.* § 701.5(c)(2). The Superintendent is then required to issue a decision on any such appeal within 20 days of its receipt. *Id.* § 701.5(c)(3).

358.    Finally, at the third and final step, the central office review committee issues a decision within 30 days which is transmitted to the Superintendent. *Id.* § 701.5(d).

359.    Because incarcerated people are required to exhaust the IGP before filing suit, Defendant Royce must have been aware of each of the instances of excessive force that occurred under his tenure that are identified above (and others), and he must also have been aware of the earlier grievance filed against Defendant Finn by Carlos Garcia. *See supra* at ¶¶ 176-79.

360.    Defendant Royce carried out each of the above responsibilities in connection with Mr. Virgil's grievance procedure that followed the March 19, 2020 incident.

361.    ***Third***, despite the foregoing, Defendant Royce failed to implement efforts to mitigate the risk that its officers would use excessive force and lie to cover it up. The sheer number of instances

of excessive force and cover ups occurring in Green Haven itself demonstrates that whatever training, guidance, or discipline is taking place (and that the CO Defendants received) is insufficient to curtail abuses like those faced by Mr. Virgil and makes clear that DOCCS COs (like the CO Defendants here) feel emboldened to use excessive force and to submit false reports to their supervisors to cover up that unconstitutional conduct and allow it to occur in the future.

362.    Further, in a previous litigation, former Green Haven Superintendent Lee testified that he never organized an officer training course addressing violence by staff members against incarcerated people. *See Stephens v. Venetozzi, et al.*, No. 13-cv-5779 (S.D.N.Y. Dec. 20, 2018), Dkt. No. 305-3 at 21.   On information and belief, Defendant Royce likewise never organized such an officer training course.

363.    On information and belief, Defendant Royce has instituted no training on how to properly fill out use of force (and similar) reports, and the consequences to officers in failing to be truthful in those reports.

**VII.    Mr. Virgil Exhausted His Administrative Remedies**

364.    Mr. Virgil filed three timely grievances as to the March 19, 2020 incident.

365.    On March 22, 2020, Mr. Virgil filed a grievance describing the assault and asked "to be free from retaliatory beatings/excessive use of force and to be monetarily compensated for my pain and suffering/permanent scarring to my face/eyebrow forehead and neck."   The March 22, 2020 grievance was assigned a grievance log number of GH 0290-20.

366.    On March 28, 2020, Mr. Virgil filed a second grievance that also described the assault and asked "to be given prompt and adequate dental care."   The March 28, 2020 grievance was consolidated with grievance log number GH 0290-20.

367.    On March 29, 2020, Mr. Virgil filed a third grievance in connection with the assault asking that he "be given adequate medical treatment."   The March 29, 2020 grievance was

consolidated with grievance log number GH 0290-20.

368.    On April 4, 2020, Mr. Virgil was interviewed as to the consolidated grievances.

369.    On April 28, 2020, Defendant Royce made a determination on Mr. Virgil's consolidated grievance, suggesting that Mr. Virgil had received adequate dental and medical care, and that, as to the underlying assault, "The Officer named in this complaint (CO F.) is not available at this time and a statement will be obtained when he returns.  Furthermore, the allegations referenced by the grievant are under review by the Department Office of Special Investigations."  The decision concluded by stating:  "Grievance is denied only to the extent noted above."

370.    On April 30, 2020, Mr. Virgil appealed the April 28, 2020 determination to the Central Office Review Committee ("CORC").

371.    On July 23, 2020, CORC rendered its final decision on the combined appeal.  Noting the "Title of Grievance" as "Assault by Staff/Not Provided Medical or Dental [Care]," CORC determined that Mr. Virgil's request was "unanimously accepted in part."

372.    Mr. Virgil has thus timely exhausted all administrative remedies available to him.

## CAUSES OF ACTION

### COUNT I

**Prohibition Against Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the U.S. Constitution; Excessive Force**

**(Brought pursuant to 42 U.S.C. § 1983 against Defendant Finn)**

373.    Mr. Virgil repeats each allegation above as if set forth herein.

374.    At all relevant times, Defendant Finn acted under color of state law.

375.    At all times during the March 19, 2020 incident, Mr. Virgil was non-violent and non-resistant; he posed no threat to Defendant Finn, especially because he was restrained in handcuffs.

376.    Nevertheless, Defendant Finn physically assaulted Mr. Virgil, by slamming his head

multiple times against a wall and iron bars and letting him fall to the ground.

377.     The degree of force that Defendant Finn used was starkly disproportionate to the security risk that Mr. Virgil posed (none) and was objectively unreasonable in light of the facts and circumstances confronting Mr. Virgil.

378.     Defendant Finn's attack on Mr. Virgil served no legitimate penological or government interest and was intended to injure Mr. Virgil.

379.     Following the attack, Defendant Finn, in conjunction with fellow officers, submitted false reports to his supervisors, demonstrating among other things, his consciousness of guilt.

