**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MELVIN L. VIRGIL

              *Plaintiff,*

    v.

AARON FINN, Corrections Officer,
ALEXANDER COSTANTINI, Corrections
Officer, PHILIP LANGDON, Corrections Officer,
JOHN DOE 1-8, Corrections Officers,
ANTHONY J. ANNUCCI, Acting Commissioner
of the New York State Department of Corrections
and Community Supervision,
MARK ROYCE, Former Superintendent of Green
Haven Correctional Facility,
JOHN DOE 9, supervising employee of DOCCS,
in their individual capacities,

              *Defendants*.

Case No. 7:22-cv-3169 (CS)(JMC)

**PLAINTIFF MELVIN VIRGIL'S MEMORANDUM OF LAW IN**
**OPPOSITION TO SUPERVISORY DEFENDANTS' MOTION TO DISMISS**

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT .......................................................................................................................... 6

I.   Mr. Virgil Stated His Direct Participation Claims and the DOCCS Defendants Are Not
     Entitled to Qualified Immunity ..................................................................................... 7

     A.   Mr. Virgil Pled That Mr. Finn Posed an Objectively Unreasonable Risk of Serious Harm
          to the Population at Green Haven on March 19, 2020 ...................................................... 7

     B.   Mr. Virgil Alleged That the DOCCS Defendants Were Deliberately Indifferent to the
          Risks Posed by Defendant Finn ................................................................................... 10

II.  Mr. Virgil Stated His Policymaker Claims .......................................................................... 14

     A.   The DOCCS Defendants' Arguments That Mr. Virgil Did Not Allege a "Specific
          Policy," "Unique Practice," or "Specific Custom," Are Irrelevant and/or Incorrect ..... 16

     B.   Mr. Virgil Alleged that the DOCCS Defendants Were Aware of These Specific
          Unconstitutional Policies, Practices, and Customs ....................................................... 20

CONCLUSION ....................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) .............................................. 16

*Brunache v. Annucci*, 2023 WL 146850 (W.D.N.Y. Jan. 9, 2023) ................................................ 16

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) ...................................................................... 14, 16

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) .................................................................. 14

*Farmer v. Brennan*, 511 U.S. 825 (1994) .............................................................................. 6, 14

*Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y.) .............................................................................. 13

*Harrison v. Broderick*, 2022 WL 16837366 (W.D.N.Y. Aug. 18, 2022) ....................................... 12

*Jok v. City of Burlington, Vt.*, 2022 WL 444361 (D. Vt. Feb. 14, 2022) ................................ 16, 20

*Jordan v. Department of Correction*, 2023 WL 2503376 (D. Conn. Mar. 13, 2023) ................... 20

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ....................................... 11

*King v. Simpson*, 189 F.3d 284 (2d Cir. 1999) ............................................................................ 14

*Magalios v. Peralta*, 2022 WL 407403 (S.D.N.Y. Feb. 10, 2022) ................................................ 25

*Meli v. City of Burlington, Vt.*, 585 F. Supp. 3d 615 (D. Vt. 2022) ................................. 17, 18, 20

*Myers on behalf of Estate of Myers v. Davenport*,
   2022 WL 3017367 (N.D.N.Y. July 29, 2022) ........................................................................ 20

*Pearson v. Annucci*, 2023 WL 2537722 (N.D.N.Y. Mar. 16, 2023) ............................................. 20

*Poulos v. Annucci*, 2019 WL 6311012 (N.D.N.Y. Nov. 25, 2019) ....................................... passim

*Sanchez v. Nassau County*, 2023 WL 2457855 (E.D.N.Y. Mar. 11, 2023) ................................... 20

*Stone #1 v. Annucci*, 2021 WL 4463033 (S.D.N.Y. Sept. 28, 2021) ..................................... passim

*Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020) ..................................................................... 14

## PRELIMINARY STATEMENT

Over hundreds of paragraphs of detailed allegations, Plaintiff Melvin Virgil extensively documented how Defendants Anthony J. Annucci and Mark Royce (the "DOCCS Defendants") are responsible for the horrific assault he faced at the hands of Defendant Aaron Finn at Green Haven Correctional Facility on March 19, 2020.  The DOCCS Defendants move to dismiss Mr. Virgil's claims against them at the pleadings stage, but their arguments either dispute well-pled facts or ignore wide categories of allegations altogether.  At bottom, the DOCCS Defendants proffer as their core argument that Mr. Virgil failed to allege that either of them had "personal involvement" in the assault of Mr. Virgil.  But no faithful reading of Mr. Virgil's complaint can lead to that conclusion.  The DOCCS Defendants' motion should be denied.

Mr. Virgil meticulously documents two separate theories of deliberate indifference liability as to the DOCCS Defendants: (i) direct liability claims; and (ii) policymaker claims.

***Direct Liability Claims.*** Mr. Virgil alleged that, on March 19, 2020, the DOCCS Defendants knew Defendant Finn was a "powder keg particularly susceptible to using excessive force."  Defendant Finn was at the time in the throes of a traumatic psychological injury stemming from a workplace incident that rendered him prone to unprovoked violence.  What's more, he had a history of specifically using unprovoked violence even when he wasn't facing trauma.  Mr. Virgil alleged that the DOCCS Defendants knew of these twin risks and were deliberately indifferent to them when they ordered Defendant Finn to work that day.  The DOCCS Defendants argue that Mr. Virgil misstates the facts.  They say that he overstates these risks and that they did not know about them regardless.  But their say-so contradicts Mr. Virgil's well-pled allegations.

***Policymaker Claims***.  Mr. Virgil alleged that the DOCCS Defendants have overseen a widespread practice of unconstitutional assaults by guards, swept under the rug by conspiratorial

1

after-the-fact coverups—*i.e.*, exactly what happened here—*and* that they specifically knew about these unconstitutional practices yet have done virtually nothing to stop them.  These allegations support a policymaker liability claim under the Eighth Amendment.

In seeking an early, pleadings-stage dismissal of these claims, the DOCCS Defendants raise two principal arguments, but they are easily refuted.  *First*, although the DOCCS Defendants seem to acknowledge the widespread and consistent unconstitutional use of force by guards, they at the same time argue that Mr. Virgil failed to allege that the DOCCS Defendants knew about it.  That is abjectly false.  Even without the benefit of discovery, Mr. Virgil alleged in damning detail how both of the DOCCS Defendants were aware of a lengthy and consistent history of corrections officers' use of unconstitutional and unprovoked force against incarcerated persons.  Several reports and investigations—from the Correctional Association of New York, the Marshall Project, the New York Times, and the U.S. Attorney's Office for the Southern District of New York—had been ringing the alarm bells for years.  There was a "culture of brutality" inside DOCCS facilities and the "excessive use of force in prisons . . . has reached crisis proportions," they said.  The DOCCS Defendant knew about all of these investigations and reports.  Further, dozens of litigations had held corrections officers liable—both civilly and criminally—for using excessive force and/or lying to cover it up.  And most notably, Defendant Annucci himself acknowledged publicly that "substantial changes" were needed to curb the use of unconstitutional force.

