UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MELVIN L. VIRGIL

                 *Plaintiff*,

      v.

AARON FINN, Corrections Officer,
ALEXANDER COSTANTINI, Corrections
Officer, PHILIP LANGDON, Corrections Officer,
JOHN DOE 1-8, Corrections Officers,
ANTHONY J. ANNUCCI, Acting Commissioner
of the New York State Department of Corrections
and Community Supervision,
MARK ROYCE, Former Superintendent of Green
Haven Correctional Facility,
JOHN DOE 9, supervising employee of DOCCS,
in their individual capacities,

                *Defendants*.

Case No. 7:22-cv-3169 (CS)

---

**CORRECTED MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFF MELVIN VIRGIL'S OPPOSITION
TO DEFENDANTS PHILIP LANGDON, ANTHONY ANNUCCI,
AND MARK ROYCE'S MOTIONS FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................. 1

FACTS ..................................................................................................................................... 4

   I.   Finn Brutally Assaulted Virgil and Langdon and Costantini Failed to Intervene................. 4

   II.  Langdon (and Finn and Costantini) Drafted a False Report in a Purposeful and "Shameful" Effort to Protect Himself and Finn.......................................................................................... 5

   III. Finn Pled Guilty to Federal Criminal Charges in Connection with the Assault but Neither Langdon Nor Constantini Were Disciplined At All ................................................................ 6

   IV. The DOCCS Defendants Were Policymakers with Control Over Relevant Policies, Practices, and/or Customs ("PPCs") and Were Deliberately Indifferent to PPCs of Excessive Force and Cover Ups ...................................................................................................................... 6

ARGUMENT ............................................................................................................................ 7

   I.   Langdon's Motion for Summary Judgment Should Be Denied............................................ 7

      a.  Langdon is Incorrect That He Did Not Have Sufficient Time to Intervene "As a Matter of Law".............................................................................................................................. 7

      b.  Langdon Did Not Reasonably Intervene......................................................................... 10

      c.  Langdon Is Not Entitled to Qualified Immunity............................................................. 15

   II.  Defendant Annucci and Royce's Motions for Summary Judgment Should Be Denied ...... 15

      a.  There Were Unconstitutional PPCs of Excessive Force and Cover Ups Throughout DOCCS and at Green Haven During the DOCCS Defendants' Respective Tenures, and the DOCCS Defendants Plainly Knew About It ............................................................... 17

         i. Annucci's Awareness of Excessive Force and Cover Ups PPCs.................................. 19

         ii. Royce's Awareness of Excessive Force and Cover Ups PPCs ..................................... 26

      b.  The DOCCS Defendants Deliberately Disregarded the Risks Posed By the PPCs of Excessive Force and Cover Ups ..................................................................................... 29

         i. Annucci Deliberately Disregarded the Risks Posed by the PPCs of Excessive Force and Cover Ups ......................................................................................................... 29

            1.  Evidence That Annucci Deliberately Disregarded the Risks Posed by the PPCs of Excessive Force and Cover Ups .................................................................. 30

            2.  The "Programs" Annucci Claims He "Enacted" Do Not Negate Evidence He Disregarded the Risks Posed by PPCs of Excessive Force and Cover Ups, and At Most Creates an Issue of Fact................................................................................ 33

         ii. Royce Deliberately Disregarded the Risks Posed by the PPCs of Excessive Force and Cover Ups ......................................................................................................... 39

CONCLUSION......................................................................................................................... 41

TABLE OF AUTHORITIES

**Cases**

*Bulgari v. Bulgari*, 2024 WL 4345580 (S.D.N.Y. Sept. 30, 2024) ................................................ 17

*Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608 (N.D.N.Y 2023) ...................................................... 8

*Davis v. City of New York*, 2018 WL 10070540 (S.D.N.Y. March 30, 2018) ............................... 18

*Dollard v. City of New York*, 408 F. Supp. 3d 231 (E.D.N.Y. 2019) ............................................ 8, 9

*Edwards v. Quiros*, 986 F.3d 187 (2d Cir. 2021)................................................................................ 16

*Ekukpe v. Santiago*, 823 F. App'x 25 (2d Cir. 2020)......................................................................... 8

*Farmer v. Brennan*, 511 U.S. 825 (1970)............................................................................................. 16

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) ............................................................................ 7, 8

*Harris v. Westchester Cty. Dep't of Corr.*, 2019 U.S. Dist. LEXIS 178392 (S.D.N.Y. 2019)......... 8

*Hayes v. NYC Dep't of Corr.*, 84 F.3d 614 (2d Cir. 1996)................................................................ 16

*Hulett v. City of Syracuse*, 253 F. Supp. 3d 462 (N.D.N.Y. 2017) ................................................. 14

*Ivery v. Baldauf*, 284 F. Supp. 3d 426 (W.D.N.Y. 2018) ................................................................. 14

*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501 (S.D.N.Y. 2008)................................................... 7

*Magalios v. Peralta*, 2022 WL 407403 (S.D.N.Y. Feb. 10, 2022)................................................... 17

*Meli v. City of Burlington, Vt.*, 585 F. Supp. 3d 615 (D. Vt. Feb. 14, 2022)................................ 40

*Moore v. Keller*, 498 F. Supp. 3d 335 (N.D.N.Y. 2020)................................................................... 14

*Moran v. Greco*, 2024 WL 1597624 (2d Cir. 2024)........................................................................ 14

*O'Neill v. Krzeminksi*, 839 F.2d 9 (2d Cir. 1988)............................................................. 7, 8, 9, 11

*Olutosin v. Lee*, 2018 WL 4954107 (S.D.N.Y. Oct. 12, 2018)........................................................ 27

*Pearson v. Callahan*, 555 U.S. 223 (2009) ........................................................................................ 15

*Santiago v. Annucci, et al.*, No. 12-cv-02137 (S D.N.Y. Nov. 30, 2022)....................................... 33

*Sash v. United States*, 674 F. Supp.2d 531 (S.D.N.Y. 2009)............................................................ 8

*Stone #1 v. Annucci*, 2021 WL 4463033 (S.D.N.Y. Sept. 28, 2021) ............................................. 16

*Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999)................................................................................ 15

*Varrone v. Bilotti*, 123 F.3d 75 (2d Cir. 1997)................................................................................. 15

*Vincent v. Annucci, et al.*, 63 F.4th 145 (2d Cir. 2023) .................................................................. 33

*Vincent v. Annucci, et al.*, 718 F. 3d 157 (2d Cir. 2013) ............................................................... 33

*Wilkinson v. Lewis*, 289 F. Supp. 3d 371 (N.D.N.Y. 2018) ........................................................... 14

**Statutes**

18 U.S.C. § 242................................................................................................................................... 6

**PRELIMINARY STATEMENT**

The summary judgment motions of Defendants Anthony Annucci, Mark Royce, and Phillip Langdon wish away almost entirely the devastating and voluminous record developed in discovery. The silence speaks volumes because the extensive record reveals several dark and sobering truths: about the horrific, unjustified, and criminal assault of Plaintiff Melvin Virgil by Defendant Aaron Finn; about the shameful conduct of Defendants Philip Langdon and Alexander Costantini, who stood by as the assault happened in front of them and then *repeatedly* lied to cover it up; and about the violent culture fostered by Annucci and Royce that allowed all of it happen.

As to Langdon, this record—and applicable law—easily casts aside the suggestion that he could not have intervened to stop the brutal, unjustified, and multi-phased attack that he witnessed in its entirety and that he sought to cover up at every turn with manifest lies. In any event, Langdon's arguments present pure questions of disputed fact that can only be resolved by a jury.

As to Annucci and Royce, the record presents a uniquely incriminating picture of their respective tenures as the head policymakers of DOCCS and Green Haven Correctional Facility. Discovery revealed that far from being anomalous, what happened to Virgil has been *commonplace* for years and almost *nothing* meaningful has been done to even try to stop it. The result? Operating amidst a culture of violence, silence, and impunity, DOCCS' corrections officers have for years been assaulting incarcerated people with abandon while their colleagues lie to cover it up for them.