380.     Defendant Finn's attack on Mr. Virgil caused Mr. Virgil substantial physical injuries.

381.     Defendant Finn thus deprived Mr. Virgil of the rights, privileges, or immunities that are guaranteed to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

## COUNT II

**Prohibition Against Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the U.S. Constitution; Failure to Intervene**

**(Brought pursuant to 42 U.S.C. § 1983 against the Defendants Langdon, Costantini, and John Does #1-8)**

382.     Mr. Virgil repeats each allegation above as if set forth herein.

383.     At all relevant times, Defendants Langdon, Costantini, and John Does #1-8 acted under color of state law.

384.     As alleged above, by way of his conduct on March 19, 2020, Defendant Finn deprived Mr. Virgil of the rights, privileges, or immunities that are guaranteed to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

385.     Defendants Langdon, Costantini, and John Does #1-8 each had a legal duty to intervene to prevent the use of excessive force by a fellow officer, Defendant Finn.

386.     Defendants Langdon, Costantini, and John Does #1-8 each had a reasonable

opportunity to intervene.

387.    Defendants Langdon, Costantini, and John Does #1-8 each failed to intervene.

388.    Following the attack, Defendants Finn, Langdon, Costantini and others submitted false reports to their supervisors, demonstrating among other things, their consciousness of guilt.

389.    The failure to intervene by each of Defendants Langdon, Costantini, and John Does #1-8 caused Mr. Virgil substantial physical injuries.

390.    By way of the foregoing, Defendants Langdon, Costantini, and John Does #1-8 each deprived Mr. Virgil of the rights, privileges, or immunities that are guaranteed to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

## COUNT III

**Prohibition Against Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the U.S. Constitution; Failure to Train/Discipline/Supervise**

**(Brought pursuant to 42 U.S.C. § 1983 against Defendants Annucci, Royce, and John Doe #9)**

391.    Mr. Virgil repeats each allegation above as if set forth herein.

392.    At all relevant times, Defendants Annucci, Royce, and John Doe #9 acted under color of state law.

393.    As alleged above, by way of their conduct on March 19, 2020, Defendants Finn, Langdon, Costantini, and John Does #1-8 each deprived Mr. Virgil of the rights, privileges, or immunities that are guaranteed to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

394.    Defendants Annucci, Royce, and/or John Doe #9 were responsible for allowing Defendant Finn to work (and/or ordering him to work) as a CO at Green Haven on March 19, 2020, despite the fact that they knew, should have known, recklessly disregarded, and were deliberately indifferent to the fact that Defendant Finn at that time specifically posed an unacceptable risk of using

unjustified excessive force against incarcerated people.

395.    Defendants Annucci and Royce were aware that DOCCS COs, including those at Green Haven, were repeatedly accused, charged, and criminally convicted of using excessive force against incarcerated people and submitting false reports to cover up that excessive force.

396.    Defendants Annucci and Royce were directly and personally responsible for the safety of incarcerated people at Green Haven, including Mr. Virgil.

397.    Defendants Annucci and Royce failed to implement and enforce policies and practices to protect incarcerated people at Green Haven from the use of excessive force by corrections officers, including policies and practices as to training, discipline, and supervision.

398.    Defendants Annucci and Royce created a custom and policy, through their actions and failure to act, in which DOCCS staff regularly submitted false reports concerning the use of force.

399.    Defendants Annucci and Royce were deliberately indifferent to a serious risk to the safety of incarcerated people at the hands of corrections officers.

400.    The foregoing conduct of Defendants Annucci, Royce, and/or John Doe #9 led to the assault of Mr. Virgil, and Defendants Annucci, Royce, and/or John Doe #9 were personally involved in that assault.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Virgil prays for relief and demands judgment in his favor on each of his claims against Defendants as follows:

(a)    Declaring and adjudging that Defendants' acts alleged herein violated Mr. Virgil's rights under the Constitution and laws of the United States;

(b)    Entering judgment in favor of Mr. Virgil and order that Mr. Virgil shall recover (i) compensatory damages against each of the Defendants, jointly and severally, to

compensate Mr. Virgil for his past, present, and future pain, suffering, and other hardships arising from the Defendants' conduct; and (ii) punitive damages against each of the Defendants;

(c)     Entering injunctive relief sufficient to deter future attacks in DOCCS facilities;

(d)     Awarding Mr. Virgil the costs of the suit herein, including but not limited to attorney's fees pursuant to 42 U.S.C. § 1988;

(e)     Granting such other and further relief as the Court deems just and proper.


Dated: New York, New York
       March 24, 2023

By:    */s/ Benjamin D. White*
        Benjamin D. White

**BLOCH & WHITE LLP**
Michael L. Bloch, Esq.
Benjamin D. White, Esq.
Cristina Alvarez, Esq.
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 901-3825
mbloch@blochwhite.com
bwhite@blochwhite.com
calvarez@blochwhite.com

**PRISONERS LEGAL SERVICES OF NEW YORK**
James Bogin, Esq.
Madison Levin, Esq.
41 State Street, Suite M112
Albany, NY 12207
(518) 438-8046
jbogin@plsny.org
mlevin@plsny.org

*Attorneys for Plaintiff*