*Next*, the DOCCS Defendants argue Mr. Virgil did not allege a "specific policy" or "unique practice or specific custom" that is unconstitutional.  Of course he did.  He meticulously documented the specific practices and customs for which the DOCCS Defendants were responsible and that directly led to his assault.  These include not just the horrific and customary regularity

with which officers engage in the use of unjustified force, but a failure to train and to discipline as to the use of force, the reporting of the use of force, and the use of body worn cameras.

*     *     *

For the avoidance of doubt, each system-wide failure detailed in the complaint played out paradigmatically in this case.   Under the DOCCS Defendants' policies, practices, and customs, Defendant Finn felt emboldened to commit a sustained assault against a handcuffed and compliant incarcerated person in broad daylight, in the open, and surrounded by other guards.   Defendants Costantini and Langdon casually stood by and felt no compulsion to stop it.   Defendant Langdon even felt comfortable enough to shut off his camera amidst the assault.   Each of Defendant Finn, Costantini, and Langdon (and many other officers) had no qualms conspiring together to manufacture an entirely false story and then relaying those lies repeatedly and consistently in official reports.   And, shockingly, not a single one of those officers was disciplined for their filing of false reports.

In sum, the horrific facts of this case are the paradigmatic sequence of events that the DOCCS Defendants have knowingly let happen, time and again, without making any meaningful changes.   The DOCCS Defendants' failure to address the problem of unconstitutional force directly caused Mr. Virgil's attack, and they should be held responsible.

## STATEMENT OF FACTS

On March 19, 2020, Mr. Virgil was attacked by Defendant Aaron Finn, a Green Haven corrections officer with a history of using unjustified force against defenseless incarcerated persons and who was suffering from psychological trauma following a recent workplace incident that made him particularly susceptible to unprovoked violence.   SAC ¶¶ 21-78, 169-88, 208-17.   Without provocation, Defendant Finn pepper sprayed Mr. Virgil, handcuffed him, and then repeatedly bashed his head and body at first into a cement wall and then steel bars.   SAC ¶¶ 32-60.   Defendants

3

Costantini and Langdon were adjacent to Defendant Finn and did almost nothing to stop it, even though they easily could have.  SAC ¶¶ 42-58.  Defendant Langdon purposefully turned off his body worn camera amidst the assault.  SAC ¶ 53.  Each of Defendants Finn, Costantini, and Langdon (and several other officers) submitted false official reports after the incident, falsely yet consistently claiming that Mr. Virgil was the aggressor, that Defendant Finn only struck Mr. Virgil once, and that Defendant Finn's use of force was justified.  SAC ¶¶ 98-134.  Defendant Langdon admitted in a sworn statement in this case that his reports were not accurate.  White Decl. ¶ 3.  Defendant Finn was criminally charged for his conduct, pled guilty to civil rights violations, and served time in prison.  SAC ¶¶ 159-68.  Neither Defendants Costantini nor Langdon, nor any other officers besides Defendant Finn, were in any way disciplined in connection with the assault, either for their failure to intervene or for their filing of false reports.  SAC ¶¶ 134, 150-58.

At the time of the assault, Defendant Anthony J. Annucci was the Acting Commissioner of DOCCS and Defendant Mark Royce was the Superintendent of Green Haven.  SAC ¶ 8, 18-19.  Defendant Annucci set the policies, practices, and procedures for all of DOCCS' facilities, and Defendant Royce did so for Green Haven.  SAC ¶¶ 309, 347.  The DOCCS Defendants were made aware through various sources of an epidemic of corrections officers' use of unconstitutional unjustified force against incarcerated persons.  In 2013, Defendant Annucci was briefed on a report by the Correctional Association of New York ("CANY"), which documented horrific unjustified abuses at Green Haven.  SAC ¶¶ 229-237, 251, 316.  Defendant Royce knew about that report too.  SAC ¶ 350.  The DOCCS Defendants also knew that corrections officers in their charge had consistently faced civil and criminal liability for using unconstitutional force and lying to cover it up.  SAC ¶¶ 314, 349.  Dozens of examples are documented in Mr. Virgil's complaint.  SAC ¶¶ 263-301.  The Marshall Project and the New York Times commissioned a lengthy investigation

between 2015-16 that documented a "culture of brutality" in DOCCS facilities.  SAC ¶¶ 238-256. The investigators asked Defendant Annucci to participate, but he refused.  SAC ¶ 255.  In 2016, then-U.S. Attorney Preet Bharara held a press conference announcing the indictment of five officers at Downstate Correctional Facility who brutally assaulted an incarcerated person and launched an "elaborate cover up" to hide their misconduct.  SAC ¶¶ 257-60.  In announcing the charges, Mr. Bharara stated that the problem of the unconstitutional use of force "has reached crisis proportions in New York State" and that drastic changes were required.  SAC ¶ 260.  Defendant Annucci was with Mr. Bharara at that press conference as he made those statements.  SAC ¶ 261. Later, following the indictment, Defendant Annucci acknowledged that "substantial changes" were needed to curb the problem of the unconstitutional use of force in DOCCS facilities.  SAC ¶¶ 245, 318-19.   Despite all of the foregoing, the DOCCS Defendants instituted almost no meaningful policy changes in advance of March 19, 2020.  SAC ¶¶ 305-363.

During the prosecution of Defendant Finn, additional facts were revealed that created more reason to hold the DOCCS Defendants responsible for his attack.  Specifically, in connection with his sentencing, Defendant Finn revealed that he had been suffering from psychological trauma at the time of his assault of Mr. Virgil.  SAC ¶ 169.  He reported that his trauma was triggered by a horrific violent incident involving himself and another incarcerated person that took place in October 2019.  SAC ¶ 170.  Defendant Finn had been stabbed several times and was later hospitalized.  SAC ¶ 170.  He felt like his colleagues had failed to protect him.  SAC ¶ 181. Defendant Finn and his colleagues specifically suggested that the attack on Mr. Virgil was a direct consequence of the psychological trauma he faced stemming from the October 2019 incident.  SAC ¶¶ 172-87.  He reported that when he attacked Mr. Virgil, he was "more vulnerable to impulse control difficulties and aggressive behavior" because of his trauma.  SAC ¶¶ 172-73.  Letters filed

by his fellow Green Haven corrections officers (and others) in support of his sentencing submission made clear that Defendant Finn's vulnerable mental state was obvious to them—they said, among other things, that he seemed "withdrawn," "on edge," and "acted like everyone wanted to harm him." SAC ¶¶ 175-87. Each of these witnesses reported that they felt Defendant Finn was ordered back to work dangerously too soon. SAC ¶¶ 176-77, 179, 181-83, 185-87.

The DOCCS Defendants knew about the October 2019 incident and its consequences. They spoke to Defendant Finn soon after and "assur[ed] him that they would make sure he was 'taken care of.'" SAC ¶¶ 185. They nonetheless ordered him back to work without even ordering a psychological evaluation, likely due to staff shortages. SAC ¶¶ 177, 181-82, 185-87.