Indeed, in a documentary record they do not cite even *once*, discovery revealed that Annucci and Royce were keenly aware of the scope and gravity of these deadly problems, yet deprioritized them into obscurity. For example, both were kept closely informed of nearly every instance of excessive force that came to DOCCS' or their facility's attention. DOCCS itself substantiated 294 instances of unjustified excessive force and/or cover ups thereof between 2010-22, which is certainly a fraction of the total. Annucci also knew that a huge proportion of these

1

wrongdoers faced *no* discipline *at all*, just like Langdon and Costantini—in one analysis, just **9.5%** of these wrongdoers were terminated. Consistent with these horrific numbers, Annucci candidly and repeatedly acknowledged—both in his deposition and elsewhere—that the problem of excessive force and cover ups was a "cultural" one that would have required "substantial changes" to address. The record also reveals that both Annucci and Royce were consistently told so by an army of trusted authorities: DOCCS' Office of Special Investigations, federal and state government officials, independent investigative bodies, investigative journalists that they trusted and thought were fair-minded and did their homework, and the list goes on. These entities repeatedly told them about things like "Beat-Up Squads," the "culture of brutality [that] has been allowed to thrive in [DOCCS] prisons," and that "excessive use of force in prisons . . . has reached crisis proportions in New York State." ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

Discovery also revealed what these supervisors did armed with the knowledge of a cultural problem of excessive force: they shamefully disregarded and deprioritized it. They offered no initiatives specifically aimed at addressing excessive force or cover ups, did not discuss the issue at high-level meetings, offered no department-wide communications on the subject, did not train COs on these issues, kept no data on assaults by COs (but kept data on assaults *of* COs), and so on. What's more, they both harbored disgraceful views that woefully downplayed the magnitude of the problem. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████ It is that very attitude that permeated throughout DOCCS and emboldened Finn, Langdon, and Costantini to carry out their horrific assault on Virgil and lie about it repeatedly to cover it up.

To be sure, Annucci now points to certain steps he claims to have taken to address the plague of excessive force and cover ups (Royce shockingly admitted he took *no* such steps). But it's all post-hoc window dressing plainly drudged up for purposes of this litigation. The record makes clear that *none* of those so-called "programs" were actually designed to meaningfully limit the occurrences of excessive force (and none of them did so). They were each either (i) totally unrelated to excessive force (*i.e.*, a program letting incarcerated people use tablets), (ii) designed for *other* reasons (usually, to protect *COs*, not incarcerated people), and/or (iii) meaningless (and failed) efforts akin to shifting the chairs on the Titanic's deck. In any event, whether the evidence of those "programs" outweighs the extensive countervailing evidence that the DOCCS Defendants were deliberately indifferent to the problem of excessive force is a paradigmatic jury question.

*　　*　　*

In reviewing the allegations in Virgil's Second Amended Complaint, this Court noted that "excessive force complaints alleging deliberate indifference by supervisory officials rarely have the level of detail present here," and that "one might ask if the claim here does not survive a motion to dismiss, is a claim of supervisory liability ever going to survive?" The same analogous question can be asked at this stage, and for a particular reason: Virgil not only proved the truth of nearly *every* allegation in his pleading as to the DOCCS Defendants' role in the problem of excessive force and cover ups, he unearthed a massive amount of additional supporting evidence, not to mention Defendants' damning sworn admissions. In sum, then, "one might ask if the claim here does not [deserve a trial by a finder of fact], is a claim of supervisory liability ever going to"?

3

## FACTS[1]

### I.    Finn Brutally Assaulted Virgil and Langdon and Costantini Failed to Intervene

On March 19, 2020, Virgil was incarcerated at Green Haven.  D. SOMF ¶ 1.  As Virgil was returning from lunch, Finn confronted him and ordered him to lock in.  F. Tr. 165:6-8, 167:7-8. Finn demanded that Virgil give him his identification card.  L. SOMF ¶ 6; V. Tr. 32:14-19, 47:17-19.  Virgil asked Finn what he had done wrong, and then told Finn to take his ID.  V. Tr. 32:14-19, 47:17-19.  Finn sprayed Virgil in the face with "pepper spray."  L. SOMF ¶ 7.  Virgil was compliant. *Id.*  Finn ordered Virgil to get on the wall, which Virgil did, and Finn handcuffed Virgil behind his back.  *Id.*  Finn called a "red alert" and escorted Virgil off the company to the nearby wall.  *Id.* Costantini was behind Finn and Virgil during this interaction.  *Id.*  Langdon responded to Finn's red alert. ███████████████████████████████████████

███████████████████████████████████████████████████████  L. Tr. 104. Langdon observed Costantini walking toward Finn.  L. Tr. 104:4-8.

Langdon then observed Finn strike Virgil multiple times in the back of the head using his elbow, slamming Virgil's head into the wall each time.  L. SOMF ¶ 19.  Langdon next saw Finn grab Virgil and bring him to the ground.  L. Tr. 108:13-14.  Finn then dragged Virgil's head across the metal bars, brought him back up, and then dragged his head across the bars again.  L. Tr. 104:12-16; ███████████████████████████████████

███████████████████████████████████████████████████████

---

[1] This memorandum uses the following abbreviations: (i) "Ex." for exhibits attached to the Declaration of Benjamin D. White ("White Decl."); (ii) "D. SOMF" and "L. SOMF" for the DOCCS Defendants' Statement of Material Facts ("SOMF") and Langdon's SOMF, respectively; (iv) "D. Br." and "L. Br." for the defendants' memoranda of law, respectively; (v) "F. Tr.", "L. Tr.", "C. Tr", "A. Tr.", and "R. Tr.", for the parties' respective deposition transcripts, attached as exhibits to the White Decl.; ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ Langdon then pressed the record

button on his BWC and held it down for two seconds to shut it off.  ███████████ L. Tr. 122:21-

123:10.  Langdon shut off his camera because he "panicked for [his] own personal well-being,"

and because knew he knew the incident was "bad."  L. SOMF ¶ 33; L. Tr. 125:16-20.

█████████████████████████████████████████████

██████████████████████ Ultimately, Langdon and Costantini brought Virgil to

his feet and held him against the wall as a response team arrived.  L. Tr. 105.  Sgt. Dennis Benitez

arrived and asked several times, "Who was involved?"  Langdon did not identify himself as a "way

of hopefully getting out of the situation" and to "protect himself."  *Id.* 142:8-43:15.

## II.    Langdon (and Finn and Costantini) Drafted a False Report in a Purposeful and "Shameful" Effort to Protect Himself and Finn

Each Defendant officer drafted and submitted false reports that omitted Finn's wrongful

conduct and blamed Virgil for the use of force.  For example, Finn drafted a false Use of Force

staff memorandum (also referred to as a 2104A), indicating, among other things, ████████████

███████████████████████████████████████ Finn now admits his report was

purposefully false.  F. Tr. 275:10-12, 287:6-288:7, 294:18-20.  For his part, Langdon initially failed

to fill out a 2104A because he "wanted nothing to do with it" and he wanted to "protect" himself,

even though he knew DOCCS' rules required him to draft it on the same day of the incident.  L.

Tr. 161:11-162:3, 176:13-18.  When Langdon returned to work several days later, however, his

supervisor, Sgt. Benitez, told him to fill out a "To/From" memorandum.  *Id.* 160:5-11.  Langdon

knew officers must fill out To/From memoranda accurately that it could be a federal crime to fill

them out falsely.  *Id.* 79:22-81:15.  Langdon's To/From memorandum was false, claiming Finn

5

only struck Virgil once.  Langdon admitted that he wrote the false report to "protect" Finn and himself.  *Id.* 161:25-162:3, 174:13-17, 176:13-18.  He further admitted that, in failing to report Finn's strikes to Virgil's head, and in shutting off his camera, his actions were "disgraceful," he did not "act[] in good faith," and he "discredited the facility as a whole."  *Id.* 215.

### III.    Finn Pled Guilty to Federal Criminal Charges in Connection with the Assault but Neither Langdon Nor Constantini Were Disciplined At All

In connection with the assault, Finn pled guilty to violating 18 U.S.C. § 242.  F. Tr. 331-32:22-25.  Langdon and Costantini were investigated by DOCCS' Office of Special Investigations ("OSI"), which substantiated allegations of misconduct against both.  OSI substantiated allegations that Langdon and Costantini (i) violated policy by shutting off (Langdon) or not activating (Costantini) their BWCs; and (ii) submitted false reports.  Despite those findings, neither Langdon nor Costantini were disciplined in connection with this incident.  L. Tr. 186:7-14; A. Tr. 161:18-22.  Langdon left DOCCS in 2023 because the assault on Virgil "kept on weighing on [his] mind . . . and other incidences would continue to occur," and thus he could not "get out from one without being buried by another."  L. Tr. 21:19-25. Costantini is still employed by DOCCS.  C. Tr. 34:7-9.

### IV.    The DOCCS Defendants Were Policymakers with Control Over Relevant Policies, Practices, and/or Customs ("PPCs") and Were Deliberately Indifferent to PPCs of Excessive Force and Cover Ups

The DOCCS Defendants were policymakers.  D. SOMF ¶¶ 16, 30.  Annucci's career at DOCCS spanned over thirty-eight years and in 2013 he became Acting Commissioner with "all of the powers of a full commissioner."  A. Tr. 28:13-16, 30:24-25.  ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████  As laid out in detail below, both were aware of PPCs of excessive force and cover ups among COs and were deliberately indifferent to the risks it posed.