In addition to the risk that Defendant Finn posed due to his psychologically vulnerable state, the DOCCS Defendants also knew of Defendant Finn's history of using excessive force against incarcerated persons. SAC ¶¶ 208-217. On at least two prior occasions, Defendant Finn was accused of using such force in a manner eerily similar to the type of force he used against Mr. Virgil. SAC ¶¶ 208-09, 212-216. In 2015, Defendant Finn was accused of ramming a handcuffed individual's head into a brick wall. SAC ¶¶ 208-09. For this incident, Defendant Finn was sued in federal court in 2018, a lawsuit that he settled in 2022. SAC ¶ 268. On another occasion in 2015, when an incarcerated person corrected Defendant Finn's pronunciation of his name, Defendant Finn said "you need to shut your fucking mouth and stop being such a pussy about your name," and grabbed him by the waist and threw him to the floor. SAC ¶ 212-14.

## ARGUMENT

An incarcerated person states an Eighth Amendment deliberate indifference claim where he alleges that: (i) he faced an objectively unreasonable risk of harm; and (ii) the defendants acted with deliberate indifference to that risk. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As the

DOCCS Defendants acknowledge, Mr. Virgil's complaint proceeds on two general theories of deliberate indifference liability against them: (i) deliberate indifference to the specific and unreasonable risk posed by Defendant Finn on March 19, 2020 ("Direct Participation Claims"); and (ii) deliberate indifference to the risk to Mr. Virgil of unconstitutional policies, practices, or customs that they knowingly created or allowed to continue ("Policymaker Claims").  In their motion, the DOCCS Defendants attack each theory.  *First*, they attack the Direct Participation Claims by arguing that Mr. Virgil failed to allege that, as a factual matter, the DOCCS Defendants were deliberately indifferent to a specific risk posed by Defendant Finn (and are separately entitled to qualified immunity as to these claims).  *Second*, they attack the Policymaker Claims on the grounds that Mr. Virgil supposedly did not allege (i) a "specific policy," a "unique practice," or a "specific custom" as to which the DOCCS Defendants were deliberately indifferent, and (ii) that the DOCCS Defendants were aware of (and thus deliberately indifferent to) any such unconstitutional policy, practice, or custom.  None of these arguments has any merit.

## I.   Mr. Virgil Stated His Direct Participation Claims and the DOCCS Defendants Are Not Entitled to Qualified Immunity

Mr. Virgil alleged that the DOCCS Defendants were aware of an objectively unreasonable risk Defendant Finn posed to the Green Haven population on March 19, 2020, and that they were deliberately indifferent to that risk and sent him to work nonetheless.  In arguing for dismissal, the DOCCS Defendants effectively argue that Mr. Virgil's story is implausible as a factual matter.  The Court should reject that argument.

### A.  Mr. Virgil Pled That Defendant Finn Posed an Objectively Unreasonable Risk of Serious Harm to the Population at Green Haven on March 19, 2020

In his complaint, Mr. Virgil alleged that the confluence of two factors rendered Defendant Finn an unacceptable risk to be around incarcerated persons on March 19, 2020: (i) he was

suffering from an obvious psychological injury stemming from an October 2019 violent workplace incident that rendered him prone to unjustified and unprovoked violence; and (ii) he had a history of unjustified and unprovoked violence against incarcerated persons.

The DOCCS Defendants argue that neither of these risks were independently sufficient to render Defendant Finn too risky to work on March 19, 2020.  Specifically, they argue Defendant Finn's psychological injury in Point I, and they argue Defendant's Finn's excessive force history in Point II.  *See* Dkt. No. 83 at 4-8.  But they err in considering each issue in isolation.  *See, e.g.*, *Poulos v. Annucci*, 2019 WL 6311012, at *8 (N.D.N.Y. Nov. 25, 2019) (in assessing the level of risk in a deliberate indifference claim, looking to "the totality of the allegations," "taken together, as they must be").  Although these risks were independently serious, they also were overlapping and reinforcing, and together they posed a serious and unreasonable risk of harm to Mr. Virgil.  *See* SAC ¶¶ 190, 207.  Stated differently, Defendant Finn's mental state, *i.e.*, that he was  "susceptible to impulse control difficulties and aggressive behavior," was exponentially more precarious given that he had a history of unprovoked aggression against incarcerated persons.  The two issues cannot only be viewed in isolation, and the DOCCS Defendants' effort to do so is in error.

Regardless, the DOCCS Defendants' attacks as to each risk are insufficient because they simply dispute the truth of the alleged facts.  For example, the DOCCS Defendants argue that, at the time Defendant Finn returned to work from his traumatic workplace episode, he was not "so objectively unstable" that he posed an unreasonable risk to the safety of the Green Haven population.  Dkt. No. 83 at 5.  But Mr. Virgil's complaint alleges that he was.  And it does so with specific factual allegations.  As reported by Dr. Elliot B. Rosenbaum—a psychologist who evaluated Defendant Finn and confirmed his diagnosis—Defendant Finn's symptoms "rendered him more vulnerable to impulse control difficulties and aggressive behavior" when he attacked

Mr. Virgil.  SAC ¶¶ 171-173.  Specifically, Dr. Rosenbaum reported: "When taking into account the relevant literature on PTSD and the available information regarding [the attack], it is my opinion that the events on March 2020 likely served as a trigger for the re-experiencing/intrusive symptoms and dissociative reactions caused by the traumatic nature of the prior stabbing incident." SAC ¶ 173.  Further, Mr. Virgil alleged that five other individuals, including three Green Haven corrections officers, noticed a drastic change in Defendant Finn's psychological state following the October 2019 incident and that he returned to work dangerously early.  SAC ¶¶ 177-184; SAC ¶ 177 (CO Robert Faby stating that Defendant Finn was brought back to work "too soon"); SAC ¶ 182 (CO Ryan Lieberman stating that Defendant Finn was "withdrawn" and "quiet," and that he "returned to work after that incident but to many of us it seemed too soon after enduring such a traumatic experience"); SAC ¶ 183-84 (CO Katrina Eicher also expressing that Defendant Finn had returned to work "too soon" and that Defendant Finn was "on edge" and "acted like everyone wanted to harm him").  Taken together, Mr. Virgil has not just plausibly alleged that Defendant Finn was "objectively unstable," but that he was obviously so.

The DOCCS Defendants dispute that Defendant Finn was intolerably unstable on March 19, 2020 by focusing on the timing of Defendant Finn's PTSD *diagnosis*.  They note that Defendant Finn did not receive his diagnosis until *after* the attack on Mr. Virgil.  Dkt. No. 83 at 5.  Thus, they suggest, there is no evidence Defendant Finn posed any danger when he attacked Mr. Virgil.  That is a red herring.  Although Defendant Finn may have been formally *diagnosed* with PTSD only after he attacked Mr. Virgil, SAC ¶ 171, it is his *symptoms* that are relevant in assessing the risk that he posed prior to the attack.  In other words, it is fanciful to suggest that Defendant Finn's psychological trauma did not manifest itself until he received a formal diagnosis.[1]

---

[1] There is also something quite nefarious about the DOCCS Defendants' suggestion that they are not liable for the assault on Mr. Virgil because Defendant Finn only received a PTSD diagnosis after he attacked Mr. Virgil.  As Mr.