6

**ARGUMENT**

**I.      Langdon's Motion for Summary Judgment Should Be Denied**

Virgil brings a failure-to-intervene claim against Langdon.  The Eighth Amendment imposes on COs "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1998).  "Liability attaches on the theory that the officer, by failing to intervene, becomes a *tacit collaborator* in the illegality." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (emphasis added).  An officer is liable where "(1) [he] had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).  In moving for summary judgment, Langdon primarily proffers three arguments: (i) he did not, as a matter of law, have an opportunity to intervene in Finn's attack; (ii) he *did* intervene in the attack; and (iii) he is protected by qualified immunity.  Each argument fails.

**a.  Langdon is Incorrect That He Did Not Have Sufficient Time to Intervene "As a Matter of Law"**

Langdon argues he was only present for seven seconds of Finn's assault, *see* L. Br. 7,[2] a period he argues is insufficient as a matter of law to support a failure-to-intervene claim because it does not provide a "genuine opportunity to intercede." L. Br. 7-8.  He is simply wrong.

Contrary to Langdon's argument, the Second Circuit in *Figueroa*, 825 F.3d at 107, expressly rejected any "hard-and-fast temporal cutoff" in failure-to-intervene cases.  It did so precisely because failure-to-intervene claims can arise out of "a limitless variety of factual circumstances." *Id.*  ("[T[he number of officers present, their relative placement, the environment

---

[2] Virgil does not agree with or concede that "Langdon was only present on the scene for seven (7) seconds before Finn's use of force was complete." L. Br. 7.

7

in which they acted, the nature of the assault, and a dozen other considerations.").  Although the assault's duration "will always be relevant," there are also "circumstances other than an assault's duration [that] might bear significantly on an officer's ability to stop it from happening."  *Id.*  Langdon appears to have missed *Figueroa*.  Rather, he instead wrongly relies on *Sash v. United States*, 674 F. Supp.2d 531 (S.D.N.Y. 2009), which concluded thirty seconds was too short for a failure-to-intervene claim.  But the Second Circuit in *Figueroa* stated *expressly* that *Sash* was wrong.  Indeed, the district court in *Figueroa* had relied on *Sash* to reject the plaintiff's failure-to-intervene claim and the Second Circuit reversed precisely because it found *Sash*'s "bright-line rule unsupportable."  825 F.3d at 107.  Despite the brevity of the assault, the Court concluded, the plaintiff's failure-to-intervene claims "were for the jury to decide."  *Id* at 108. [3]

Apart from *Sash*, Langdon also curiously relies on *O'Neill*, 839 F.2d at 9.  But *O'Neill* affirmed a plaintiff's verdict on nearly analogous facts to this case; it thus *strongly* supports Virgil's failure-to-intervene claim against Langdon.  There, an officer witnessed fellow officers strike a handcuffed plaintiff three times in "rapid succession" and then subsequently drag the plaintiff by the throat across a room.  *Id*. at 12.  That officer did not intercede and was sued on a failure-to-intervene theory.  *Id*.  In ultimately assessing whether the observing officer had failed to intervene

---

[3] Consistent with *Figueroa*, courts regularly sustain failure-to-intervene claims even where the incidents were brief.  *See, e.g.*, *Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) (affirming denial of judgment as a matter of law where the assault lasted **less than fifty seconds** because the officer himself testified that he was in "very close proximity" to the victim, and even at one point "directly in front of him," and the officer identified "no obstacles that might have hindered [his] ability to intercede."); *Harris v. Westchester Cty. Dep't of Corr.*, 2019 U.S. Dist. LEXIS 178392 (S.D.N.Y. 2019) ("This Court must not 'stray into the realm of improper fact-finding, and cannot hold as a matter of law that the **15-second fight** was not of sufficient duration for the officers to attempt to intervene by breaking up the fight"); *Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608, 621 (N.D.N.Y 2023) (denying summary judgment as to an "**extremely brief**" use of force); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 235-36 (E.D.N.Y. 2019) (denying summary judgment where the altercation spanned approximately **nine seconds** because a reasonable juror could conclude that the officer had an opportunity to intervene to stop *some* of the use of force).

8

in violation of the Eighth Amendment, the court viewed these events as two separate episodes: one consisting of strikes to plaintiff's head and the other of the fellow officers dragging of the plaintiff across the floor. *Id*. To be sure, as to the first episode, the court held that the strikes to the head happened in "such rapid succession" that the observing officer did not have a realistic opportunity to prevent them. *Id* at 11. But the court came out differently as to the second episode—*i.e.*, the dragging of the plaintiff across the floor—and thus affirmed the jury's liability finding. *Id* at 12. The court reasoned that the observing officer, having seen the victim beaten in the incident's first phase, was alerted to the need to protect the victim from further abuse, and thus he could be liable for failing to make a reasonable attempt to stop that second episode. *Id*.[4]

*O'Neill* is thus almost directly on point. The physical strikes against Virgil, just like the strikes on the *O'Neill* plaintiff, were committed in at least two separate general stages: (i) the strikes to the back of Virgil's head while he was standing; and (ii) the subsequent dragging of Virgil's head against steel bars while he was on the ground. Consequently, even assuming, *arguendo*, that Langdon could not have stopped the initial strikes to the back of Virgil's head, there is at least a question of fact as to whether he could have stopped Finn from subsequently dragging Virgil's head against steel bars, just like the officer in *O'Neill*. Indeed, Langdon admitted during his deposition that he had time to purposefully shut off his body camera amidst the assault in an effort to protect Finn and himself, and that the effort took two seconds. L. Tr. 123:8-10. It requires a certain amount of *chutzpah* for Langdon to argue that he had enough time to protect himself and Finn from the consequences of their wrongdoing, but not enough time to protect Virgil.[5]

---

[4] *See also Dollard v. City of New York*, 408 F. Supp. 3d 231, 235-36 (E.D.N.Y. 2019)

[5] Langdon also argues he did not directly or proximately cause Virgil's injuries because he did not have a "realistic opportunity to prevent" them. In so arguing, Langdon simply repackages the same argument he already made—that he did not have a reasonable opportunity to intervene. For

### b. Langdon Did Not Reasonably Intervene

Despite arguing he *could not* intervene, Langdon also argues that he *did* intervene, *i.e.*, that he in fact took reasonable steps to intervene in Finn's attack on Virgil.  But the record is clear that he did not, and, in any event, Langdon has at most identified a material dispute for a factfinder.

As previewed above, Finn's assault took place in several discrete phases.  From Langdon's perspective, there were at least five separate phases.  *First*, as Langdon has acknowledged, when he arrived on the scene, Finn had not yet started assaulting Virgil; rather, Langdon saw that Finn had a compliant and handcuffed Virgil up against a concrete wall.  As Langdon testified: "Everything seemed normal at that point."  L. Tr. 104:9-10.  *Second*, Langdon witnessed "Finn then start[] hitting [Mr.] Virgil's head."  *Id*.  Specifically, Langdon saw Finn strike Virgil twice in the back of the head against the wall.  *Id.* 106:7-12.  *Third*, Langdon then saw Finn tackle Virgil down to the ground.  *Id.* 108:13-14 (Q. "[I]s it right that they both fell to the ground?  A.  No. No. Finn brought Virgil to the ground.").  *Fourth*, Langdon then saw Finn violently drag Virgil's head against steel bars several times, knocking him unconscious, causing Virgil to snore.  *Id.* 104:17-19. ███████████████████████████████████████████████

███

Contrary to the chart in Langdon's motion papers, *see* LSMOF ¶ 23, Langdon did not take any steps to stop Finn's horrific assault until the very end of the fourth phase, when he quietly and passively said, "Take it easy."  In other words, Langdon took no steps to stop or even limit Finn's unjustified, unlawful, and potentially lethal assault on a handcuffed and compliant Virgil until *after* he had already seen Finn (i) begin issuing deadly strikes to the back of Virgil's head; (ii) tackle Virgil to the ground; and (iii) gruesomely slam his head multiple times against steel bars.

---

all the reasons discussed above, whether Langdon had sufficient time to prevent the attack on Virgil cannot be resolved at this stage.