Finally, the DOCCS Defendants spill much ink arguing that Defendant Finn's two prior instances of unconstitutional force are insufficient as a matter of law "to demonstrate that Defendant Finn had a practice of using excessive force." Dkt. No. 83 at 8. They do so solely in reliance on *Poulos v. Annucci*, 2019 WL 6311012 (N.D.N.Y. Nov. 25, 2019), a case they claim "bears a striking similarity to the facts of" this case. Dkt. No. 83 at 8. But the DOCCS Defendants are wrong and their reliance on *Poulos* is simply mistaken. As addressed more fully below, *Poulos* was a *policymaker* claim, not a direct liability claim. *See id.* at *1 ("The Court notes that only the [supervisory policymaker] claim against Defendants Annucci and Miller is at issue on this motion to dismiss."). Consequently, when *Poulos* held that three lawsuits were insufficient to state a claim, it was concluding that it was insufficient to establish a *DOCCS-wide* problem, *i.e.*, to show that DOCCS policymakers had notice of "widespread instances of unconstitutional conduct." *Id.* at *7. But of course, even an individual's single previous instance of misconduct (and especially two) can be relevant to assessing that individual's future dangerousness. This is common sense and nothing the DOCCS Defendants present suggests otherwise.

## B. Mr. Virgil Alleged That the DOCCS Defendants Were Deliberately Indifferent to the Risks Posed by Defendant Finn

The DOCCS Defendants next suggest that even if Defendant Finn posed an unreasonable risk to incarcerated persons' safety on March 19, 2020, Mr. Virgil is incorrect in alleging that the DOCCS Defendants were aware of (and were deliberately indifferent to) any such risk. *See* Dkt. No. 83 at 6-8. This argument should also be rejected.

To start, there is, for good reason, a low bar for pleading an adversary's knowledge. *See Stone #1 v. Annucci*, 2021 WL 4463033, at *10 (S.D.N.Y. Sept. 28, 2021). Courts "recognize the

---

Virgil alleges, the DOCCS Defendants mandated that Defendant Finn return to work without any psychological evaluation to determine his fitness to return to work. *See* SAC ¶ 196. It is thus the DOCCS Defendants' own deliberate indifference that contributed to the delayed diagnosis of Defendant Finn's PTSD.

common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge of his intent." *Id*.  Consequently, a "complaint is allowed to contain general allegations as to a defendant's knowledge." *Id.* (quoting *Kaplan v. Lebanese Canadian Bank*, *SAL*, 999 F.3d 842, 864 (2d Cir. 2021)).  In sum, then, at the motion to dismiss stage, a plaintiff need only point to "allegations of the facts or events they claim give rise to an *inference of knowledge*. *Kaplan*, 99 F.3d at 864 (emphasis added).  Mr. Virgil has plainly done so, *i.e.*, he raises at least an inference that the DOCCS Defendants knew Defendant Finn posed an intolerable risk to the safety of incarcerated persons on March 19, 2020.

The DOCCS Defendants dispute that Mr. Virgil sufficiently alleged their knowledge of the risk posed by Defendant Finn's mental state stemming from the October 2019 incident.  Dkt. No. 83 at 6.  But the complaint provides ample basis to infer their knowledge.  For one, as noted above, five separate individuals, including three of Defendant Finn's colleagues, were able to conclude through their own observations of Defendant Finn that he posed too much of a risk to return to work so soon after the incident.  And those individuals obviously believed Defendant Finn's mental state prior to the attack was precarious enough to cause the attack to happen—indeed, the entire purpose of their sentencing submissions was to mitigate Defendant Finn's responsibility (*i.e.*, to explain that something that was not innate to Defendant Finn caused the attack).  And the DOCCS Defendants too were specifically aware of the October 2019 incident, and it is reasonable to infer they shared similar observations as did Defendant Finn's colleagues.  Indeed, when the DOCCS Defendants called Defendant Finn about the incident, they acknowledged that the incident would have ongoing repercussions.  Specifically, they "assured him that they would make sure he was 'taken care of' and other such things."  SAC ¶¶ 199, 203.  It can reasonably be inferred that the reason that the DOCCS Defendants believed Defendant Finn needed to be '"taken care of' and

other such things" was because they knew, just like the individuals who wrote sentencing letters, that there would be ongoing and potentially dangerous effects from the incident.

Further, the nature of the October 2019 incident itself is independently sufficient to infer the DOCCS Defendants' knowledge of the risk it posed to Defendant Finn.  The complaint documents in detail how the October 2019 incident was particularly traumatic and violent.  As reported by Green Haven staff, the incident involved other officers failing to assist Defendant Finn during an altercation with an incarcerated person, resulting in several stab wounds and Defendant Finn's hospitalization.  SAC ¶¶ 9, 181.  Defendant Finn was required to take several months off work while he was "on cocktail."  SAC ¶ 185.  On top of that, following the incident, Defendant Finn reported to his father-in-law that "there seemed to be some kind of political shenanigans going on around the whole incident," strongly intimating the gravity of the situation.  SAC ¶ 185. Finally, the DOCCS Defendants knew that, as a general matter, corrections officers who had suffered a serious injury could be psychologically impacted by it.  Indeed, DOCCS Directive 4944 makes clear that "[a]ny staff member who suffers an injury that is categorized as either sever [*sic*] or serious must be offered an opportunity to speak with a Critical Incident Stress Management (CISM) representative prior to returning to duty."  White Decl. Ex. A at § VI.A.[2]

The DOCCS Defendants next argue that Mr. Virgil failed to sufficiently allege that they knew of Defendant Finn's history of excessive force.  Dkt. No. 83 at 7-8.  But Mr. Virgil alleged as such as to both of the DOCCS Defendants.  SAC ¶¶ 210, 359  And the DOCCS Defendants' denials are hard to square with the fact that, at the time of the assault on Mr. Virgil, there was an *ongoing* federal civil rights litigation against Defendant Finn in connection with one of his earlier alleged uses of unjustified and unprovoked force, a case that Defendant Finn would later settle.

---

[2] *See Harrison v. Broderick*, 2022 WL 16837366, at *14 n.14 (W.D.N.Y. Aug. 18, 2022) (collecting cases for proposition that a "Court may . . . take judicial notice of DOCCS directives").