Langdon appears to quibble with the foregoing facts. Although the facts recounted in his papers are not a model of clarity, Langdon seems to suggest that he *physically* intervened to stop Finn *before* he first said, "Take it easy." Specifically, Langdon asserts that he "place[d] his leg in front of Finn's leg, place[d] his baton in between Finn and Plaintiff." L. SOMF ¶ 21. In other words, Langdon seems to suggest he physically intervened at the beginning of the fourth phase described above, *i.e.*, before he verbally intervened at the *end* of the fourth phase. But there is *no* support in the record whatsoever for Langdon's described physical intervention. For one, contrary to Langdon's representation, it is not remotely captured on any of the BWC footage. Moreover, it is directly contradicted by Langdon's deposition testimony. When asked, "Did you ever use your baton to come into physical—did you ever use your baton against Mr. Finn," Langdon testified, "No." L. Tr. 111:23-112:2. Langdon also admitted in his deposition that he only first made efforts to physically insert himself into the situation after Virgil was lifeless and "snoring" on the ground, which was *after* Langdon said, "Take it easy." *Id.* 104:12-23 ("Then he brought him down to the ground and dragged his head across the bars some more. . . . *and then* I heard him snoring and so I knew there was no resisting *to which I stepped in* and told Finn to chill and tried to, you know, take custody and pull him back."). In sum, then, especially construing the facts in Virgil's favor, it is clear a reasonable jury could conclude that Langdon took no steps to intervene at all until after he saw Finn strike Virgil in the back of the head twice, tackle him to the ground, and then violently drag his head against steel bars numerous times.

A review of even those basic facts could easily lead a jury to conclude that Langdon did not take reasonable steps to intervene in Finn's assault. *See O'Neill*, 839 F. 2d at 12. But there's more. At the time of the assault, Langdon *knew* officers were particularly prohibited from delivering blows to the back of an incarcerated person's head because that could cause permanent

11

damage or even death.  L. Tr. 55:22-56:9.  Langdon also knew his duty to intervene "applies even if the excessive force is a single strike."  *Id.* 58:22-59:4.  Langdon thus should have known almost immediately on his arrival that he needed to stop what was happening.  Langdon also knew he was required to intervene "via any means necessary" because otherwise he would be viewed "as an accomplice to the act."  *Id.* 58:8-10, 61:14-19.  And even though Langdon conceded he could have used physical force, his pepper spray, or his baton to physically stop Finn, he did none of those things.  *Id.* 61:21-23, 111:16-112:8.  Langdon did not even tell Finn to "stop," and instead just calmly said, "Take it easy."  *Id.* 61:24-62:2 (Langdon conceding that "any means necessary" includes "verbal commands to stop").

Further, Langdon's conduct *after* the assault establishes a clear consciousness of guilt for not intervening.  Specifically, at every chance, Langdon lied about what happened all to protect *himself*.  *First*, Langdon turned off his BWC at the tail end of the assault, and when asked if he "intentionally shut it off in order to protect [him]self," he said, "Yes."  *Id.* 178:17-19.  *Second*, Langdon failed to inform the arriving Sergeant that he was involved in the incident, and when asked if he "chose not to tell Sergeant Benitez that [he was] involved in part to protect [him]self," he again said, "Yes."  *Id.* 143:23-144:3.  *Third*, Langdon failed to write a Use of Force report after the incident, as required by DOCCS rules, and when asked if he "chose not to write a report in order to protect [him]self," he again said, "Yes."  *Id.* 161:11-162:3.  *Finally*, Langdon was given an opportunity to correct his false To/From report after reviewing BWC footage, and when asked whether he refused to revise his memorandum "in order to protect [him]self," he again said, "Yes."  *Id.* 200:13-16.  In sum, after the incident, Langdon took every step available to hide his involvement in Finn's assault and did so to protect *himself*.  The obvious question becomes: protect

12

himself from what?   The unavoidable implication is protecting himself from suffering consequences for his failure to try to stop an obviously wrongful attack.

In sum, whether or not Langdon took reasonable steps to intervene in Finn's horrific assault is a quintessential jury question.

\*       \*       \*

In conclusion, three additional points raised by Langdon are worth a response.

*First*, Langdon cites as evidence for his supposed reasonable intervention the fact that Virgil supposedly "expressed gratitude" toward him in his deposition.  L. Br. at 7.  This argument is cynically misleading.  Langdon seems to rely on Virgil's testimony that the fact that certain unidentified COs came to the scene "saved my life."  V. Tr. 125:9.  Even assuming Virgil was testifying about Langdon—and not the nearly dozen other officers that arrived after him—the argument is tragically misplaced.  For one, it ignores Virgil's very next sentence, where he made clear he was referring to the fact that "they could have joined and they didn't."  V. Tr. 125:10. Thus, if Virgil "expressed gratitude," it was gratitude that the arriving COs did not *join* Finn's assault, *not* that they stopped it.[6]  And in Virgil's next sentence of testimony he made clear that the COs to which he was referring "could have stopped it too and they didn't." V. Tr. 125:12-14.

*Second*, contrary to Langdon's suggestion, *see* L. Br. at 6., it is far from clear that Langdon's verbal statements actually stopped the assault, for several ███████████████████████ ██████████████████████████████████████████████████████████████ ███████████ (ii) Finn continued to use force by holding Virgil down on the ground, even as Virgil remained unconscious; (iii) Langdon told Finn to "take it easy" at least two more times after he

---

[6] Indeed, at most, Virgil's testimony reflects his exceedingly low expectations of COs.  That is to say, his testimony could be read to suggest he did not expect a CO to stop the assault and was instead grateful that COs simply did not join in it.  But incarcerated peoples' expectations about how COs will act does not set the floor for COs' lawful conduct—the Constitution does.

first told Finn to "take it easy," with approximately six seconds between; and (iv) Finn confirmed Langdon said "take it easy" when the attack was "pretty much . . . over." F. Tr. 197:15-19.[7]

*Finally*, Langdon's suggestion that his own interpretation of the BWC footage leaves no issue of fact for the jury is wrong. Although a court must consider video evidence in determining whether any material facts are to be tried, "the mere existence of a videotape in the record depicting some or all of the events in dispute will not always be dispositive at the summary judgment stage." *Moore v. Keller*, 498 F. Supp. 3d 335, 351 (N.D.N.Y. 2020). Rather, "the appropriate course of action is still to permit the jury an opportunity to resolve the [parties'] competing versions of events, in conjunction with the video, through the ordinary fact-finding process in which juries engage." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017). Thus, the "*interpretation* of the events is most likely appropriately reserved for the triers of fact." *Wilkinson v. Lewis*, 289 F. Supp. 3d 371, 379 (N.D.N.Y. 2018) (emphasis added). This is particularly true where, as here, "the vantage point of the video does not allow the factfinder to determine with pinpoint accuracy the distance between [the plaintiff] and the officers at the time the force was applied and, under the totality of circumstances, allows for fair debate" about how the parties' "movement[s] would be reasonably perceived." *Moran v. Greco*, 2024 WL 1597624, at *3 n.3 (2d Cir. 2024).

---

[7] Langdon's sole reliance on *Ivery v. Baldauf*, 284 F. Supp. 3d 426 (W.D.N.Y. 2018), is unavailing. In *Ivery*, the district court dismissed a failure to intervene claim against an officer where it was undisputed that the officer arrived on scene when a "scuffle" was already underway between a fellow officer and the plaintiff and where the plaintiff conceded that the observing officer stopped the attack. *Id*. at 439. However, as noted, whether Langdon caused Finn to stop the attack on Virgil is highly disputed. Moreover, Langdon, unlike the observing officer in *Ivery*, did not arrive on the scene to a "scuffle" between Finn and Virgil: when he arrived, everything appeared "normal," Virgil was not resisting, he was handcuffed, and compliant.

### c.  Langdon Is Not Entitled to Qualified Immunity

Finally, Langdon argues he is entitled to qualified immunity.  He is not.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted).  Where the plaintiff alleges a violation of a clearly established federal right (like being free from excessive force), "defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time."  *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997).  Langdon argues that he did not violate a constitutional right.  However, for all the reasons discussed above, there are undoubtedly genuine disputes of material fact concerning whether Langdon violated Virgil's Eighth Amendment rights.  Langdon argues that based on the steps he purportedly did take to intervene, coupled with his stance that the attack lasted seven seconds, a "reasonable officer" would not have known that his conduct was unlawful.  But given that there are several material facts in dispute that are central to a determination of reasonableness—*i.e.*, whether the steps Langdon took were in fact reasonable and as to the duration of the incident— dismissal on the basis of qualified immunity is not appropriate.  *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness").