*See* SAC ¶ 268; *Garcia v. Griffin*, No. 18-cv-8761 (S.D.N.Y.).  This is especially so as to Defendant Annucci, who, by his own sworn admission, "owns everything bad" at DOCCS.  SAC ¶ 312.  Although Defendant Royce offers a factual dispute as to whether he knew about Defendant Finn's prior uses of excessive force because he only became Superintendent of Green Haven in 2019, *see* Dkt. No. 83 at 7, Mr. Virgil alleges otherwise.  SAC ¶ 359.  Again, there was pending civil rights litigation against Defendant Finn during the *entirety* of Defendant Royce's tenure as Green Haven Superintendent.   Further, Defendant Royce was heavily involved in Green Haven's Inmate Grievance Procedure and was the Superintendent who oversaw "all aspects of the facility operation through [his] staff."  SAC ¶¶ 347, 351-60.  Moreover, by his own admission, Defendant Royce was already the Superintendent at Green Haven during the October 2019 incident, during the subsequent investigation into that incident, and when Defendant Finn attacked Mr. Virgil.  The DOCCS Defendants nevertheless argue that it is "doubtful" Defendant Royce knew about Defendant Finn's previous excessive force incidents because, "[a]s the incoming superintendent in 2019, Defendant Royce would not have been obligated—nor likely able—to review every correction officer's disciplinary record and therefore unlikely to know of Defendant Finn's prior allegations."  Dkt. No. 83 at 7.  Defendant Royce's "doubt" notwithstanding, and whether or not an incoming superintendent would review the files of *all* corrections officers, it is certainly reasonable to infer that someone in Defendant Royce's (or Defendant Annucci's) position would have reviewed the files of a traumatically and obviously psychologically damaged and symptomatic corrections officer when deciding whether to send that officer back to work.  This is especially so when that corrections officer was involved in *pending* civil rights litigation accusing him of an unjustified and unprovoked attack on a handcuffed incarcerated person.

*     *     *

The DOCCS Defendants are not entitled to qualified immunity as to the Direct Participation Claims, *see* Dkt. No. 83 at 9-10, especially at this early pleading stage. *See Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003) (noting that the defense of qualified immunity rests on a factual showing of who did what and why); *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999) (noting that the qualified immunity defense is typically addressed at the summary judgment stage because it turns on specific facts of the case). The DOCCS Defendants argue that they are entitled to qualified immunity because it did not violate clearly established law to permit Defendant Finn to return to work absent a mental health evaluation. Dkt. No. 83 at 10. But it is not Mr. Virgil's claim that the DOCCS Defendants violated the law by not ordering a mental health evaluation; it is that they violated the law by allowing Defendant Finn to work amongst incarcerated persons when he posed a substantial risk of serious harm to Mr. Virgil. And it is indeed "clearly established that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the constitution." *Farmer*, 511 U.S. at 828.

## II.  Mr. Virgil Stated His Policymaker Claims

The DOCCS Defendants agree that a supervisor may be liable for constitutional injuries caused by their subordinates where the supervisor "created a policy or custom under which [the] unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Stone #1*, 2021 WL 4463033, at *6 (quoting *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)). To be sure, in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the court confirmed that a defendant must have "personal involvement" in a constitutional violation to be liable for it. But, as the DOCCS Defendants do not dispute, "personal involvement" in unconstitutional conduct for purposes of *Tangreti* is established where the *Colon* policymaker test outlined above is met, *i.e.*, where a policymaker knowingly created or continued policies, practices, or customs that led to an

unconstitutional injury.[3]  Indeed, the DOCCS Defendants concede that courts, following *Tangreti*, have denied dismissal motions where plaintiffs have alleged "specific facts from which a discernable practice or custom can be gleaned to have plausibly led to a particular plaintiff's injury."  Dkt. No. 83 at 13 (citing, *inter alia*, *Stone #1*).  Here, Mr. Virgil has alleged just that.

Over a span of nearly 30 pages, Mr. Virgil documented with extensive and meticulously supported allegations the DOCCS Defendants' "personal involvement," as policymakers, in Mr. Virgil's attack.  *See* SAC ¶¶ 225-363; 391-400.  Specifically, Mr. Virgil alleged a policy, practice, or custom that the DOCCS Defendants created or allowed to continue: DOCCS corrections officers' rampant unjustified use of force against incarcerated persons.  Mr. Virgil also alleged that the DOCCS Defendants were not just on notice of this, through a wealth of sources, but that Defendant Annucci had specifically acknowledged it.  Finally, Mr. Virgil alleged that the DOCCS Defendants were deliberately indifferent to this unconstitutional custom by doing virtually nothing to stop it, an inaction that led to the attack on Mr. Virgil.  In sum, although Mr. Virgil's policymaker claims are supported with robust detail, the claims are quite simple:  the DOCCS Defendants were aware of the intolerable prevalence of unconstitutional use of force within DOCCS facilities, they did nothing to stop it, and Mr. Virgil paid the consequences.

Despite the breadth of these allegations, the DOCCS Defendants effectively commit just two paragraphs to attacking them.  *See* Dkt. No. 83 at 14-15.  And in that cursory analysis, they offer just two arguments.  One, that Mr. Virgil was required to but somehow did not allege a "specific policy," "unique practice," or "specific custom" that was unconstitutional.  Dkt. No. 83 at 14.  And two, that although Mr. Virgil alleged a widespread problem of unconstitutional force

---

[3] As the DOCCS Defendants do not dispute, courts in this Circuit have almost uniformly concluded that the policymaker liability theory discussed in *Colon* remains viable after *Tangreti*.  *See, e.g. infra* note 6.

in DOCCS facilities, including at Green Haven, he apparently did not allege that the DOCCS

Defendants knew about the problem.  Dkt. No. 83 at 14-15.  These arguments have no merit.

### A.  The DOCCS Defendants' Arguments That Mr. Virgil Did Not Allege a "Specific Policy," "Unique Practice," or "Specific Custom," Are Irrelevant and/or Incorrect

The DOCCS Defendants' first argument is not a model of clarity but seems to be that the

policymaker claims must fail because Mr. Virgil was required to but did not allege a "specific

policy," "unique practice," or "specific custom."  Dkt. No. 83 at 14.  Neither contention has merit.