## II.  Defendant Annucci and Royce's Motions for Summary Judgment Should Be Denied

Virgil pursues claims against the DOCCS Defendants for violations of the Eighth Amendment on the ground that they were responsible for creating and maintaining unconstitutional PPCs of excessive force and cover ups that led to his assault.  *See* SAC ¶¶ 302- 363.  As this Court recognized in denying their motions to dismiss, courts in this Circuit have held that a "supervisor could be liable if he . . . created a policy or custom under which unconstitutional

15

practices occurred or allowed the continuance of such a policy or custom." MTD Op. 26-27. As to an Eighth Amendment claim, such liability attaches where a supervising prison official fails to take reasonable measures to guarantee the safety of incarcerated people in their custody. *See Stone #I v. Annucci*, 2021 WL 4463033 (S.D.N.Y. Sept. 28, 2021). To prevail on such a claim, a plaintiff must demonstrate that (i) objectively, the conditions of his incarceration posed a substantial risk of serious harm and (ii) subjectively, that the defendant acted with deliberate indifference to that risk. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1970). Deliberate indifference requires a culpable intent, meaning the official had knowledge that an inmate faces a substantial risk of serious harm, and disregards that risk by failing to take reasonable measures to abate it. *See Hayes v. NYC Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). The official must know of and disregard that risk, *i.e.*, he must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. *See Farmer*, 511 U.S. at 837. Significantly, however, "evidence that a risk was obvious or otherwise must have been known to a defendant official may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Edwards v. Quiros*, 986 F.3d 187, 194 (2d Cir. 2021).

The DOCCS Defendants move for summary judgment, arguing that Virgil failed to adduce "any evidence," D. Br. at 12, that: (i) unconstitutional PPCs of excessive force and cover ups existed within DOCCS or Green Haven; (ii) the DOCCS Defendants knew of same; or (iii) the DOCCS Defendants disregarded it. The DOCCS Defendants are simply wrong. They only arrive at the conclusion that there is not "any evidence" for the foregoing by simply ignoring entirely the devastating factual record developed in discovery. Indeed, the DOCCS Defendants do not cite to a *single* document of the thousands that were produced in this case and instead rely *entirely* on exceedingly select portions of their own (self-serving) deposition testimony. Yet, "self-serving

16

deposition testimony, by itself, 'is insufficient to *defeat* summary judgment' when contradicted by the 'hard evidence adduced during discovery,'" *Bulgari v. Bulgari*, 2024 WL 4345580, at *7 (S.D.N.Y. Sept. 30, 2024) (emphasis added), and it thus obviously cannot be used to *grant* summary judgment.  In any event, the DOCCS Defendants' failure to grapple with the record dooms their motion for a more fundamental reason: the record paints a dark and sordid picture about the use of excessive force and cover ups in DOCCS facilities (including Green Haven), the DOCCS Defendants' knowledge thereof, and their indifference thereto.  Specifically, the record makes clear that the DOCCS Defendants were keenly aware of this egregious problem throughout their tenures and did almost nothing that would demonstrate a meaningful or deliberate attempt to solve it.  Rather, the record reveals that the DOCCS Defendants cavalierly and shamefully downplayed and underprioritized the problems of excessive force and cover ups, placing it at such a low priority that it allowed the problem to flourish.[8]

      **a.**   **There Were Unconstitutional PPCs of Excessive Force and Cover Ups Throughout DOCCS and at Green Haven During the DOCCS Defendants' Respective Tenures, and the DOCCS Defendants Plainly Knew About It**

The DOCCS Defendants argue Virgil has not adduced evidence to create an issue of fact as to the existence of PPCs of excessive force and cover ups or that they knew about it.[9]  Again, they arrive at that argument by simply ignoring the extensive record to the contrary.  For one, they ignore that DOCCS' own data revealed that DOCCS *itself* substantiated *at least* 294 instances of

---

[8] That the DOCCS Defendants were personally involved in the assault of Mr. Virgil by being aware of the substantial risk of serious harm to him and being deliberately indifferent to it is also sufficient to defeat their qualified immunity argument.  *See* MTD Op. at 27:1-6.

[9] Because of the overlapping evidence supporting (i) the existence of the PPCs, and (ii) the DOCCS Defendants' awarenesses thereof, we combine these two issues into one section.

excessive force and/or cover ups between 2010-22, Ex. 76, a stunning statistic especially given Annucci's testimony that even one instance is too many, A. Tr. 367:9-11.[10]

Rather than grapple with the summary judgment record, the DOCCS Defendants oddly focus all of their attention on 19 of the cases of excessive force and cover ups that Virgil identified in his Second Amended Complaint ("SAC").  Br. 9.  This approach is at least triply misguided. *First*, the SAC identified 22 cases, not 19.  SAC ¶¶ 267-281, 285-299.  *Second*, contrary to the DOCCS Defendants' suggestion, those cases are relevant evidence of the existence of unconstitutional PPCs, especially given that nearly all them resulted in liability, along with four criminal cases that resulted in criminal convictions.[11]  *Finally*, but most significantly, the DOCCS Defendants' focus on the allegations in the SAC is misplaced at this stage, where there is now a complete and robust summary judgment record, spanning thousands of documents and including the sworn deposition testimony of the DOCCS Defendants and other key figures.  As shown below, when reviewing that voluminous record, it is clear that Virgil relies on ***far more*** than just 19 allegations of excessive force and that the existence of the PPCs of excessive force and cover ups (and the DOCCS Defendants' knowledge thereof) is in fact all but undisputed.

---

[10] *See Magalios v. Peralta*, 2022 WL 407403, at *7 n.7 (S.D.N.Y. Feb. 10, 2022) (Seibel, J.) (concluding that DOCCS COs who committed unconstitutional excessive force and lied to cover it up have disgraced themselves and their office, and their conduct seems to be all too acceptable among certain employees of New York's prison system").

[11] The DOCCS Defendants cite to *Davis v. City of New York*, 2018 WL 10070540 (S.D.N.Y. Mar. 30, 2018) in which a court granted summary judgment to the City of New York on a *Monell* claim because the plaintiff had failed to establish a "pattern" of excessive force within the NYPD.  *Davis* is readily distinguishable (apart from being a *Monell* claim against a *municipal police force*).  Most notably, the *sole* evidence of the "pattern" were two government reports reporting the same data from the Civilian Complaint Review Board that substantiated about 50 allegations per year "related to the use of force," which the report ***itself*** concluded was "a notably modest number, given the size of the NYPD, and a positive indication of the NYPD's restraint."  Here, there is a mountain of evidence from various sources—including Annucci himself—that the frequency of excessive force in DOCCS facilities is certainly not "modest."  In any event, the *Davis* plaintiff relied entirely on a "pattern" theory, rather than a culture or policy theory.

18

### i. Annucci's Awareness of Excessive Force and Cover Ups PPCs

As laid out in detail in response to Paragraph 18 of the DOCCS Defendants' SOMF, the summary judgment record contains devastating evidence making clear Annucci was not just keenly aware of the PPCs of excessive force and cover ups, he effectively admitted their existence.

*First*, Annucci admitted in his deposition that he knew the problem of excessive force and cover ups was one embedded in a "**culture**" amongst **"certain [DOCCS] corrections officers**," including a "**culture of brutality**," a "**culture of violence**," and a "**culture of silence**." *See* A. Tr. 259:16-18 ("I would agree that there was some **culture of brutality** amongst a small number of rogue officers"); *id.* 253:9-11 ("Amongst a certain small number of corrections officers, there was a **culture of violence**"); *id.* 260:13-17 (Annucci agreed that there was a "**culture of silence**" "among certain [DOCCS] corrections officers"); *see also id.* 185:2-6 ("I think **there's some truth to the idea that at one time there was some individuals that thought there was – they could get away with it and there wouldn't be serious repercussions**"); *id.* 40:17-41:4 (acknowledging that amongst DOCCS COs during his tenure as Acting Commissioner "there is **an informal code of silence . . . not to reveal when another officer engages in misconduct**"); *id.* 40:17-41:4 ("There most likely were some elements of that in various areas of the department, yes."). The foregoing testimony *alone* creates an issue of fact as to whether Annucci knew about PPCs of excessive force and cover ups. But there is *much* more.

*Second*, Annucci admitted that **he knew about "Beat-Up Squads,"** which he defined as **"officers that are rogue officers who think that they can punish individuals with physical violence for some reason that they think, in their mind, warrants it."** A. Tr. 187:5-88:10. Annucci was even able to recall one such Beat-Up Squad ███████████████████

████████████████████████████████████████████████████████████

███████ ██████████████████████████████████████████████████

███████████████████████████████████████████████

Annucci was also ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████  Annucci also admitted that it was difficult to get evidence of Beat-Up Squads specifically "because **officers would cover up instances of excessive force**." A. Tr. 189:25-190:5.