The DOCCS Defendants begin by faulting Mr. Virgil for not alleging a "specific policy"

or a "series of specific practices that led to [his] injuries," Dkt. No 83 at 14, but the argument fails

at every turn.  To start, it is simply inaccurate to suggest that policymaker liability may only attach

where the plaintiff can show that the policymaker affirmatively instituted some "discernable"

"specific policy" that led to the plaintiff's injury.   Case-after-case has concluded that a

policymaker's *inaction* in the face of a known unconstitutional practice or custom demonstrates

deliberate indifference (and thus personal involvement).  *See, e.g.*, *Stone #1*, 2021 WL 4463033,

at *8 (a policymaker is liable if he "allowed the continuance of [an unconstitutional] policy or

custom" (quoting *Colon*, 58 F.3d at 873); *Brunache v. Annucci*, 2023 WL 146850, at *12

(W.D.N.Y. Jan. 9, 2023) (a policymaker is liable for the "maintenance of a [unconstitutional] policy

or custom"); *Jok v. City of Burlington, Vt.*, 2022 WL 444361, at *12 (D. Vt. Feb. 14, 2022)

(dismissing supervisor's summary judgment motion where he "failed to act" in face of

unconstitutional practice); *see also generally Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113,

126 (2d Cir. 2004) ("[W]here a policymaking official exhibits deliberate indifference to

constitutional deprivations caused by subordinates, such that the official's inaction constitutes a

'deliberate choice,' that acquiescence may be properly thought of as a city 'policy or custom' that

is actionable under § 1983.").  Indeed, this Court has already recognized as such.  *See White Decl.*

Ex. B at 24 ("[I]f the supervisor is aware of ongoing unconstitutional policies and doesn't do anything about it, that can be personal involvement.").  This black-letter law reflects the reality that a government agency simply would never have a specific policy saying things like "Unconstitutional and Unprovoked Uses of Force are Okay," or "Lying About the Unprovoked Use of Force in Violation of Federal Law is Fine."  Rather, as addressed above, discussed further below, and as the DOCCS Defendants ultimately concede, *see* Dkt. No. 83 at 13-14, policymaker liability attaches equally to unconstitutional *practices* and *customs*.

The DOCCS Defendants seem to derive their "specific policy" argument primarily from Judge Abrams' decision denying Defendant Annucci's motion to dismiss in *Stone #1*.  *See* Dkt. No. 83 at 13.   But they misread *Stone #1*.  Although Judge Abrams ultimately assessed whether there were any specific "policies, customs, or enforcement practices within Annucci['s] areas of responsibility that [were] linked to the sexual abuse," she discussed those specifics solely with respect to her assessment of *proximate cause*, not whether the plaintiff alleged an unconstitutional practice or custom.  2021 WL 4463033, at *11.  And even though Judge Abrams was inclined to identify certain specific policies that were "linked to" the alleged unconstitutional practice or custom (the widespread occurrence of sexual abuse in DOCCS facilities), *id.*, there is no logical reason that a plaintiff is *required* to allege some specific concrete policy failure to allege the foreseeability of unconstitutional conduct.  As just stated, a policymaker's failure to act in the face of an unconstitutional custom of which he is aware is sufficient to state a policymaker claim.  In other words, certain customary violations by subordinates can be so obvious as to require a policymaker's affirmative intervention even in the absence of some failed discrete policy.

For one example, in *Meli v. City of Burlington, Vt.*, 585 F. Supp. 3d 615 (D. Vt. Feb. 14, 2022), the court allowed plaintiff's policymaker claim against Burlington's Chief of Police to

proceed past summary judgment on a factual record that showed that police officers in his charge were disproportionately using force against Black citizens.  To sustain the policymaker claim, the court relied exclusively on the Chief's "failure to act" in the face of statistics showing the disparity in the use of force as against Black citizens.  *See id.* ("A reasonable factfinder could conclude that . . . Mr. Del Pozo was on notice of the disproportionate use of force against Black citizens within the police department he supervised and despite that notice, he failed to take action.  A reasonable jury could further conclude that notice coupled with inaction constitutes deliberate indifference."). The court required nothing more.  For example, it did not require the plaintiff to show some departmental policy that made it more likely officers would use force against Black citizens.  This applies equally here.  The problem of DOCCS' corrections officers using unconstitutional force against incarcerated persons is obvious, well-documented, and not even really disputed.  As noted, investigators have referred to a "culture of brutality" inside DOCCS facilities, federal prosecutors have found there to be a "crisis of epic proportions," and Defendant Annucci himself has said that "substantial changes" are needed.  There is simply no need to show some discrete policy that led to unconstitutional force in DOCCS facilities; the problem is foreseeable all on its own.

Regardless, Mr. Virgil has in any event indeed alleged several specific policies that made corrections officers' use of unconstitutional force foreseeable to the DOCCS Defendants.  Just as in *Stone #1*, Mr. Virgil has alleged several policies and practices that have "allowed correction officers to engage in illegal [use of force] activity without fear of getting caught," or "without fear of being discovered."  2021 WL 4463033, at *11.  These include:

1.  Insufficient discipline for officers involved in the use of force, and officers who submit false use of force reports.  SAC ¶¶ 134, 150-158, 211, 245, 253, 264, 283, 303, 318, 330-31, 334, 361, 397.

2.  Insufficient training and direction concerning the use of force and use of force reporting. SAC ¶¶ 303, 330-33, 361-63, 397.

3.  Failure to warn corrections officers of the consequences of not accurately reporting uses of force.   SAC ¶ 332-33.

4.  Insufficient training as to use of body worn cameras, and failure to discipline officers who either intentionally or unknowingly deactivate body worn cameras during use of force interactions.   SAC ¶ 52-53, 102, 147-48, 150-55, 157.

Moving on from their meritless argument that Mr. Virgil was required to but did not allege a "specific policy" (again, he did not have to, but he nevertheless did), the DOCCS Defendants next suggest that Mr. Virgil did not allege a "unique practice or specific custom." Dkt. No. 83 at 14.  But that is obviously wrong.  Mr. Virgil exhaustively alleges DOCCS guards' customary and regular practice of using unconstitutional force against incarcerated persons.[4]  The DOCCS Defendants oddly suggest this cannot be a "unique practice" or a "singular custom" that violates the constitution because the abuse Mr. Virgil identified occurred in "different years, different facilities, different locations, and [involved] different underlying injuries." Dkt. No. 83 at 14.  This argument makes no sense.  The fact that the *same* misconduct is occurring consistently over many years, in different forms, and across all of DOCCS' facilities *establishes* the custom; it does not refute it.  And this custom is not too "broad" or "general" to be actionable. Dkt. No. 83 at 14. Indeed, to suggest as much is to say that the more ubiquitous the unconstitutionality, the *less* it becomes actionable as a policy concern.  That too makes no sense and cannot be and is not the law.  It is further notable that the practice or custom alleged in *Stone #1* was nearly as "broad" and "general" as that alleged here: officers' sexual abuse of incarcerated persons.  And *Stone #1* involved five plaintiffs who each suffered distinct injuries at four different institutions over four

---

[4] Mr. Virgil also alleged DOCCS and Green Haven "had a policy or practice of failing to conduct sufficient psychiatric evaluations of COs after they face instances of trauma that may lead them to pose a risk of using unconstitutional excessive force," SAC ¶¶ 196, 221-22, and a "policy or practice of sending COs back to work too early after they face instances of trauma that may lead them to pose a risk of using unconstitutional excessive force," SAC ¶¶ 197-98, 223. The DOCCS Defendants do not mention these policy claims and we assume they are not moving to dismiss them.

years.  If the practice or custom alleged here is too "broad" or "general," it would have been so in *Stone #1*.[5]

### B.  Mr. Virgil Alleged that the DOCCS Defendants Were Aware of These Specific Unconstitutional Policies, Practices, and Customs

The DOCCS Defendants next argue that, even if there were a practice or custom of unconstitutional use of force within DOCCS facilities, Mr. Virgil supposedly "provides no information as to why this was known to the Supervisory Defendants other than by highlighting the fact they are or were supervisors."  Dkt. No. 83 at 14.  The suggestion that Mr. Virgil did not allege that the DOCCS Defendants actually knew about the rampant and unconstitutional use of unjustified force in DOCCS facilities is abjectly false.  Indeed, even at this preliminary stage, Mr. Virgil has unearthed an army of evidence of the DOCCS Defendants' knowledge.