*__Third__*, Annucci admitted in his deposition that **he knew that "substantial changes" were needed** to address the problems of excessive force and cover ups. A. Tr. 193:18-24. Annucci also made clear he believed there was a "**need for change**" and that to achieve those changes, ██████

████████████████████████████

*__Fourth__*, Annucci admitted in his deposition that he knew that the wrongdoers amongst DOCCS COs were ████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████  In his deposition, Annucci also

20

specifically recalled one CO notorious for assaulting incarcerated people at Attica Correctional Facility who he admitted "**was good at not leaving fingerprints on the stuff that he would set in motion**." A. Tr. 187:9-10. Similarly, after the assault on Virgil, Annucci lamented that it was ███████████████████████████████████████████████ Annucci agreed that examples of ways in which such DOCCS COs ████████████████ are (i) ██ █ ██ ███████████████████████████████████ (ii) "**conspire with each other to come up with consistent yet false stories**," *id.* 309:2-7; (iii) "**purposefully turn off their body cameras**," *id.* 309:8-12, or (iv) "**learn where the fixed camera locations are and commit an assault in a blind spot**," *id.* 310:7-12.

 ***Fifth***, Annucci was fully aware that officers who DOCCS itself believed had committed excessive force or cover ups **were rarely terminated or even disciplined**. When confronted with data concluding that only ***9.5%*** of officers who DOCCS had itself had issued a Notice of Discipline for committing excessive force or a cover up were terminated, Annucci agreed "**that would be a real crisis**" and "**a serious concern**." A. Tr. 77; *see also* Exs. 76, 88 (Marshall Project report and underlying data with which Annucci was "generally familiar" showing only 28 of 294 such officers were terminated)]. Annucci testified that "**[i]t happened enough that I was very frustrated by it**." A. Tr. 75:8-9. And of course, there are DOCCS officers who DOCCS *knows* committed excessive force or cover ups who do not even receive a Notice of Discipline and are thus **not disciplined at all**—Langdon and Costantini are particularly relevant examples. Despite the foregoing, Annucci not only understood that "disciplining certain types of misconduct is the most effective way to ensure that that type of misconduct doesn't happen again," *id*. 62:12-17, but that **where COs "know they could beat the system more often than not, it develops cultures where you have frequent instances of excessive force**," *id*. 64:10-17.

*Sixth*, Annucci learned about many instances of excessive force and cover ups from **reports provided by DOCCS' Office of Special Investigations**. For one, ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ Annucci acknowledged not only that he would "generally review e-mails of this nature," A. Tr. 84:12-14, but he would ██████████████████

██████████████████████████████████████████████████████████

███████ Annucci separately received and reviewed "**in full**" and █████████████████

███████████████████████████████████████ 98:12-16, ███████████████

██████████████████████████████████████████████████████████

Annucci also had a regular "weekly or biweekly meeting" with his head of OSI, ████████

██████████████████████████████████ A. Tr. 95:7-9██████

*Seventh*, Annucci learned about instances of excessive force and cover ups through **civil and criminal litigation**. Annucci admitted that "one way [he] could learn about an excessive force instance . . . is by way of a lawsuit." A. Tr. 347:13-16. ███████████████████

████████████████████████████████████[12] or wherever a DOCCS employee was to be indemnified. Notably, Annucci **agreed that there were "more than 160 excessive force litigations that the defendant, a DOCCS defendant, lost or settled between 2010 and 2022."** *Id.* 374:10-19. ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████ Annucci would also learn whenever a DOCCS officer was criminally

---

[12] ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

charged for excessive force or a cover up thereof.  A. Tr. 371:8-13.  For just one example, ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

*Eighth*, Annucci learned about instances of excessive force and cover ups from **outside government officials**.  Specifically, Annucci learned as such—as well as concerns that such instances were pervasive—from entities such as the U.S. Department of Justice ("DOJ"), the Governor's office, individual legislators, and legislative caucuses.  For example, Defendant Annucci ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮. Separately, ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Further, Annucci contemporaneously knew that Preet Bharara, the sitting U.S. Attorney for the Southern District of New York—whom Annucci knew as a "well-respected attorney" who "had a distinguished career"—publicly stated following a notorious instance of excessive force and cover up thereof that "**excessive use of force in prisons we believe has reached crisis proportions in New York State**."  A. Tr. 264:12-268:3.  For another example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

*Ninth*, Annucci learned about instances of excessive force and cover ups—and the prevalence thereof—by way of **media reporting that he received, reviewed, commented upon, trusted, and/or agreed with**.  Specifically, Annucci closely followed media reporting on instances of excessive force and cover ups in DOCCS facilities, including reporting that he trusted and that described the problem as a "**cultural**" one within DOCCS.  For example, ▮▮▮▮▮▮▮▮

23

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ In one such article, ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████ Further, █████████████████████████

██████████████████████████████████████████████ he also knew

Mr. Robbins personally, considered him to be fair and well-respected, believed that his reporting

could be trusted, and thought that he did his homework, A. Tr. 183:12-184:10.  Similarly, Annucci

contemporaneously reviewed █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████ Not only did Annucci review these articles personally, *see* A. Tr. 257:18-

258:7, ███████████████████████████████████████████████

███████████████████████████ As with Mr. Robbins, Annucci believed that

Messrs.  Winerip  and  Schwirtz  were  "fair-minded."    A. Tr. 218:16-20.    Annucci  also

contemporaneously  reviewed  similar  articles  by  other  media  publications.    Finally, yet most

frequently,  Annucci  would  read  regular  distributions  sent  to  his  executive  team  known  as

"**DOCCS News Clips**" and "**DOCCS News Trackers**," *see id.* 216:2-17 (he would read the News

Clips "very often"); *id.* 116:8-117:5 (he would read News Trackers), ███████████████

███████████████████████████████████████████████████

██████████████████████████

24

***Tenth***, Annucci learned about instances of excessive force and cover ups from **independent investigative bodies**. Most notably, Annucci closely reviewed publications and reports from the **Correctional Association of New York** ("CANY") documenting the cultural problems of excessive force and cover ups in DOCCS facilities. CANY issued several publications that Annucci reviewed and that addressed the "**pervasive culture and violence and abuse, and . . . attempted cover up[s]**" by DOCCS COs. A. Tr. 227; ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ For example, █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█ ███████████████████████████████████████████████████

██████████████████████ Further, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

### ii. Royce's Awareness of Excessive Force and Cover Ups PPCs

As laid out in detail in response to Paragraph 32 of the DOCCS Defendants' SOMF, the summary judgment record contains significant evidence that Royce learned about PPCs of excessive force and cover ups throughout his tenure at DOCCS, including at Green Haven.

*First*, Royce admitted during his deposition that excessive force and cover ups were a real "problem" in DOCCS. He admitted that "excessive force incidents are a problem" and there "are situations in which" officers "lie or try to cover up excessive force cases." R. Tr. 208:23-24 ("I think **excessive force incidents are a problem**."); *id.* 209:4-9 ("I do not agree that officers should lie or try to cover up excessive force cases. . . . **I believe that there are situations in which that happens**."); *id.* 218:3-4 ("I agree that **every excessive force case is a problem**."); *see also id.* 222:23-23:3 (agreeing that it is "**possible**" that officers "**cover[ing] for other officers**" can make "**disciplining officers for excessive force difficult**"); *id.* 223:4-7 (acknowledging that "**one way that officers can cover for each other is by falsifying reports**████████████████████

████████████████████████████████████████████████████

████████████████████████████

*Second*, Royce learned about excessive force and cover ups through his day-to-day administration of Green Haven as Superintendent. Most notably, as Superintendent, Royce often served as Green Haven's point of contact with OSI and the Bureau of Labor Relations ("BLR"). R. Tr. 33:17-34:8. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ R. Tr. 194:3-11, 224:2-6 (acknowledging that when an officer issues a Notice of Discipline, "it is because DOCCS believes that the underlying conduct

26

occurred and that a corrections officer should be punished"). For example, in addition to the Notice of Discipline issued against Finn in this case, Royce also received Notices of Discipline for several other COs uses of excessive force and cover ups just during his time at Green Haven. *See* Ex. 76 at 7, 8, 34.

Royce also learned about excessive force and cover ups because he was responsible for: (i) reviewing all Use of Force reports, (ii) reviewing all Unusual Incident Reports, and (iii) overseeing the Incarcerated Grievance Program. R. Tr. 19:5-10 (testifying that "all the final[] [use of force reports]" would come to him"); *id.* 19:11-23 (testifying that all final unusual incident reports "got sent to [him]," unless he was "out of facility or busy at the time."); ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

Royce was also proffered as an expert witness in at least one civil litigation involving allegations of excessive force and cover ups at Green Haven. Ex. 77. In *Olutosin v. Lee*, No. 14-cv-685, the Attorney General's Office represented to a federal court that, Royce, along with DSS Russo, could serve as experts on "correctional facility practices regarding the use of force, use of techniques, and training received by corrections officers." *Id.* at 5. In Mr. Olutosin's case, he alleged that COs at Green Haven had severely beaten him up for filing a previous lawsuit against other Green Haven COs, and then falsely charged him with violating facility rules. *See Olutosin v. Lee*, 2018 WL 4954107 (S.D.N.Y. Oct. 12, 2018).