*First*, and most obviously, Defendant Annucci publicly said "substantial changes" were needed to address the "criminal actions" of guards who "commit egregious acts of misconduct."  SAC ¶¶ 245, 318-19.  It is striking (and disheartening) that Defendant Annucci denies knowledge in this action of an issue he has publicly acknowledged requires "substantial change."

*Second*, in 2006 a public report was issued by the CANY, "the only independent organization in New York with authority under state law to monitor prisons," which documented

---

[5] Not only is this case on all fours with *Stone #1*, the DOCCS Defendants ignore other cases rejecting their arguments in similar circumstances.  *See, e.g.*, *Meli v. City of Burlington, Vt.*, 585 F. Supp. 3d 615 (D. Vt. Feb. 14, 2022), discussed above, and its companion case, *Jok v. City of Burlington, Vt.*, 2022 WL 444361 (D. Vt. Feb. 14, 2022); *Pearson v. Annucci*, 2023 WL 2537722, at *8 (N.D.N.Y. Mar. 16, 2023) (denying in part motion to dismiss "claims against Annucci based on the theory that Annucci failed to discontinue an unconstitutional policy" concerning solitary confinement); *Myers on behalf of Estate of Myers v. Davenport*, 2022 WL 3017367 (N.D.N.Y. July 29, 2022) (denying supervisory defendants' motion to dismiss by the where plaintiff alleged they failed to enact policies to prevent sexual abuse resulted in his injuries); *Sanchez v. Nassau County*, 2023 WL 2457855, at *31-33 (E.D.N.Y. Mar. 11, 2023) (denying supervisor defendants motion for summary judgment given factual questions regarding his knowledge "of violent attacks against NCCC detainees by other detainees and corrections officers"); *Jordan v. Department of Correction*, 2023 WL 2503376, at *12 (D. Conn. Mar. 13, 2023) (allowing claim to proceed where supervisory "officials failed to take 'any effective action to correct and/or remedy the longstanding and well-known abuse of prisoners'").

pervasive violence by officers in DOCCS facilities, and Green Haven specifically.  SAC ¶¶ 229-237.  Defendant Annucci was specifically "briefed" on the CANY Report when he became Acting Commissioner in 2013, SAC ¶ 316, and Mr. Virgil credibly alleges that Defendant Royce was made aware of the report as well, s*ee* SAC ¶ 350 (noting former Green Haven Superintendent William Lee's testimony that he was aware of the CANY report at least by April 2018).

*Third*, between 2015-2016, the Marshall Project and New York Times conducted a robust investigation into excessive force and cover ups within DOCCS facilities.  *See* SAC ¶¶ 238-256.  The DOCCS Defendants cannot credibly feign ignorance of this investigation.  Not only did it produce A1 stories in the New York Times, Defendant Annucci was specifically contacted by the investigators, although he declined a request for an interview.  *See* SAC ¶¶ 241, 255.

*Fourth*, following the indictment of five DOCCS corrections officers for the savage, unjustified, and unprovoked beating of Kevin Moore, and an "elaborate cover up" thereof, then-U.S. Attorney Preet Bharara announced at a press conference in September 2016 that "excessive use of force in prisons . . . has reached crisis proportions in New York State."  SAC ¶¶ 257-60.  Again, the DOCCS Defendants cannot credibly claim not to know about this.  Not only did Defendant Annucci make a public statement following the federal indictment of Mr. Moore's assailants, he was *present at Mr. Bharara's press conference*.  SAC ¶¶ 244-45, 261, 318.

*Fifth*, Mr. Virgil's complaint identifies 22 civil lawsuits brought against DOCCS corrections officers for the unconstitutional use of force and/or for filing false reports (including 8 just in Green Haven).  *See* SAC ¶¶ 263-300.  These are just the tip of the iceberg.  SAC ¶ 265 ("On information and belief these instances reflect just a small number of the instances of excessive force in DOCCS' facilities").  Indeed, the lawsuits Mr. Virgil included in his complaint are only ones that are relatively contemporaneous to Mr. Virgil's allegations (and that almost all involved

conduct occurring after the CANY report, the MP/NYT investigation, and Mr. Bharara's statement) *and* that either resulted in actual liability to the State or are likely to do so soon. Specifically, 16 of those lawsuits resulted in settlements and 4 resulted in verdicts against the corrections officers (3 by a jury). Separately, the New York Times and The Marshall Project were able to unearth just from public court records that, between 2010 and 2015, the State "paid out at least $8.8 million in settlements or jury awards in cases in which guards were accused of prisoner abuse or excessive force." SAC ¶ 256. Both Defendants Annucci and Royce have been personally served in many such lawsuits. *See* SAC ¶¶ 314, 349. Further, the complaint identifies three separate federal criminal prosecutions of DOCCS corrections officers related to excessive force and/or false cover ups, leading to the conviction of at least seven different officers. *See* SAC ¶¶ 241-44, 257-262; 278. As the DOCCS Defendants concede, and explained further below, the law is clear that this type of litigation history is relevant to alleging a supervisor's notice of an unconstitutional policy, practice, or custom. *See, e.g.*, *Poulos*, 2019 WL 6311012, at *8.

*Sixth*, the DOCCS Defendants' supervisory and administrative roles themselves further the inference that they were aware of the customary use of unconstitutional force in DOCCS facilities and at Green Haven in particular. Defendant Annucci has himself admitted in sworn testimony to the state legislature that he "owns everything—everything bad that's ever happened [in New York prisons since May 2013], I'm accountable for everything bad." SAC ¶ 312. And it is inconceivable that the DOCCS Defendants were not made aware of many if not all of the serious instances of misconduct alleged in Mr. Virgil's complaint, which includes a number of high-profile criminal and civil jury verdicts finding DOCCS officers (including those at Green Haven) liable for unconstitutional use of force and unlawfully covering it up. *See* White Decl. Ex. B at 22 (this Court noting that it "assume[s] word gets to [Defendant Annucci] about verdicts, and a number of

22

his employees have had verdicts against them in this building"). Further, Defendant Royce's central role in the Inmate Grievance Process gave him unique insight into the regularity with which Green Haven's corrections officers commit unconstitutional uses of force. *See* SAC ¶¶ 351-60.