***Third,*** Royce learned about instances of excessive force from independent investigative bodies, such as CANY. For example, Royce was responsible for receiving, reviewing, and responding to CANY's 2019 site visit memorandum concerning Green Haven, which reported

27

severe misconduct of officer abuse and retaliation.  R. Tr. 173:24-174:2; *Id.* 169:14-170:20 (Royce acknowledging that "CANY is designated by law to provide independent monitoring and oversight of state prisons in New York State."). ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

**Fourth,** apart from his time at Green Haven, Royce learned about instances of excessive force and cover ups throughout his nearly four decades' long career at DOCCS.  Over his 38-year career at DOCCS, Royce supervised and worked with and among officers involved in gruesome instances of excessive force and cover ups.  For example, as DSS of Sing Sing, Royce "**referred many . . . many cases**" of "**brutality by guards**" to OSI, ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

28

*__Fifth__*, Royce learned about instances of excessive force and cover ups through media reporting that he received, reviewed, commented upon, and sent to his staff (both as Superintendent of Green Haven and as DSS of Sing Sing), many of which described the pervasive problem of excessive force and cover ups in DOCCS. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

   b. **The DOCCS Defendants Deliberately Disregarded the Risks Posed By the PPCs of Excessive Force and Cover Ups**

      i. **Annucci Deliberately Disregarded the Risks Posed by the PPCs of Excessive Force and Cover Ups**

The current record overwhelmingly supports the notion that Annucci was deliberately indifferent to the risks posed to incarcerated people by excessive force and cover ups. As shown

below, (i) an army of evidence—including especially his own testimony—reveals Annucci's conscious disregard of the risks posed by excessive force, and (ii) the "programs" Annucci claims he "enacted" to address excessive force do not suggest otherwise.

### 1. Evidence That Annucci Deliberately Disregarded the Risks Posed by the PPCs of Excessive Force and Cover Ups

As laid out in detail in response to Paragraphs 18-31 of the DOCCS Defendants' SOMF, the record contains a devastating array of evidence making clear that Annucci disregarded and significantly underprioritized the risks posed by PPCs of excessive force and cover ups.

***First***, in his deposition alone, Annucci demonstrated a shameful underappreciation of the problem of intentional cover ups of excessive force (and, in turn, excessive force). To start, Annucci plainly understood the significant risks posed by a CO who drafts a report falsely covering up an instance of excessive force. He acknowledged that a false report "can hide the fact that an officer committed a criminal and unconstitutional assault against an incarcerated person," A. Tr. 57:10-16, that such a report "might obstruct a criminal investigation into that incident," *id.* 57:17-21, and such conduct "can constitute a separate crime of falsifying official records," *id.* 57:22-58:4. Annucci also knew that **cover ups "can certainly make it [more] difficult to discipline officers**," and that if false reporting routinely goes undisciplined it can "**develop[] cultures where you have frequent instances of excessive force**." *Id.* 64:10-24. Despite knowing all of that, Annucci testified that **he believed there are instances in which a CO might intentionally lie on a use of a force report to cover up an instance of excessive force yet should not even be terminated from their job.** *Id.* 60:10-23 ("Q. So that's a yes? In your view, there are facts or circumstances that would allow an officer who lies about a use of force in a use of force report to stay employed with DOCCS? A. But otherwise potentially be subject to other discipline short of termination."). Despite even that testimony, however, Annucci also testified that there may even

be circumstances where a CO would intentionally lie on a use of force report and **not merit *any* discipline *at all***. *Id.* 61:7-12 ("it's hypothetically possible"). Similarly, when asked whether a CO who drafts a false report to intentionally cover up an excessive use of force is too dangerous to be around incarcerated people, Annucci responded: "**not necessarily.**" *Id.* 133:16-19. Indeed, although he readily acknowledged that Langdon and Costantini filed false reports to cover for Finn in this case, he testified that such misconduct, in his view, does "**not actually reach the egregious level**." *Id.* 138:18-139:6. Rather, Annucci casually referred to Langdon and Costantini's false reports as a simple "mistake," *id.* 141:15-16 ("Their mistake was writing false reports"), a word he used repeatedly to describe a CO intentionally drafting a false report to cover another officer's assault of an incarcerated person. *See id.* 60:8-9 ███████████ 141:15-16. It is *precisely* this shameful mindset that allowed the problem of excessive force and cover ups to flourish in DOCCS facilities under Annucci's tenure—the foregoing testimony alone should be enough to defeat summary judgment.

**_Second_**, although Annucci testified that he would regularly communicate messages of priority and importance to DOCCS COs, he never once issued such a communication to DOCCS COs concerning the seriousness of excessive force and cover ups. Specifically, approximately once or twice a year, Annucci issued a memorandum for all superintendents to read at morning line-ups to COs. Annucci would decide to do this when he "**needed to make sure the entire workforce heard a message directly from me.**" A. Tr. 351:24-352:4. ███████████ ███████████ he never once sent out such a communication regarding excessive force or cover ups thereof, A. Tr. 353:5-11.

**_Third_**, Annucci failed to train COs on the importance of truth-telling in report writing. Although Annucci was regularly involved in training COs on their ethical obligations, he never

specifically identified truth-telling in report writing as an issue that's important for COs' ethical obligations.  A. Tr. 354:23-355:3.  Indeed, he dismissively stated at his deposition: "I don't know that you need to be trained to accurately fill out a report."  *Id.* 353:19-20.



. Annucci also never statistically tracked excessive force lawsuits against COs.  Rather, he testified that he was "not sure if there's an easy [way] to do it."  *Id.* 346:8-9.  And when asked whether he was "aware that the City of New York tracks lawsuits against its police officers," Annucci falsely testified that "[i]t's a smaller agency than DOCCS."  *Id.* 345:13-17; *see* White Decl. ¶ 91 (noting that there are more than 33,000 NYPD police officers and less than 16,000 DOCCS correctional employees).

***Fifth***, Annucci failed to address excessive force and cover ups at his regular Executive Team Meetings, which were exhaustive meetings in which his executive team "discussed . . . the department's highest priorities."  A. Tr. 286:7-10.

***Sixth***, although Annucci boasted about gratitude he received from incarcerated people throughout his tenure as to certain issues, he admitted that he never once received such gratitude concerning his role with excessive force and cover ups.  A. Tr. 381:17-22, 385:23-386:6.

***Seventh***,

███████████████████████████████████████████████████████████████████

███ It is particularly odd that OSI referred to this as an "achievement" given Annucci's unequivocal recognition that both Langdon and Costantini should have been disciplined for their conduct in this case (but were not).  A. Tr. 165:11-13.

**_Eighth_**, Annucci has a documented history of deliberate indifference to the constitutional rights of incarcerated persons in his charge.  *See Vincent v. Annucci*, 718 F. 3d 157 (2d Cir. 2013) and *Vincent v. Annucci*, 63 F.4th 145 (2d Cir. 2023) (addressing Annucci's deliberate disregard of a court order precluding DOCCS from unilaterally imposing conditions of supervision without court involvement).  Indeed, in November 2022, Annucci was ordered by a jury to pay $250,000 in *punitive damages* to a formerly incarcerated person for this same violation of constitutional rights.  *Santiago v. Annucci*, *et al.*, No. 12-cv-02137, Dkt. No. 209 (S D.N.Y. Nov. 30, 2022).

**_Ninth_**, contrary to Annucci's arguments, none of the supposed "programs" he implemented "mitigated" the problems of excessive force or cover ups at all, *see* Resp. to D. SOMF ¶ 19, and he knew as such at the time Finn assaulted Virgil. ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

### 2. The "Programs" Annucci Claims He "Enacted" Do Not Negate Evidence He Disregarded the Risks Posed by PPCs of Excessive Force and Cover Ups, and At Most Creates an Issue of Fact

In his SOMF, Annucci identifies seven "programs" he claims to have "enacted" in order to "address[] and mitigate[] the issue of excessive force and the attempts to cover up the misconduct that occurred in DOCCS facility [*sic*]."  D. SOMF ¶ 19.  Specifically, he supposedly: (i) increased certain resources of OSI; (ii) developed a relationship with certain unidentified law enforcement agencies; (iii) "increased the budget to increase the installation of fixed camera [*sic*]"; (iv) "initiated [a] body-worn camera program in January 2017"; (v) enacted a "de-escalation

33

program"; (vi) enacted a "tablet program"; and (vii) submitted a draft bill to the legislature that contained a "[p]ackage on safety initiatives," that was not enacted into law.