The DOCCS Defendants have no credible response to this overwhelming evidence of their knowledge, nearly all of which they ignore in their briefing. They also ignore relevant case law on the subject. Indeed, after disregarding the wealth of post-*Tangreti* case law permitting supervisory claims to proceed past a motion to dismiss or even summary judgment, *see supra* at note 3, they again try to analogize this case to a single other case: *Poulos v. Annucci*, 2019 WL 6311012 (N.D.N.Y). As noted above, the DOCCS Defendants suggest that *Poulos* "bears a striking similarity to the facts" alleged here. Dkt. No. 83 at 8. But that is not remotely true. If anything, *Poulos* is almost a near perfect counterfactual. Specifically, in granting Defendant Annucci's motion to dismiss, the *Poulos* court identified a number of deficiencies in the plaintiff's complaint and then stated what was missing. As to nearly each instance, however, Mr. Virgil's complaint contains exactly what the *Poulos* court found wanting (plus more). Specifically:

- ***The CANY Report***. In *Poulos*, like here, the plaintiff's complaint relied on the 2006 CANY Report to allege Defendant Annucci's notice, but the plaintiff there failed to allege "any facts in support of his conclusory allegation that unconstitutional actions or conditions like the ones described in the 2006 report continued to occur after the 2006 report." 2019 WL 6311012, at *7. Mr. Virgil's complaint, by contrast, *exhaustively* alleges just that. For one, as noted above, Mr. Virgil alleged that CANY had "briefed" Defendant Annucci on its findings in 2013, SAC ¶ 251, and alleges throughout the complaint that unconstitutional uses of force continued to occur across DOCCS facilities, and at Green Haven specifically, by outlining dozens of other lawsuits with those same facts, as well as subsequent robust investigations by the Marshall Project, the New York Times, and the U.S. Attorney's Office.

- ***Preet Bharara's "Crisis" Conclusion***. In *Poulos*, like here, the plaintiff relied on Mr. Bharara's statement that unconstitutional force has reached "crisis proportions in New York." *Id.* But, as the *Poulos* court specifically noted, the plaintiff there failed to allege anything "plausibly indicating how this remark shows sufficient knowledge by Defendant Annucci." *Id.* Indeed, the Court noted that "there are no allegations to plausibly suggest that the U.S. Attorney . . . discussed his concerns (or the factual bases

for them) with Defendant Annucci." *Id.* But here, in stark contrast, Mr. Virgil expressly alleged that Defendant Annucci was *present when Mr. Bharara's statement was made and his concerns relayed.* SAC ¶ 261.

- **Litigation History**. In *Poulos*, like here, the plaintiff relied on prior lawsuits to allege Defendant Annucci's notice of an unconstitutional practice of excessive force. But there the plaintiff relied on just *"*three prior lawsuits." 2019 WL 6311012, at *8. And indeed, the Court noted that "cases where motions to dismiss have been denied based in part on prior lawsuits have involved a much more significant number of lawsuits than the number alleged here." *Id.* The Court there then cited three cases *denying* motions to dismiss where the plaintiff cited 18, 17, and 15 lawsuits respectively. *Id.* Here, by stark contrast, Mr. Virgil has alleged 22 lawsuits that almost all resulted in liability to the state, as well as four criminal cases that resulted in convictions. *See supra* at 21-22.

- **Other Notice Evidence**. Finally, the complaint in *Poulos* was missing several other indicators of the DOCCS Defendants' notice that are present here. Most notably, Defendant Annucci's own statement following a notorious unconstitutional force case that "substantial changes" are needed. SAC ¶¶ 245, 318-19. Further, the *Poulos* court did not have the benefit of the much more contemporaneous and exhaustive reporting from the Marshall Project and the New York Times. SAC ¶¶ 238-256.

Mr. Virgil has plainly alleged the DOCCS Defendants' notice of an unconstitutional policy, practice, or custom of unjustified force by corrections officers.[6]

\*    \*    \*

Finally, at the end of his brief, Defendant Annucci offers some sort of equitable "floodgates"-type argument. He argues that if Mr. Virgil's allegations state a claim against him, "it would mean [he] could be held liable for every future lawsuit alleging excessive force by *virtue of his title*, as long as references to prior lawsuits were made." Dkt. No. 83 at 14. This suggestion requires a brief response. For one, of course, the impact that a decision of this Court might have on any future case is certainly irrelevant and outside the purview of Rule 12(b)(6). If Defendant

---

[6] Refusing to even admit that Mr. Virgil had notice of an unconstitutional practice or custom, the DOCCS Defendants do not even address Mr. Virgil's extensive allegations that the DOCCS Defendants disregarded the risks of their unconstitutional practices, *i.e.*, that they were deliberately indifferent. And this is for good reason. Mr. Virgil plainly alleged that in addition to their deficient policies, they disregarded the risk by, for example, failing to enact corrective policies, publicly downplaying uses of excessive force, acknowledging that substantial change was needed yet doing nothing, and resisting efforts for public accountability. SAC ¶¶ 282-83, 318-19, 336-42.

Annucci's inaction violated the constitution in a way that harmed Mr. Virgil, it is of no moment if Defendant Annucci's inaction harmed other incarcerated persons similarly.  In any event, given the near certainty that Defendant Annucci would be indemnified for any liability, his complaining rings hollow.  Regardless, there is no floodgates concern: policymaker liability attaches only where there is an underlying constitutional violation—that is to say, even if Defendant Annucci might conceivably be added to more complaints, more complaints would not be filed.

Regardless, any increase in liability or litigation that Defendant Annucci might face under the theory pursued by Mr. Virgil is a problem wholly of Defendant Annucci's own making.  This is in no way "vicarious liability," Dkt. No. 83 at 15, because it is well within his control to fix.  As noted above and in Mr. Virgil's complaint, Defendant Annucci is liable for Mr. Virgil's injuries because he has *chosen* to act unconstitutionally.  As he nowhere disputes in his brief, Defendant Annucci has done virtually nothing to fix the well-documented "culture of brutality" that exists within DOCCS facilities and that he and this Court have both recognized.  *See Magalios v. Peralta*, 2022 WL 407403, at *7 n.7 (S.D.N.Y. Feb. 10, 2022) (noting that the use of unjustified and unprovoked violence by DOCCS corrections officers and covering it up with conspiratorial lies "seems to be all too acceptable among certain employees of New York's prison system").  The Court should give no credence to Defendant Annucci's fear that he may be dragged into Court again to account for his misconduct.

## **CONCLUSION**

Based on the foregoing, the DOCCS Defendants' motion to dismiss should be denied.

Dated:       May 5, 2023
               New York, New York

By:   _____

Benjamin D. White

**BLOCH & WHITE LLP**
Michael L. Bloch, Esq.
Benjamin D. White, Esq.
Cristina Alvarez, Esq.
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 901-3825
mbloch@blochwhite.com
bwhite@blochwhite.com
calvarez@blochwhite.com

**PRISONERS LEGAL SERVICES OF NEW YORK**
James Bogin, Esq.
Madison Levin, Esq.
41 State Street, Suite M112
Albany, NY 12207
(518) 438-8046
jbogin@plsny.org
mlevin@plsny.org

*Attorneys for Plaintiff*