None of these "programs," however, remotely reflect a deliberate effort on Annucci's part to meaningfully address the deadly and known risks created by PPCs of excessive force and cover ups. Specifically, as shown below, each of these "programs" either: (i) on their face have *no* plausible connection to the problems of excessive force or cover ups (*e.g.*, a tablet program); (ii) were designed to address *other* problems—such as protecting *COs*, rather than incarcerated persons—as confirmed by the documentary record and Annucci's testimony; and/or (iii) were pure window-dressing,[13] *i.e.*, such weak measures that they do not evince a meaningful effort to eliminate the PPCs of excessive force and cover ups. Regardless, even if any of these "programs" reflect some modicum of interest that Annucci had in mitigating the issues of excessive force and cover ups, that would simply present a material disputed fact that the jury will have to weigh— against the strong countervailing evidence of Annucci's *disinterest* cited above—in order to determine whether or not Annucci was deliberately indifferent to the problem. We take each supposed "program" in turn.

***Increasing Resources of OSI***. There is no evidence as to what this "program" consists of, nor that Annucci specifically increased OSI's resources to address excessive force or cover ups. Indeed, he acknowledged that, of the steps he took concerning OSI, "not all of it had to do with excessive force." A. Tr. 323:3-6. ██████████████████████████████

---

[13] ███████████████████████████████████████████████████████████ Annucci admitted in his deposition that in crafting these responses, he was "mindful of DOCCS's reputation and public perception," and that he "want[ed] to present the department in as positive a light as the facts would allow. A. Tr. 117:18-118:9.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

***Establishing Relationships with Law Enforcement***.   There is no evidence in the record

concerning any "program" to establish relationships with law enforcement (to address excessive

force or otherwise), let alone Annucci's role therein.   ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

***Fixed Cameras***.   There is exceedingly little evidence in the record showing that Annucci's

role in expanding fixed cameras within DOCCS facilities reflected a meaningful and deliberate

effort to curb the problems of excessive force and cover ups.   ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████   And Annucci himself acknowledged that a fixed camera system is an exceedingly poor tool

to address a CO's intentional use of excessive force and cover ups.   *See* A. Tr. 310:7-12 (one way

that COs can "be expert at leaving no fingerprints . . . [is] they can learn where the fixed camera

locations are and commit an assault in a blind spot");   █████████████████████████████

███████████████████████████████████   *id.* 328:25 ("It can't capture every inch.").

Further,   █████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

***BWCs***.   As with the expansion of fixed cameras, there is little evidence showing that Annucci's launching of a BWC program in January 2017 reflected a meaningful and deliberate effort to curb the problems of excessive force and cover ups.   Rather, Annucci testified and the documentary record makes clear that Annucci instituted the BWC program to (again) protect *COs*. A. Tr. 271:3-8 ("That was one of the reasons, yes.").   For example, ███████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███ Further, █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████ Specifically, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ (Unsurprisingly, DOCCS does not appear to have kept any statistics on the impact BWCs have had on the number of assaults *by* COs.)

Most tellingly, however, and as Annucci admitted he knew in his testimony, the BWC program as he implemented it would do almost nothing to stop a CO like Finn who aimed to *intentionally* assault incarcerated people.   Specifically, Annucci was unable to explain why—if the BWC program were meant to protect incarcerated people—the program he implemented gave full control over the cameras to the COs themselves.   Specifically, as Annucci agreed, according to the

BWC policy he enacted, it "is entirely up to [the CO] whether or not to turn the camera on."  A.

Tr. 313:8-9; █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

For obvious reasons, a BWC program dependent on COs to turn on and off the camera would do

little to stop intentional assaults by COs.  And notably, the record makes clear that Annucci *himself*

knew that.  Specifically, ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

        If that were not enough, the present case is a near perfect demonstration of how the BWC

program Annucci enacted was not designed to stop intentional use of excessive force.  It was purely

fortuitous that the assault on Virgil was captured by any of the BWCs of the three COs that were

present.  Finn did *not* activate his BWC; his turned on completely accidentally in the middle of the

assault.  F. Tr. 222:2-6.  Costantini did not activate his BWC at all; there is thus no footage from

his camera.  C. Tr. 122:18-23.  And Langdon *purposefully* turned off his BWC because he realized

37

that misconduct was occurring and he did not want to create a record of it.  L. Tr. 178:17-19. Consequently, Annucci was unable to answer when asked: "isn't it right that the body-worn camera policy that allowed the officers to decide when to turn their cameras on and off did nothing to disincentivize any of the three officers involved in the assault on Virgil?"  A. Tr. 333:22-334:12.

*De-escalation Training*.  There is no evidence Annucci's motivation for establishing a de-escalation "program" had *anything* to do with excessive force or cover ups, nor is that in any way apparent.  Annucci himself acknowledged he was "[n]ot sure" how such training would stop someone like Finn who sought to intentionally assault an incarcerated person.  A. Tr. 325:2-7.

*Tablet Program*. There is also no evidence that Annucci's motivation for establishing a tablet program had *anything* to do with excessive force or cover ups, nor does any make sense.

*Failed Draft "Safety" Bill*.  There is almost no evidence in the record concerning the draft "safety" bill to which Annucci testified, and there is even less suggesting that Annucci's role with that draft bill reflected a meaningful and deliberate effort to address the problems of excessive force and cover ups. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ would have had little effect given that, as made clear above, Annucci drastically undervalued the issues of excessive force and especially cover ups thereof.  *See supra* pp. 30-33.

38

In any event, Annucci acknowledged that the bill did not make it into law and the record makes clear Annucci took exceedingly minimal steps to push for it to be passed. Annucci testified he has "a wall full of governor's pens that recognized the laws that [he] created," A. Tr. 21:21-23, and that generally when he would draft a bill he would do outreach to "key members of the legislature" and "advocated for them because [he] thought they were the right thing to do," *id.* 49:1-5, 17-18. In stark contrast, Annucci did not "take *any* steps to try to lobby to get [the bill at issue] enacted into law." *Id.* 340:19-22 ("No, I did not take any personal steps."). Nor did he even "ever follow up with the governor's office about the status of the bill after [he] proposed it." *Id.* 340:23-341:2 ("No, I did not."). █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████   In sum, to the extent there is *any* truth to the idea Annucci sought to address the issues of excessive force and cover ups by way of the draft bill, it was pure window dressing.

### ii. Royce Deliberately Disregarded the Risks Posed by the PPCs of Excessive Force and Cover Ups

Proving that Royce deliberately disregarded the PPCs of excessive force and cover ups is quite straightforward because, unlike Annucci, Royce admitted in his deposition that he took *not*

*a single* step to do so.[14]  R. Tr. 237:12-329:21.  He did not implement *a single* rule, program, or protocol that could have ostensibly curbed excessive force and cover ups at Green Haven, all of which were exclusively within his authority as Superintendent.  He did not implement anything to "ensure the accuracy of" reports, or to ensure that reports were filled out by COs "independently and without collaboration."  *Id.* 68:6-17.  He never investigated a single allegation of CO harassment, even though he was in the "best position" to do so.  Ex. 71 at 9.  He never availed himself of his authority to "initiate an in-house investigation" into grievances involving CO misconduct.  *Id.*; R. Tr. 152:13-23.  He did not even discuss excessive force at meetings with his executive staff at Green Haven.  *Id.* 22:7-23:10.  He did nothing as Superintendent, even though, as Annucci testified, Royce could have made a "huge difference in how" Green Haven could have been "guided and changed."  A. Tr. 39:10-13.  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

---

[14] A "reasonable jury could [] conclude that notice coupled with inaction constitutes deliberate indifference." *Meli v. City of Burlington, Vt.*, 585 F. Supp. 3d 615 (D. Vt. Feb. 14, 2022).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant Langdon, Annucci, and Royce's motions for summary judgment.


Dated:  October 21, 2024
        New York, New York

                                        By:  _____
                                             Benjamin D. White

                                             BLOCH & WHITE LLP
                                             Benjamin D. White, Esq.
                                             Michael L. Bloch, Esq.
                                             Cristina Alvarez, Esq.
                                             152 West 57th Street, 8th Floor
                                             New York, New York 10019
                                             (212) 901-3825
                                             bwhite@blochwhite.com
                                             mbloch@blochwhite.com
                                             calvarez@blochwhite.com

                                             PRISONERS' LEGAL SERVICES OF NEW YORK
                                             James Bogin, Esq.
                                             Madison Levin, Esq.
                                             41 State Street, Suite M112
                                             Albany, NY 12207
                                             (518) 438-8046
                                             jbogin@plsny.org
                                             mlevin@plsny.org

                                             *Attorneys for Plaintiff*